# 20-3716

## United States Court of Appeals for the Second Circuit

Arkansas Public Employees Retirement System, Louisiana Sheriffs' Pension & Relief Fund, Erste-Sparinvest Kapitalanlagegesellschaft mbH,
*Plaintiffs - Appellants*,
Jennifer Tung, Individually and on behalf of all others similarly situated, Metzler Asset Management GmbH,
*Plaintiffs*,
v.
Bristol-Myers Squibb Company, Michael Giordano, Fouad Namouni, Francis M. Cuss, Giovanni Caforio, Lamberto Andreotti, Charles A.Bancroft,
*Defendants - Appellees*.

On Appeal from the United States District Court
for the Southern District of New York
(Hon. Mary Kay Vyskocil, U.S.D.J.)

## JOINT BRIEF FOR PLAINTIFFS-APPELLANTS
## AND SPECIAL APPENDIX

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
SALVATORE J. GRAZIANO
LAUREN A. ORMSBEE
JESSE L. JENSEN
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

*Counsel for Lead Plaintiffs-Appellants
Arkansas Public Employees Retirement
System and the Louisiana Sheriffs' Pension
& Relief Fund, and Lead Counsel for the
Class*

BLEICHMAR FONTI & AULD LLP
JAVIER BLEICHMAR, ESQ.
7 Times Square
New York, New York 10036

*Additional Counsel for Lead Plaintiffs-
Appellants*

(*Counsel continued on inside cover*)

MOTLEY RICE LLC
WILLIAM H. NARWOLD
20 Church St., 17th Floor
Hartford, CT 06103

*Counsel for Named Plaintiff-Appellant
Erste Asset Management GmbH (formerly
d/b/a Erste-Sparinvest
Kapitalanlagegesellschaft mbH)*

KLAUSNER, KAUFMAN, JENSEN & LEVINSON,
P.A.
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317

*Liaison Counsel for co-Lead Plaintiff-Appellant
Louisiana Sheriffs' Pension & Relief Fund*

## **CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellants Arkansas Public Retirement System and the Louisiana Sheriffs' Pension & Relief Fund do not have any parent corporation or publicly held corporation that owns 10% or more of their stock.

Plaintiff-Appellant Erste Asset Management GmbH (formerly d/b/a Erste-Sparinvest Kapitalanlagegesellschaft mbH) states that the following two parent entities each own more than 10% of Erste Asset Management GmbH's stock: Erste Group Bank AG (which is publicly held) and Erste Bank der oesterreichischen Sparkassen AG (which is not publicly held).

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

INTRODUCTION AND STATEMENT OF THE CASE........................................2

STATEMENT OF FACTS ......................................................................................8

I.  Bristol-Myers Takes An Early Lead In The Race To Capture The
    Market For PD-1 Checkpoint Inhibitor Cancer Treatments............................8

II. In Numerous Pre-Class Period "Checkmate" Trials, Bristol-Myers
    Used 5% PD-L1 Expression As The Cutoff For Minimal PD-L1
    Positivity. ........................................................................................................9

    A.  There Was Industry Consensus That 5% PD-L1 Expression
        Was A Weak Or Minimal Level Of PD-L1. ........................................10

    B.  There Was Industry Consensus That PD-L1 Expression Levels
        Greater Than 50% Were "Strong." ......................................................11

    C.  Plaintiffs' Medical Oncology Expert Confirmed That 5%
        Expression Was Considered Weak And "Strong" Referred To
        50% Or Greater Expression..................................................................13

    D.  Defendants Touted Checkmate-026's Focus On "Strong"
        Expression. ..........................................................................................14

    E.  Former Employees Confirm Defendants' Knowledge Of
        Checkmate-026's Expression Cutoff And The Industry Usage
        Of Expression Levels. .........................................................................17

III. The Truth Is Revealed When Defendants Disclose Their False And
     Misleading Use Of "Strong" Expression........................................................19

    A.  Bristol-Myers' Revelation That Checkmate-026 Defined 5% As
        "Strong" Expression Left Analysts "Completely Puzzled." ...............19

i

B. Defendants Admit That Checkmate-026 "Was Not Designed To Look At . . . High Expression Of PD-L1.".........................................20

IV. The Individual Defendants Made More Than $55 Million From Sales Of Bristol-Myers Stock While Prices Were Artificially Inflated From The Market's Misunderstanding Of Checkmate-026's Risks......................22

SUMMARY OF THE ARGUMENT .......................................................................23

STANDARD OF REVIEW .....................................................................................25

ARGUMENT ..........................................................................................................27

I. The District Court Disregarded The Proper Standards Applicable To A Motion To Dismiss A Complaint. .............................................................27

A. The Complaint Alleges Materially False Or Misleading Statements And Omissions..................................................................28

1. Defendants' Statements That Checkmate-026 Focused On "Strong" And "High" PD-L1 Expressing Tumors Are Actionably False And Misleading. ...........................................29

2. Defendants' Repeated Refusals To Disclose The True Cutoff Are Actionable Omissions.............................................32

3. Defendants' Statements Describing Checkmate-026's Design And Defendants' Confidence Were Misleading. .........33

B. The District Court Erred By Requiring Definitive Proof Of—As Opposed To Plausible Allegations Supporting—An "Industry Standard Definition" Of "Strong Expression."...................................34

C. The District Court Erred In Imposing A Heightened Pleading Standard As To The Consideration Of Industry Customs And Usages Evidence...................................................................................38

D.    The District Court Improperly Considered And Weighed Evidence Beyond The Complaint. .......................................................41

E.    The District Court Erred In Dismissing Purportedly Protected Forward-Looking Statements Or Opinions. .......................................46

F.    The District Court Erred In Concluding That The Complaint Did Not Plead Scienter. ........................................................................47

    1.    Defendants' Admissions That Checkmate-026 Was Not Designed To Target High Expression Is Compelling Evidence Of Scienter. ...............................................................49

    2.    Former Employees Demonstrate Defendants' Awareness Of Relevant Facts. ......................................................................50

    3.    Defendants Were Involved In Developing The Industry Standards At Issue. ......................................................................52

    4.    Defendants Knew That Investors And Analysts Focused On "Strong" PD-L1 Expressions And Failed To Correct Any Misconceptions. ................................................................53

    5.    The Suspicious Resignations Of Cuss And Giordano Further Support Scienter. ............................................................55

    6.    The Significant Stock Sales And Profits Reaped By Certain Individual Defendants Raise A Sufficient Inference of Scienter. ...............................................................55

G.    Defendants' Fraudulent Intent Is The More Compelling Inference. ...........................................................................................59

II.    The Complaint Adequately Alleges Loss Causation. ....................................60

III.    The Complaint Pleads Violations Of Sections 20(a) And 20A ....................61

CONCLUSION .....................................................................................................62

STATEMENT OF COMPLIANCE .......................................................................64

iii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abramson v. Newlink Genetics Corporation*,
  965 F.3d 165 (2d Cir. 2020) ............................................................30, 31, 46, 61

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 89 (2d Cir. 2007) ...................................................................................28

*Billhofer v. Flamel Tech.*,
  663 F. Supp. 2d 288 (S.D.N.Y. 2009) .................................................................54

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................................32

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..............................................................................58

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) .................................................................................32

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) .................................................................................60

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...............................................................................35

*In re Delcath Sys. Inc., Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) ...................................................................47

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) .................................................................................44

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y 2017) ..................................................................55

*Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) .....................................................................24, 37, 49

iv

*In re Eros International Sec. Litig.*,
No. 15-cv-8956 (AJN), 2017 WL 6405846 (S.D.N.Y. Sept. 22,
2017) *aff'd sub nom. Eisner v. Eros Int'l PLC,* 735 F. App'x 15
(2d Cir. 2018)...............................................................................................33, 36

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................57

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................................31

*Friedl v. City of New York*,
210 F.3d 79 (2d Cir. 2000) ...........................................................24, 26, 41, 43

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) ..............................................................................43

*Institutional Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ..............................................................................52

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011) ..............................................................................25

*In re ITT Educ. Servs. Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014) .................................................................47

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......................................................................44, 45

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) ...................................................................37, 44, 46

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities LLC*,
797 F.3d 160 (2d Cir. 2015) ..............................................................................61

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .............................................................................50

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .................................................................33, 53, 59

*Marx & Co. v. Diners Club, Inc.*,
550 F.2d 505 (2d Cir. 1977) .........................................................................38, 39

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).................................................................................32, 59, 60

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .......................................................................32, 35

*Micholle v. Ophthotech Corp.*,
    No. 17-CV-210 (VSB), 2019 WL 4464802 (S.D.N.Y. Sept. 18,
    2019) ...............................................................................................................31

*In re Mylan Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)....................................................52

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed. App'x 10 (2d Cir. 2011) .....................................................................53

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018) ...............................................................57

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) .............................................................................43

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .............................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................................31

*Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software,
Inc.*,
    No. 17 CV 5753 (JGK), 2019 WL 2360942 (S.D.N.Y. Mar. 4,
    2019) ...........................................................................................................58, 59

*In re Quality Systems, Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..........................................................................33

*Rezzonico v. H. & R Block*,
    182 F.3d 144 (2d Cir. 1999) .............................................................................48

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .............................................................................44

vi

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ..................................................................56

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001), *cert denied*, 534 U.S. 1071 (2001) ............26, 41, 55

*Setzer v. Omega Healthcare Investors, Inc.*,
  968 F.3d 204 (2d. Cir. 2020) .......................................................52, 60

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
  467 F.3d 107 (2d Cir. 2006) ......................................................passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................passim

*In re Time Warner Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..................................................................32

*United States v. Blizerian*,
  926 F.2d 1285 (2d Cir. 1991) ............................................................38

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).........................................................................35

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..............................................................33

## STATUES AND RULES

15 U.S.C. §78aa .......................................................................................1

15 U.S.C. §78j(b) .....................................................................................2

15 U.S.C. §78t(a) .....................................................................................2

15 U.S.C. §78t-1 ......................................................................................2

15 U.S.C. §78u-4......................................................................................25

28 U.S.C. §27...........................................................................................1

28 U.S.C. §1291 .......................................................................................1

28 U.S.C. §1331 .......................................................................................1

28 U.S.C. §1337 ........................................................................................................1

17 C.F.R. §240.10b-5 ...........................................................................................2, 32

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York had subject matter jurisdiction over this securities class action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa. The district court entered final judgment, dismissing with prejudice Plaintiffs' Consolidated Second Amended Class Action Complaint (the "Complaint"). SPA-31.[1] Plaintiffs filed a timely notice of appeal on October 29, 2020. JA-1947-50. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether given allegations of a "widely-accepted" industry usage of the term "strong" or "high" expression that rendered Defendants' statements misleading, the district court erred in holding that Plaintiffs failed to sufficiently allege an actionable misrepresentation or omission and scienter.

2.     Whether the district court erred in discounting Plaintiffs' allegations of a "widely-accepted" use of the term "strong" or "high" expression in a clinical drug

---

[1] Citations herein to particular pages in Joint Appendix are referred to as "JA." Citations herein to particular pages in the Special Appendix are referred to as "SPA." All emphasis is added unless otherwise noted. All citations and quotation marks omitted unless otherwise noted.

trial, which was inconsistent with well-established Circuit precedent holding that the existence of a uniform industry standard or usage is an issue of fact for the jury.

3.     Whether the district court erred in considering and crediting information submitted by Defendants outside of the Complaint, which this Court strictly forbids, in finding that Plaintiffs failed to "establish" an industry standard that the district court deemed necessary to prove an actionable misrepresentation and scienter.

4.     Whether the district court erred in refusing to consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) ("*Tellabs*").

## **INTRODUCTION AND STATEMENT OF THE CASE**

This is a putative class action for securities fraud against Bristol-Myers Squibb Company ("Bristol-Myers," "BMS," or "the Company") and six executives, Michael Giordano, Fouad Namouni, Francis M. Cuss, Giovanni Caforio, Lamberto Andreotti, and Charles A. Bancroft (together, "Individual Defendants"). Plaintiffs-appellants ("Plaintiffs") are two employee retirement systems and one investment company asserting claims under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

2

The multi-billion-dollar market to create a new, effective cancer treatment is highly competitive. And for those pharmaceutical companies who succeed in developing an efficacious new drug, it is highly lucrative. Given that the success or failure of a clinical trial may have a substantial impact on a pharmaceutical company's profits or losses—and, by extension, its stock price—the securities laws require those companies to provide accurate information about a clinical trial's contours and risk to allow investors to make informed investment decisions.

From January 27, 2015 to October 9, 2016 (the "Class Period"), Bristol-Myers and its executives fraudulently misrepresented the scope and risk of a key clinical trial (called Checkmate-026) designed to treat non-small cell lung cancer ("NSCLC") using a new immuno-oncology drug, Opdivo. Opdivo is a "checkpoint inhibitor" that targets and inhibits cancer cells expressing a protein called PD-L1— a protein that normally prevents the immune system from attacking healthy cells— to allow the body's immune system to attack the cancer cells. Successful treatment allows the body's own immune system to destroy cancerous cells and, in theory, provide a greater benefit than chemotherapy with far fewer side effects.

By the start of the Class Period, more than a decade of research and clinical trials formed an industry consensus that the efficacy of Opdivo, and similar immuno-oncology treatments, was related to the level of PD-L1 expressed from a patient's cancerous cells, with levels of at least 50% expression or more showing the

3

best results. As a result of these years of clinical trials and published research, the industry used common terms to describe the levels of detected PD-L1 expression. On the one hand, common industry terminology employed the terms "strong" or "high" to denote an expression of 50% or greater. Relatedly, Bristol-Myers itself in numerous public trials, as well as other industry competitors and researchers, described a PD-L1 expression level of 5% as the baseline for PD-L1 positivity, i.e., indicative of only minimal or weak expression. The industry—and Defendants— understood that patients exhibiting just 5% PD-L1 expression were considered less likely to see positive treatment results from a checkpoint inhibitor than patients exhibiting 50% or greater expression.

It was against this backdrop that Defendants made a secret, strategic decision to test the pivotal Checkmate-026 clinical trial on a pool of NSCLC patients expressing just 5% PD-L1. If successful, Bristol-Myers would capture a larger market share of this sought-after NSCLC label than that of its chief competitor in this market, Merck & Company, Inc. ("Merck"). Key to understanding Defendants' gamble was the fact that Merck developed a similar drug, Keytruda, and the two companies were in a race to capture the immuno-therapy market, valued at up to $40 billion. Notably, Merck, both historically and in its contemporaneous, parallel NSCLC clinical trial, Keynote-024, targeted a much less risky patient pool

4

expressing 50% of PD-L1. Merck publicly referred to this 50% level as "strong" expression, as did the industry at large.

Plaintiffs take no issue with Defendants' decision to gamble on a trial targeting larger market share by focusing on a larger, yet riskier pool of patients. However, Plaintiffs allege fraud because Defendants repeatedly misrepresented to the market that Checkmate-026, like Merck's Keynote-024, targeted patients with a "strong" or "high positive" PD-L1 expression, which the market understood to be exponentially higher than 5%. The Complaint alleges that the Individual Defendants knew, or recklessly disregarded, that Defendants' use of "strong" to mean just 5% PD-L1 expression was misleading through, among other things, (i) the Company's own trials, consistent with overwhelming industry practice, that defined 5% expression to mean a minimal level of expression; (ii) the Individual Defendants' knowledge that "strong" was commonly understood to define 50% or greater expression, through the accounts of former employees who worked directly with the Individual Defendants; (iii) the opinion of a Medical Oncologist with more than forty years' experience in the clinical trial industry who confirmed that defining "strong" expression as just 5% expression was inconsistent with "historical and contemporaneous convention" and against what was "widely-accepted" in the industry; and (iv) Defendants' admissions at the close of and after the Class Period

5

that Checkmate-026 "didn't stratify at high levels of PD-L1" and was not focused on "high expression of PD-L1."

The eventual revelation that the Checkmate-026 trial focused exclusively on patients with just 5% and not "strong" expression—and that this study design, now revealed as aggressive, failed—stunned industry observers and led to a concomitant drop in the stock price. One analyst wrote he was "completely puzzled" by Defendants' description of 5% as "strongly expressing." Analysts blamed the secret, aggressive 5% cutoff as "likely the contributing factor[] to the failure," with one calling Checkmate-026's failure the "biggest clinical surprise of my career." Meanwhile, Merck's Keynote-024 trial that focused on the industry-expected "strong" 50% cut-off experienced a successful outcome, allowing Merck to achieve market dominance.

Despite the failure of Checkmate-026, and the resulting drop in Bristol-Myers' stock price, several Individual Defendants earned a windfall through sales of their Bristol-Myers stock. From public trading records, Plaintiffs allege that the reporting Individual Defendants sold over $75 million in stock during the period in which they concealed the aggressive risk they took, netting nearly $55 million in profits. They did not otherwise purchase any Company stock during that period.

Plaintiffs filed their first Consolidated Amended Complaint ("CAC") on July 16, 2018. JA-19-120. After briefing, on September 30, 2019, the Honorable United

6

States District Judge J. Paul Oetken issued an Opinion and Order granting Defendants' motion to dismiss the CAC with leave to amend. SPA-1-12. The district court held that Plaintiffs failed to adequately plead scienter, and that Plaintiffs could amend their pleadings with citations to a "publication, guidance, communication, document, or other specific source of information that could have alerted Defendants, at the time of the alleged misrepresentations, to an industrywide consensus that 'strong' PD-L1 expression was inconsistent with a 5% 'cut-off.'" (SPA-10). Judge Oetken did not opine on falsity or loss causation.

On October 29, 2019, Plaintiffs filed the operative Complaint (JA-708-838), which included numerous additional allegations supporting falsity and scienter, as set forth in detail herein. Defendants filed their motion to dismiss the Complaint on December 13, 2019 (JA-983-84), and the district court heard argument on June 25, 2020 (JA-1951-2001).

On September 30, 2020, the Honorable Judge Mary Kay Vyskocil—to whom the case was transferred—issued an Opinion and Order dismissing the Complaint with prejudice on the grounds that Plaintiffs had failed to allege any false statements or adequately allege scienter (SPA-13-30), and judgment was entered against Plaintiffs. SPA-31-32. Plaintiffs filed a timely notice of appeal on October 29, 2020. JA-1947-50.

7

## STATEMENT OF FACTS

## I. Bristol-Myers Takes An Early Lead In The Race To Capture The Market For PD-1 Checkpoint Inhibitor Cancer Treatments.

Since at least 2002, Bristol-Myers has focused considerable effort on immuno-oncology: cancer treatments that attempt to harness the body's immune system to fight cancer by targeting pathways that cancer cells use to evade recognition and destruction. JA-726-27(¶36). Immuno-oncology-based treatments presented an enormous breakthrough and an unprecedented market opportunity for Bristol-Myers and competitor pharmaceutical companies. JA-727(¶37).

Bristol-Myers' Opdivo is a PD-1 "checkpoint inhibitor." A "checkpoint" is a naturally occurring braking mechanism in a normal cell that prevents immune responses triggered by those healthy cells. JA-727-28(¶38). Without the checkpoint inhibitor, healthy cells would generate immune reactions, causing autoimmune disorders. The PD-1 checkpoint involves the interaction between PD-1, a protein on the surface of immune system attack cells known as "T-cells," and PD-L1, a protein on healthy cells that binds with PD-1 to prevent T-cells from attacking a healthy cell. JA-727-728(¶38).

Bristol-Myers raced to harness the potential of PD-1 in treating cancer by developing a drug that blocked PD-1 from binding with PD-L1 in cancerous cells, enabling the body's immune system to attack cancerous cells. In 2009, the Company acquired the rights to Opdivo, making Bristol-Myers an early leader in immuno-

8

oncology. JA-728(¶39). By 2015, experts predicted that immuno-therapy treatment would soon be a $40 billion industry, with the treatment of lung cancer as its "most lucrative use," making critical FDA approval for treatment of NSCLC in particular. JA-742-3(¶73). Within a year, Bristol-Myers disclosed that Opdivo had been granted a "Fast Track" designation by the FDA for the treatment of NSCLC, renal cell carcinoma, and advanced melanoma. JA-728-29(¶40). On January 24, 2014, one year before the Class Period begins, Bristol-Myers' CEO, Defendant Andreotti, stated, "PD-1 is a cornerstone for immunotherapy and we are very committed to it." JA-729(¶41).

Bristol-Myers and Merck were the two frontrunners in PD-L1 checkpoint inhibitors, and each company sought the coveted "first-mover advantage," which refers to the increased market share typically awarded to the first entrants to a market. JA-730(¶42). While Bristol-Myers took an early lead, Merck secured the first FDA approval for its drug, Keytruda, on September 4, 2014, which *Forbes* described as a "triumph" that "allowed Keytruda . . . to leapfrog" Opdivo. JA-730(¶¶42-45).

## II.    In Numerous Pre-Class Period "Checkmate" Trials, Bristol-Myers Used 5% PD-L1 Expression As The Cutoff For Minimal PD-L1 Positivity.

Opdivo's future success depended heavily on new FDA approvals, including most importantly for NSCLC, the most common form of lung cancer. Bristol-Myers and Merck launched clinical trials—Checkmate-026 and Keynote-024—within months of each other, both seeking FDA approval to replace chemotherapy with

9

Opdivo and Keytruda, respectively, for NSCLC patients exhibiting "strong" or "high positive" PD-L1 expression. JA-744-45(¶¶77-79); JA-747-48(¶¶84-85). PD-L1 expression has a critical relationship to the efficacy of Opdivo and Keytruda. JA-732-34(¶¶48-53). While 70% of all cancer patients express some positive amount of PD-L1, only 25% of cancer patients expressed a level of PD-L1 equal to 50% or greater. JA-713(¶3); JA-758(¶108). As a result, a decision to focus on "strong" or "high" PD-L1 expression communicated that the study conservatively targeted a smaller percentage of patients for whom trial success and FDA label approval were likely. JA-716(¶8); JA-759(¶112).

### A. There Was Industry Consensus That 5% PD-L1 Expression Was A Weak Or Minimal Level Of PD-L1.

Checkmate-026 and Keynote-024 occurred subsequent to, and concurrently with, many clinical trials and research papers testing PD-1 checkpoint inhibitors, which had established an industry consensus around the use of PD-L1 expression in the likely efficacy of such drugs. The Complaint demonstrates that, to the extent Bristol-Myers' "Checkmate" studies discussed PD-L1 expression prior to the Class Period, Defendants employed 5% expression to describe the bare minimum level of expression to establish PD-L1 expression. The Complaint details at least seven clinical trials where Bristol-Myers publicly used 5% expression as a cutoff to describe mere positive expression between September 2012 and May 2015, which

10

the district court did not acknowledge in its Order. *See* JA-734-39(¶¶54-61); JA-751(¶95).

Bristol-Myers' use of a 5% cutoff for minimal PD-L1 positivity in its clinical studies was noted by the market. For example, on January 23, 2014, in a report titled "Bristol-Myers Squibb: Why Biomarkers Matter . . . & More Thoughts on BMY's IO Strategy," an analyst reported that Bristol-Myers "defined" "PD-L1 expressing tumors" as those tumors exhibiting at least 5% expression of PD-L1. JA-738(¶60). The academic community also shared this understanding: a July 2015 *Journal of Thoracic Oncology* article summarized that the majority of published findings concerning lung cancer and PD-L1 had defined baseline PD-L1 positivity as 5% or greater by the beginning of the Class Period—including five of Bristol-Myers' own Checkmate studies. JA-735(¶55). Accordingly, 5% expression represented the minimum level of positivity—and any percentage below 5% was not considered to "express" PD-L1 at all.

## B. There Was Industry Consensus That PD-L1 Expression Levels Greater Than 50% Were "Strong."

While Bristol-Myers and the industry established that 5% was the baseline for PD-L1 expression, Merck and other participants clearly defined "strong" or "high" expression as 50% prior to and during the Class Period. JA-739-40(¶¶62-65); JA-741(¶69). In this context in which "strong" or "high" is 50%, the baseline expression of 5% is certainly neither "strong" nor "high," but rather weak or low.

11

For example, pre-Class Period, on April 6, 2014, Merck issued a press release describing early findings from its Keytruda studies, concluding that the "preliminary analysis suggests that the optimal cut-point is ≥50 percent of tumor cells" and that "[w]hen using this [50%] measurement, approximately 25 percent of advanced NSCLC patients had tumors that ***strongly expressed*** PD-L1." JA-739(¶63). Then, during a June 2, 2014 industry presentation, Merck explicitly defined "strong" PD-L1 as greater than or equal to 50% expression, while defining "weak" PD-L1 expression as 1-49%. JA-739-40(¶64).

By June 1, 2015, Merck implicitly confirmed that Keynote-024—the parallel study to Checkmate-026—defined "strong" expression as ≥50% expression level. JA-751-52(¶96). The market noted its understanding that Merck's Keynote-024's "strong" PD-L1 expression referred to at least 50% was not in doubt, which was unchallenged and then openly confirmed in February 2016 when Merck's President stated that Keynote-024 "looks at those that are PD-L1 ***high*** . . . scores ***above 50%***." JA-751-52(¶¶95-96).

Other competitors similarly described "strong" expression. In a March 25, 2015 presentation, the Vice President of Pre-Clinical Research at Peregrine Pharmaceuticals referred to both Opdivo and Keytruda and incorporated the industry conceptions of "high" and "low" PD-L1 tumor expression in NSCLC studies, discussed above. JA-741(¶69). Similarly, in an October 8, 2015 presentation,

12

participants at a conference held by competitor Nektar spoke about Keytruda's application for the "subset of high PD-L1 expression of more than 50%." *Id*.[2]

Industry publications also reported that "strong" expression meant $\geq$50% expression. For instance, the European Society for Medical Oncology's ("ESMO") 2014 Congress Meeting Report described Merck's studies as focused on "patients with strong PD-L1 expression" and "patients with PD-L1 strong-positive vs. PD-L1 weak-positive/negative tumors." JA-740(¶65). Similarly, an article in *PLOS One*, a peer-reviewed scientific journal, on March 16, 2015, noted that "strong" expression referred to expression of at least 50%. JA-740(¶66).

## C. Plaintiffs' Medical Oncology Expert Confirmed That 5% Expression Was Considered Weak And "Strong" Referred To 50% Or Greater Expression.

Ronald H. Blum, M.D., a Medical Oncologist with more than forty years' experience as a clinician, academic and researcher, confirmed that "strong" PD-L1 expression could not refer to expression levels of just 5%. Dr. Blum participated in independent oversight of late phase clinical trials for more than twenty years, and he served on Data Safety Monitoring Committees for over one dozen clinical trials,

---

[2] Contrary to Defendants' mischaracterization of a single "Nektar Slide" purportedly disseminated at this conference, which was improperly submitted as an exhibit to Defendants' reply brief below and relied on in error by the district court, nothing discussed at this conference contradicts the allegations that Merck publicly defined 50% expression to denote "strong" expression and that Bristol-Myers historically defined 5% expression to denote mere positivity. *See infra*, Argument, §I(D).

including trials testing PD-1 checkpoint inhibitors, such as Merck's Keynote-006. JA-760-62(¶¶117-20).

Based on his review of source documents referenced in the Complaint and his own substantial practical and academic expertise, Dr. Blum opined that: (i) by the beginning of the Class Period, the industry understood that the strength of PD-L1 expression was a critical variable in assessing the probability of successful response to PD-1 checkpoint inhibitors such as Opdivo and Keytruda (JA-733(¶52); JA-762(¶121)); (ii) the strength of the PD-L1 expression cutoff used in a clinical trial such as Checkmate-026 was a critical study variable in the design, conduct, and interpretation of PDL1 trials, which was required to be accurately disclosed (*id.*); (iii) the medical oncology industry used 5% PD-L1 expression level to be a standard measure of low or minimal PD-L1 expression (JA-762(¶120)); and (iv) the industry used "strong expression" to denote a level closer or equal to 50% expression (*id.*).

## D. Defendants Touted Checkmate-026's Focus On "Strong" Expression.

Against the backdrop above, Defendants prominently stated on *ClinicalTrials.gov* that Checkmate-026's "primary outcome" was focused on "subjects with *strongly Programmed death-ligand 1+ (PD-L1+) tumor expression*" in dozens of postings throughout the Class Period. JA-745(¶79); JA-775-79(¶¶158-63). At the same time, Merck identically stated that Keynote-024 had the

14

same "strong" focus, which Merck explained meant ≥50%. JA-747-48(¶85); JA-751-52(¶¶96).

Given its importance to Bristol-Myers, Defendants spoke about Checkmate-026. For example, on September 8, 2015, Giordano reaffirmed "that the magnitude of benefit in the PD-L1 expressors confirms our first-line monotherapy approach to study the PD-L1 expressors in study 026." JA-753-54(¶99); JA-782-83(¶¶172-73). In January 2016, in response to heightened interest in the study, Cuss confirmed that Bristol-Myers has "taken great care in the design of this study," "paid real attention to the choice of end point," and "of course, the role of PD-L1 expression and the sample size," as guided by "a wealth of data, both published and our internal data, on Opdivo to help guide us." JA-756(¶103); JA-785(¶179).

On March 7, 2016, Defendants conveyed to investors their conformity with the industry standard usage of "strong" expression. That day, Cowen issued an analyst report stating that, while Bristol-Myers had not disclosed Checkmate-026's "cut-off for strong positivity," "a *cut-off of ≥50% is likely,* given that *a high threshold gives the study a higher chance of success.*" JA-756(¶105). During a Cowen conference that same day, Defendant Namouni was invited by a Cowen analyst to correct any inaccuracies in the Cowen report , but refused to do so—and instead reaffirmed that Checkmate-026 "has been well-designed and well-powered

15

to detect the difference in all the positives but also in what we define [as] *the high positives.*" JA-756-57(¶106). Thereafter, as Defendants continued to characterize Checkmate-026's cutoff as "strong" and "high," the market continued to reasonably understand that cutoff was at a minimum much higher than 5%. JA-758(¶110).

Defendants deliberately refused to correct this false impression. On April 28, 2016, an analyst noted during an earnings call that "investors are very focused on the upcoming front-line long studies from both Merck and [Bristol-Myers]," and asked Defendants to "compare and contrast" the studies. JA-792(¶193). In response, Caforio and Cuss failed to reveal precisely what Checkmate-026 considered "strongly expressing patients," stating only that the exact cut-off was "lower than 50%"—thereby confirming the reasonableness of the market's assumption that the cut-off was 50%, while still giving no indication that the true cutoff was *ten times lower*. *Id.*

On June 16, 2016, Merck announced that Keynote-024 succeeded in demonstrating that Keytruda worked better than chemotherapy in the treatment of NSCLC patients with "strong", i.e., greater than 50%, PD-L1 expression. JA-759(¶113). Yet Defendants still failed correct the market's misunderstanding as to Checkmate-026's quite different focus on "strong" PD-L1 expression, and instead emphatically stated their confidence in the study's design. JA-759-60(¶114).

16

After reviewing Bristol-Myers' representations that Checkmate-026 focused on patients that exhibited "strong" or "high" PD-L1 expression and the other documents referenced in the Complaint and considering his own expertise, Dr. Blum concluded that Defendants' representations as to Checkmate-026's PD-L1 expression focus were contrary to the industry's "widely-accepted" (a) standard use of 5% PD-L1 expression level to be a measure of low or minimal PD-L1 expression, and (b) standard use of "strong" PD-L1 expression to denote a level closer or equal to 50% expression. JA-761-62(¶¶120-21).

### E. Former Employees Confirm Defendants' Knowledge Of Checkmate-026's Expression Cutoff And The Industry Usage Of Expression Levels.

Former Bristol-Myers employees (referred to as "FE") confirm that the Individual Defendants personally participated in and approved the decision to focus Checkmate-026 on patients expressing just 5% PD-L1 expression. FE-1, Senior Vice President for Global Commercialization for Oncology until early 2014 (when Checkmate-026 was announced), discussed with Defendants Giordano and Namouni the Company's and Merck's PD-L1 expression levels, as well as Merck's use of a 50% PD-L1 expression level and what a "good" level of expression would be. JA-741-42(¶71).

FE-2, the Company's Associate Director of Global Oncology Forecasting and Strategic Planning, explained that the Company gathered information on clinical

17

trials performed by its competitors, including Merck. JA-742(¶72). FE-2 stated that the Company would have immediately incorporated information it learned about Merck's 50% "strong" PD-L1 cutoff and that this information would have been elevated to Namouni. *Id*. FE-2 also attended several Checkmate-026 strategy meetings with Caforio and Namouni, whose approval FE-2 stated were required for the PD-L1 expression level used in Checkmate-026. JA-748(¶87). FE-2 also stated that Caforio kept "pushing and pushing to drive" the largest forecasted patient pool, which corresponded to lower expression levels. *Id*.

FE-3, the Company's former Head of Product Portfolio and Access Strategy for Oncology, explained that senior management engaged in a constant dialogue with members of the C-suite about developments concerning Opdivo. JA-749(¶88). FE-3 stated that it was internally known that Checkmate-026's primary focus was 5% PD-L1 expression, and discussions about the cutoff included Defendants Cuss, Namouni, Giordano, and Caforio. *Id*. Further, FE-3 stated that a development team in charge of Checkmate-026—which FE-4 confirmed was a "critical study" (JA-749(¶89))—reported to Cuss and Giordano, who would have been apprised of and approved the Company's strategy with respect to the trial. JA-749(¶89).

FE-5, a former Group Medical Director who oversaw a group of physicians on project teams involved in establishing the safety measures for clinical trials, including Checkmate-026, confirmed that the Company's senior executives would

have known the cutoffs for the Opdivo trials because it is "one of the most important parameters in patient selection." JA-749-50(¶90). FE-5 also confirmed that Giordano was directly involved in the decision to select 5% PD-L1 expression as the cutoff in Checkmate-026 and that Cuss's approval of the strategy was similarly required. *Id*.

## III.    The Truth Is Revealed When Defendants Disclose Their False And Misleading Use Of "Strong" Expression.

### A.    Bristol-Myers' Revelation That Checkmate-026 Defined 5% As "Strong" Expression Left Analysts "Completely Puzzled."

On August 5, 2016, Bristol-Myers shocked the market by revealing that Defendants had defined "strong" PD-L1 expression as just 5% expression—the minimal level historically used by the Company and the industry to define mere positivity—and that Checkmate-026 had failed to show that Opdivo was a successful alternative to chemotherapy in such an aggressive study design. JA-763(¶122).

Analysts were "completely puzzled by Bristol's decision to evaluate . . . at a threshold this low [i.e. 5%], particularly given that [Defendants'] trial description indicated patients would be strongly expressing PD-L1," and noted the high risk of this newly disclosed 5% threshold. JA-763(¶123). The market quickly attributed the secret 5% cutoff as "likely the contributing factor[] to the failure." Checkmate-026's resulting failure caused what one analyst described as "[A] MAJOR SURPRISE – possibly the biggest clinical surprise of my career." JA-763(¶125). *See generally* JA-

19

763-65(¶¶123-29). Bristol-Myers' stock fell 16% that day, but the drop would have been worse had Defendants not raised investors' hopes that the Company's competitive position against Merck was preserved by falsely stating that day (and again on September 13, 2016) that Checkmate-026 could still yield useful data about 50% PD-L1 expressors. JA-766-68(¶¶134-36).

## B. Defendants Admit That Checkmate-026 "Was Not Designed To Look At . . . High Expression Of PD-L1."

Ultimately, on October 9, 2016, Defendants revealed that their concealed aggressive design had left them unable to yield any data concerning strong PD-L1 expressors. JA-768-69(¶¶138-40). That day, the Company admitted in its presentation at an important annual industry conference that Checkmate-026 "didn't stratify at *__high levels of PD-L1__*"—conceding that Defendants' repeated claims otherwise had been false and misleading. JA-769-70(¶142). In addition, Defendants were forced to admit that their aggressive trial design left Checkmate-026 underpowered to explore the results on smaller subsets of patients in a range of PD-L1 expressions, like Merck's Keynote-024 study. JA-768-69(¶138). An analyst report issued the same say described the announcement as the Company's "'worst case scenario' for Opdivo." JA-769(¶139). Defendants further conceded that, had they tracked Merck in targeting expressors of 50% of greater—as they had conveyed by tracking Merck in describing Checkmate-026—"it seems possible we may have

seen a favorable outcome." JA-769-70(¶142). Bristol-Myers' stock fell another 10%. JA-770(¶¶143-44).

After the Class Period, Defendants again admitted that their aggressive focus on a 5% cutoff did not target "high" or "strong" expressors and was responsible for Checkmate-026's failure. At the Credit Suisse Health Care conference on November 8, 2016, Namouni admitted that Checkmate-026 did not focus on tumors exhibiting "high" expression of PD-L1: "Obviously, *the study was not designed to look at the smaller subgroup of <u>highly</u> inflamed tumor or <u>high</u> expression of PD-L1*. Basically, that's the reason we are having a study that did not meet its primary endpoint." JA-773(¶151); JA-801(¶218). When Caforio, Bancroft, Namouni and Gordon met with analysts from Leerink and spoke about Checkmate-026, Leerink's December 2, 2016 report summarizing their conversation indicated that "[o]verall, mgmt. believes the failure of Checkmate-026 was due to it choosing the wrong endpoint." JA-773(¶152).

Dr. Thomas J. Lynch, who became the Company's Chief Scientific Officer in March 2017, confirmed in a *Forbes* article that, as the article summarized, "the most likely difference [between Checkmate-026 and Keynote-024] is the obvious one: *Bristol chose a lower cutoff* . . . . Quite simply, Lynch says, it looks as if Merck's predictive cutoff was 'superior' to Bristol's. *No excuses, no mysteries*." JA-774(¶155). Shortly after the Company's stunning admission that it *never* targeted

21

"high" PD-L1 expressors, on March 8, 2017, Cuss resigned—a result, according to industry commentators, of the study's "unexpected and brutal failure." JA-773-74(¶153).

Finally, on June 26, 2017, Bristol-Myers altered the description of Checkmate-026 on *ClinicalTrials.gov*, replacing the focus on "subjects with ***strongly Programmed death-ligand 1+ (PDL1+) tumor expression***" to "Progression-Free Survival in Participants ***With PD-L1 Expression>= 5%***." This retroactive change was yet another admission that 5% expression could not be considered "strong." JA-775(¶156).

## IV. The Individual Defendants Made More Than $55 Million From Sales Of Bristol-Myers Stock While Prices Were Artificially Inflated From The Market's Misunderstanding Of Checkmate-026's Risks.

Certain Defendants realized substantial financial gains from insider sales of Bristol-Myers stock while the stock price was artificially inflated. Andreotti, Bancroft, Caforio, and Cuss—each of whom was required to disclose their trades—collectively sold $75.7 million of stock, profiting nearly $55 million. JA-817(¶260). These Defendants made ***no*** open-market stock purchases during the Class Period, yet they were able to convert and acquire previously granted stock options at prices drastically lower than the inflated prices at which they traded during the Class Period. JA-819(¶262). Defendants' trades were suspicious: as the district court

22

noted, some trades "came at a pivotal time during the CM-026 trial" and were not made pursuant to a Rule 10b5-1 trading plan. SPA-26, citing JA-817-18(¶261).

## SUMMARY OF THE ARGUMENT

As set forth herein, the district court erred in granting Defendants' motion to dismiss the Complaint for several reasons.

First, the district court erred in finding that the Complaint failed to allege that Defendants' description of Checkmate-026's focus on patients whose cancerous tumors exhibited "strong" expression of PD-L1 was materially false and misleading. Rather than accept all well-pled factual allegations in the Complaint and draw all reasonable inferences in Plaintiff's favor, as required, the district court improperly ignored many of Plaintiffs' allegations and made unsupported factual determinations of others, while drawing unreasonable factual inferences in Defendants' favor. *See infra*, Argument, §§I(A), (B), (C).

Second, with respect to both its analysis of falsity and scienter, vacatur is independently required based on the district court's treatment of the Complaint's industry customs and usage allegations and consideration of evidence beyond the Complaint. The district court discounted allegations, supported by documentary and expert evidence, of a "widely-accepted" definition of a "strong" expression of checkpoint inhibitors, contrary to well-established Circuit precedent holding that the existence of a uniform standard or usage in an industry is a factual issue to be

23

ultimately determined by the trier of fact. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134-36 (2d Cir. 2006). *See infra*, Argument, §I(B). Compounding this error, the district court inappropriately credited as true a third-party document that was not referenced in the Complaint—and that Defendants submitted only on *reply*—to find that Plaintiffs could not establish the requisite industry standard as a matter of law. This Court strictly forbids such determinations. *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000). *See infra*, Argument, §I(C). Both errors independently mandate reversal.

Third, the district court erred in finding that the Complaint failed to allege scienter by failing to "consider the complaint in its entirety" and consider "whether *all* of the facts alleged, taken collectively" set forth the requisite elements, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Here, in addition to the errors noted above concerning the district court's incorrect requirement that Plaintiffs "establish" uncontroverted proof of an industry standard, the district court impermissibly refused to consider the *collective* weight of Plaintiffs' allegations and the reasonable inferences that should be drawn therefrom. Instead, and contrary to *Tellabs*, the district court analyzed Plaintiffs' scienter allegations "in a vacuum" (*id.* at 323), ignoring or rejecting key allegations supportive of scienter, such as Defendants' own admissions that Checkmate-026 was not focused on high expressors, Defendants' knowledge of

24

the industry usage of the term "strong," and Defendants' own historic characterization of 5% expression as the opposite of strong. Moreover, the district court erred in failing to properly credit Defendants' motivation to commit fraud from their "significant personal gain"—profits of \$55 million during the Class Period. *See Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308-09 (2d Cir. 2015).

## STANDARD OF REVIEW

The Court reviews *de novo* a judgment of dismissal pursuant to Rule 12(b)(6), assuming all facts alleged within the four corners of the complaint to be true and drawing all reasonable inferences in favor of the plaintiff. *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011).

Following the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, a series of appellate decisions established the principles governing consideration of a Rule 12(b)(6) motion to dismiss an action for securities fraud. First and foremost, the Supreme Court stressed that, when "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322-24.

With respect to the requirement of scienter, however, *Tellabs* held that "in determining whether the pleaded facts give rise to [the requisite] 'strong' inference

25

of scienter, the court must take into account plausible opposing inferences" and engage in a comparative analysis after considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. The Supreme Court nonetheless cautioned that "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" and the inference of scienter need only be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The Supreme Court added two other important caveats. First, courts must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Second, as the court is "unaided by discovery" at the motion to dismiss stage, courts should not apply the more demanding tests appropriate to summary judgment or judgment as a matter of law. *Id.* at 324, n.5, 326-27.

The Second Circuit has likewise stressed that the PSLRA's heightened pleading standards do not place impossible burdens on plaintiffs at the pleading stage. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), *cert denied*, 534 U.S. 1071 (2001). The Court of Appeals has provided additional guidance on these standards in deciding a Rule 12(b)(6) motion, including

specifically warning that reliance on exhibits submitted by defendants or on factual

allegations contained in legal memoranda is reversible error. *See, e.g.*, *Friedl*, 210

F.3d at 83-84.

## ARGUMENT

## I.     The District Court Disregarded The Proper Standards Applicable To A Motion To Dismiss A Complaint.

The district court erred in accepting Defendants' factual assertions as true and

in ignoring or otherwise discounting Plaintiffs' well-pled fraud claims in both its

falsity and scienter analyses. In the Complaint, Plaintiffs pled allegations that, when

accepted as true and viewed holistically, demonstrated a "widely-accepted,"

"industrywide consensus" known to Defendants that "'strong' PD-L1 expression

was inconsistent with a 5% cut-off."

These allegations included (i) publications and documents that not only

"alerted Defendants, at the time of the alleged misrepresentations, to an industrywide

consensus that 'strong' PD-L1 expression was inconsistent with a 5% cut-off," but

further, established that Bristol-Myers helped create that industry consensus through

its own published studies and statements prior to and during the Class Period (JA-

733-39(¶¶51-61)); (ii) additional competitor studies and industry publications

establishing the industry consensus that considered 'strong' expression to be

significantly greater than 5% and most often at least 50% expression (JA-740-

41(¶¶65-69)); (iii) the accounts of five former Bristol-Myers employees that certain

27

of the Defendants were directly involved in Bristol-Myers' use of the 5% cutoff and knew that Merck used a 50% cutoff to define "strong" in its own parallel studies (JA-741-42(¶¶71-72); JA-748-50(¶¶87-90)); and (iv) expert testimony from an esteemed oncologist and independent overseer of similar clinical trials who, based on his own significant experience and review of the documents cited in the Complaint, concluded, among other things, that the clinical oncology industry understood 5% to be a measure of weak, not "strong" PD-L1 expression (JA-760-62(¶¶116-21)). Ultimately, the meaning of "strong" is a jury question, and the district court erred in compartmentalizing Plaintiffs' allegations and diminishing the import and inferences to be drawn therefrom.

The Complaint also further bolstered the inference of scienter with allegations showing that the Individual Defendants' Class Period sales were unusual and suspicious, including by setting forth both those Defendants' stock sales and purchases during the Class Period (JA-817-24(¶¶260-74)), and heightening the connection between the fraud and two Defendants' suspicious resignations (JA-825-26(¶¶279-80)).

### A. The Complaint Alleges Materially False Or Misleading Statements And Omissions.

In its September 30, 2020 Order, the district court acknowledged this Court's requirement in *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 89, 98 (2d Cir. 2007) that it must "accept all factual allegations in the complaint and draw all

28

reasonable inferences in the plaintiff's favor." SPA-17-18. However, as set forth herein, the district court did exactly the opposite by misapplying the Rule 12(b)(6) dismissal standard and erroneously dismissing multiple materially false or misleading statements and omissions.

### 1. Defendants' Statements That Checkmate-026 Focused On "Strong" And "High" PD-L1 Expressing Tumors Are Actionably False And Misleading.

At the start of the Class Period and on numerous dates thereafter, Bristol-Myers stated on FDA website *ClinicalTrials.gov* that "[t]he purpose of [Checkmate-026] is to show that [Opdivo] will improve progression free survival in subjects with ***strongly . . . PD-L1+ non-small cell lung cancer***," and that the study's Primary Outcome Measure and the top two Secondary Outcome Measures concerned "subjects with ***strongly Programmed death-ligand 1+ (PD-L1+) tumor expression.***" JA-775-79(¶¶158-63). Defendants also made similar representations elsewhere. JA-787(¶183); JA-790(¶189); JA-792(¶193); JA-795(¶202).

Data published for years before the start of the Class Period gave rise to an industry understanding that higher levels of PD-L1 expression directly correlated to the success of PD-1 checkpoint inhibitors. JA-732-34(¶¶48-53). Therefore, by specifically characterizing Checkmate-026 as focused on tumors with "strong" and "high" expressions of PD-L1, Defendants communicated that Checkmate-026 was conservatively designed to target a subset of NSCLC patients that were most likely

to see improved survival from the use of Opdivo as a replacement for chemotherapy. JA-743-44(¶¶74-77); JA-746(¶¶80-81); JA-750-51(¶¶92, 94). This was because the industry understood that (i) "strong" was ≥50% expression; (ii) 5% was weak, minimally positive expression; and (iii) PD-L1 expression level materially correlated to the success of treatment. *See supra*, Statement of Facts ("Facts"), §§II(A)-(B).

Defendants' repeated, affirmative statements that Checkmate-026 focused on patients with tumors with "strong" and "high" PD-L1 expression were false and misleading because, in reality, Checkmate-026 aggressively focused on a broad group of patients who showed PD L1 expression of at least 5%—not the "strong" 50% level used by Merck, adopted by the industry, and co-opted by Defendants— but a level that Bristol-Myers and the industry had consistently defined to indicate the bare minimum for PD-L1 positivity. JA-734-39(¶¶54-61); JA-763(¶122); *supra*, Facts, §II(A).

Misrepresentations concerning the design of a clinical trial are actionable. Indeed, the recent decision in *Abramson v. Newlink Genetics Corporation*, 965 F.3d 165 (2d Cir. 2020), is directly relevant here. In *Newlink*, this Court overturned the dismissal of a securities fraud complaint, holding that plaintiffs plausibly pled material misrepresentations and loss causation for defendants' statements that

30

concerned public clinical industry literature and the description of Newlink's clinical trial design for a developing immunotherapy cancer treatment. *Id.* at 178.

Following its rationale in *Newlink*, this Court should conclude that "[a] *jury* could find that [Defendants'] statement . . . would, absent clarification, lead a reasonable investor to the falsifiable conclusion" that Defendants' use of "strong" expression indicated a conservative cutoff of some level far in excess of 5%, and most likely 50%. *Id.* at 177. Accordingly, Defendants' repeated affirmative statements that Checkmate-026's focus was on patients with "strong" and "high" PD-L1 expression were false and misleading because the true focus "so departed from [their] public statements" that the statements "became materially false [and] misleading." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010); *see also Micholle v. Ophthotech Corp.*, No. 17-CV-210 (VSB), 2019 WL 4464802, at \*12 (S.D.N.Y. Sept. 18, 2019) (ruling statements actionable where "there is evidence suggesting that Defendants' characterization of . . . the [clinical] trial's . . . criteria may well have been 'inconsistent' with the data known to them"); *accord Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (investors expect that statements "fairly align[] with the information in the issuer's possession at the time").

**2.      Defendants' Repeated Refusals To Disclose The True Cutoff Are Actionable Omissions.**

Defendants' decision to conceal from investors that Bristol-Myers defined "strong" PD-L1 expression as just 5%, when the market understood it to mean something far different, was an actionable material omission because Defendants had a duty to disclose information necessary "'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (quoting 17 C.F.R. §240.10b-5(b)) (requiring disclosure of adverse information while discussing "very strong momentum").

The district court rejected allegations of actionable omissions by finding exculpatory that Defendants refused to correct analysts' incorrect understanding that Defendants' use of "strong" meant something exponentially more than 5%, characterized that "BMS declined to offer publicly any definition of the term 'strong' as used in reference to the Checkmate-026 clinical trial." SPA-27. But Defendants' refusal to disclose the true cutoff *supports*—not undermines—the false and misleading nature of Defendants' statements. "Having chosen to speak" about the strength of the PD-L1 expression cutoff and design of Checkmate-026, Defendants "had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (citing *Meyer*,

32

761 F.3d at 250). *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

### 3. Defendants' Statements Describing Checkmate-026's Design And Defendants' Confidence Were Misleading.

Throughout the Class Period, Defendants spoke about the design of Checkmate-026, including specifically the role of PD-L1 expression. JA-753-60(¶¶99-115); JA-780-96(¶¶166-205); *supra*, Facts, §II(D). Defendants' descriptions and statements of confidence concerning the study's design misleadingly conveyed that Defendants had designed Checkmate-026 conservatively to target the smaller pool of patients with whom the study had a strong chance of success. JA-740(¶¶65-66); JA-750-52(¶¶93-97).

For example, Namouni's statement that Checkmate-026 "has been *well-designed* and *well-powered* to detect the difference in all the positives but also in what we define [as] the high positives" was false and misleading because—as Defendants later admitted—the study was not powered to detect results when stratified at high levels of expression. JA-790-91(¶¶189-192). *See, e.g., In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 243-53 (2d Cir. 2016) (sustaining jury finding that assertions of "confidence" were materially false or misleading); *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1137 (9th Cir. 2017) (statements about defendants' confidence in "guidance" and "growth prospects" are actionable);

33

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)

("*Tellabs II*") (statement that the defendants are "as confident as ever" actionable).

## B. The District Court Erred By Requiring Definitive Proof Of—As Opposed To Plausible Allegations Supporting—An "Industry Standard Definition" Of "Strong Expression."

The district court primarily rejected all three categories of statements and

omissions based on its determination that the facts alleged were not "sufficient to

suggest that there was an industry standard definition of that term [i.e., "strong"].

Without such a definition, or indication that Defendants themselves agreed with

Plaintiffs' supposed definition before speaking, the statements are not actionable."

SPA-27; *see also, e.g.*, SPA-28 (dismissing omissions on the basis of its

determination that there was "no industry-wide understanding . . . . [N]o reasonable

investor would have any particular understanding of those terms [i.e., "strong" and

"high"] in light of Merck's usage.").

The district court's erred for at least three reasons: (1) the securities laws do

not limit liability to misuse of "industry standard definitions;" (2) even assuming an

industry standard definition must be alleged, the district court engaged in improper

factfinding in discounting Plaintiffs' expert allegations; and (3) the district court

erred by accepting as true (and drawing factually incorrect inferences from)

Defendants' improperly-submitted "Nektar Slide."

34

Pleading securities fraud does not require proving—much less pleading—an "industry standard definition." Rather, the securities laws impose "a duty to tell the *whole truth*" once a person has chosen to speak. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

It is inarguable that Defendants here did *not* tell the "whole truth": even as they described Checkmate-026's design and cutoff, they never disclosed that they secretly defined "strong" at the level the industry considered weak, or at a level one-tenth of what the market understood was "strong." JA-775-80(¶¶158-65). Investors reasonably understood Defendants' statements concerning the design of Checkmate-026 to rest on two factual bases: first, that "strong" meant at least more than the most commonly understood bare minimum; and second, that "strong" did not dramatically depart from the definition widely promulgated by Bristol-Myers' chief competitor, Merck, as used throughout the industry at large. Courts—including the Supreme Court—routinely sustain similar sorts of statements (e.g., concerning "strong" and "high" metrics) as actionable where, as here, they "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *See, e.g.*, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–94 (1991) (statement that merger had "high" value was actionable). *See also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "under control" when "the contrary was true" were actionable); *City of Monroe*

35

*Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005) (statement concerning "high-quality, safe tires" was actionable).

The few authorities cited by the district court do not dictate otherwise. The district court primarily relies on *In re Eros International Securities Litigation*, in which the plaintiffs argued that statements about a company's growth in its "registered users" were false and misleading because, according to the plaintiffs, the term necessarily communicated that those users were actually able to "extract some functional benefit" from the company's products. No. 15-cv-8956 (AJN), 2017 WL 6405846, at \*5 (S.D.N.Y. Sept. 22, 2017) *aff'd sub nom. Eisner v. Eros Int'l PLC,* 735 F. App'x 15 (2d Cir. 2018) (cited at SPA-27). Although the defendants in *Eros* disagreed with the plaintiffs' alleged definition, the court's dismissal did not turn on resolving this "semantic battle." Rather, the issue was "beside the point" because the allegations in *Eros* did not actually demonstrate that any statements were false. *Id*.

In contrast, it is inarguable that Defendants' statements about Checkmate-026—e.g., that the study focused on "strong" PD-L1 expression—***did*** convey incorrect information about the expression level used in the study: for example, one analyst was "completely puzzled" when they learned the true expression cutoff, "particularly given that the trial description indicated patients would be strongly expressing PD-L1." JA-763(¶123); JA-815(¶254); *supra*, Argument, §I(A)(3).

36

As stated in more detail below, the district court's requirement that Plaintiffs plead—much less ***prove*** at the Rule 12(b)(6) stage with incontrovertible facts—the existence of a uniform standard in the medical oncology industry is in error, as such a level of proof is a factual issue for the jury. *See SR Int'l Bus. Ins. Co.*, 467 F.3d at 134-36. But even assuming that—as the district court here ruled—the securities laws require a "shared definition" (SPA-27), the Complaint contains well-pleaded facts that sufficiently demonstrate such a definition at the pleading stage. *See supra*, Facts, §§II(A)-(C). To require anything more is improper. *See, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (Rule 12(b)(6) motion requires the court to "'accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor'"); *Blanford*, 794 F.3d at 304.

Finally, even if the Court should weigh the allegations and inferences in the Complaint against competing inferences (which it should not in its falsity analysis), the district court still erred. The district court rejected the well-pled allegations above as insufficient to demonstrate the existence of an industry standard. But the district court does not cite any record evidence showing there was ***no*** industry understanding. To the contrary, the Complaint alleges that, toward the end of the Class Period, analysts directly pushed Bristol-Myers on whether Checkmate-026 cutoff was 50%. The ***only*** reasonable inference from this question is that the industry understood that "strong" ***did*** refer to "50%." JA-756-57(¶¶105-06). Nor does the

37

district court cite any facts contradicting the expert opinions of Dr. Blum that Defendants' claims to focus on strongly-expressed PD-L1 tumors in Checkmate-026 was "disingenuous," "misleading," and "inconsistent" with industry usage and understanding of 5% expression. JA-746(¶80); JA-752(¶97); JA-761-2(¶¶120-21).

Thus, even if the district court were permitted to engage in the sort of factfinding assessments at the pleading stage, which it is not, its ruling against Plaintiffs simply cannot be squared with these well-pled allegations.

## C. The District Court Erred In Imposing A Heightened Pleading Standard As To The Consideration Of Industry Customs And Usages Evidence.

The district court erred as a matter of law in discounting Plaintiffs' expert's conclusions that "an industry standard definition of 'strong' and 'low' PD-L1 expression was "widely accepted" by the beginning of the class period" (SPA-22-23) and that Defendants would have been aware of those meanings (a fact corroborated by several former employees, *supra*, Facts, §II(E)). In so doing, the district court erected a heightened pleading standard requiring consideration of industry customs and usages evidence for ***both falsity and scienter***, which is inconsistent with this Court's prior precedent.

This Court has long recognized that expert testimony may be admissible and helpful to the jury in securities cases, so long as such testimony does not concern an ultimate legal conclusion. *See, e.g.*, *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505,

509-12 (2d Cir. 1977) (stating that "an expert may testify to an ultimate fact, and to the practices and usage of a trade"); *United States v. Blizerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (finding that the district court did not err in admitting testimony from a government expert in a criminal securities fraud "concerning the meaning of terms, the procedures which are followed, and his opinion as to the reason for these procedures").

The Court has also defined the contours of what type of customs and usages evidence is sufficient to establish the meaning of a term and a defendant's understanding of that meaning. In *SR International*, this Court found that an expert witness was qualified to testify as an expert on custom and usage in the insurance industry, including the industry's understanding of the term "occurrence." 467 F.3d at 133-34. The Court explained that "evidence of custom and usage must establish that (1) the term in question has a 'fixed and invariable' usage and (2) that the 'party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." *Id.* at 134 (quoting *British Int'l Insur. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003).[3] Whether a trade usage exists, though, "is a question of fact, to be determined by the trier of fact." *Id.* at 134. The Court determined that the expert's testimony was sufficient "to establish

---

[3] Although the Court of Appeals was applying New York law, because it was exercising diversity jurisdiction, the Court has permitted similar evidence of custom and usage in the securities context. *See Marx* and *Bilzerian*, *supra.*

that there was a 'fixed and well-established' industry custom" regarding "occurrence" where the expert testified that the definition "does not vary" and was "well-known" within the industry. *Id.* at 134-35.

Here, Plaintiffs advanced sufficient allegations regarding the industry understanding of the terms "strong," "weak," and "minimal." The Complaint references the expert opinion of Dr. Blum, a medical oncologist and professor with over forty years' experience in the field of clinical pharmaceutical trials, including trials examining PD-L1 checkpoint inhibitors. JA-760-62(¶116-21). Dr. Blum opined that the "widely accepted" definition of "strong" or "high" expression during the Class Period denoted a level of PD-L1 expression "closer or equal to 50%." JA-761-62(¶¶120-21). In contrast, "the industry's standard use of a 5% PD-L1 expression level" is a "measure of low or minimal PD-L1 expression." JA-761-62(¶120). Defendants, thus, used the terms "strong," "weak," and "minimal" in a manner that was inconsistent "with historical and contemporaneous convention." JA-762(¶121).

As in *SR International*, expert testimony that describes a "well known" trade usage is admissible as to customs and usages evidence, and the district court should have considered it in determining the sufficiency of Plaintiffs' falsity and scienter allegations. The district court erred in finding that the expert allegations were insufficient as a matter of law because they did not lead to an inference of falsity and

40

scienter. Yet Dr. Blum's information further substantiated the relevant, "widely accepted" industry standards and the "historical and contemporaneous conventions" of the terms at issue. Such evidence raises an inference that the customs and usages evidence is so notorious as to impute knowledge of these terms to Defendants, who prominently boasted of their industry awareness and involvement—which ultimately is a factual question for the jury. *SR Int'l*, 467 F.3d at 134.

## D. The District Court Improperly Considered And Weighed Evidence Beyond The Complaint.

The district court also erred in considering evidence beyond the Complaint, here a single-page excerpt from a third-party presentation that Defendants attached only in their reply brief. Doing so violated this Court's clear prohibition on considering matters outside the complaint on a Rule 12(b)(6) motion. *Friedl*, 210 F.3d at 83-84. It was also illogical, given that no evidence supported an adverse inference against Plaintiffs regarding Defendants' understanding of the term "strong."

In a footnote in their reply brief, Defendants slipped in an entirely new document that they incorrectly represented was cited in the Complaint. JA-1906 n.15; JA-1932-34 (the "Nektar Slide"). Based on this single reference in the reply brief, and then in the final minutes of Defendants' rebuttal argument at the hearing (JA-1998-99), the district court embraced the improperly-submitted Nektar Slide, in violation of *Tellabs*, *Friedl*, *Scholastic* and other controlling authorities. In both its

41

falsity and scienter analyses, the district court ignored and discounted Plaintiffs' numerous well-pled allegations in favor of making an improper factual determination that the Nektar Slide defeated both falsity and scienter, ruling that the Nektar Slide "*seems* to contradict Lead Plaintiff's arguments about the existence of an industry standard" and "supports Defendants' argument that almost two years into the Checkmate-026 trial, the industry had not yet settled on any standard, and thus that Defendants *could not* have knowingly misrepresented that its trial conformed to such a standard." SPA-24.[4] The district court's interpretation of, and reliance on, the Nektar Slide is reversible error.

First, Plaintiffs did *not refer to or attach* any slide presentations to the Complaint that could be incorporated by reference by the district court. At most, the Complaint contains a single reference to a statement made during a conference hosted by Nektar that confirmed Merck's use of the "subset of high PD-L1 expression of more than 50%." JA-741(¶69); JA-812(¶246). The Nektar Slide does not contain that statement. Yet the district court not only considered the Nektar Slide, but conclusively credited Defendants' factual interpretation of it, ruling that the single-page excerpt *established* as a matter of law that Plaintiffs could not establish

---

[4] *See also* SPA-29 ("Lead Plaintiffs assert that an industry standard was developed before the class period began, but the Nektar Slide *alone* demands a different conclusion."); SPA-27-28 (concluding that the Nektar Slide "*defeats any argument* that Defendants' used of 'strong' to refer to PD-L1 expression in Checkmate-026 participants was false in light of a supposed industry standard.").

42

uniform industry usages of key terms. Given the clear nexus with the district court's dismissal of allegations of falsity and scienter, this improper consideration of a document outside the complaint alone independently mandates vacatur.

*Friedl* is on-point. There, like here, the district court granted the defendants' motion to dismiss after considering factual material that defendants had submitted only in their reply papers. 210 F.3d at 83-84.[5] On appeal, this Court held that vacatur of the dismissal was "required" where the district court's ruling "raise[d] the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion." *Id.* at 84. This Court further admonished that there is no "'harmless error' analysis in this context," and that reversal is required where it could not "be certain" that the district court's consideration of matters beyond the complaint impacted the court's analysis of the merits of the plaintiff's claims. *Id.*

The district court's decision to incorporate by reference the Nektar Slide was also error because the Nektar Slide was not cited in the Complaint. For a document to be incorporated into a complaint by reference, a plaintiff must "rely on the terms and effect of the document in drafting the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016). Just "[m]erely mentioning a document in the

---

[5] "When matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl*, 210 F.3d at 83.

complaint will not satisfy this standard," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Here, Plaintiffs neither relied upon nor even mentioned the Nektar slide. At most, Plaintiffs refer to a separate transcript of remarks made at the conference where the Nektar Slide was purportedly used. And here there is a dispute regarding the "authenticity[, relevance,] or accuracy of the document," which the district court could not resolve. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The case cited by the district court further confirms its error. In *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007), this Court explained that, in addition to documents attached to a complaint or incorporated by reference (of which the Nektar Slide is neither), a court may also consider documents that the parties filed with the SEC on the basis that "no serious question as to their authenticity can exist," and even then, those documents could be considered only for the limited purpose "to determine what the documents stated . . . not to prove the truth of their contents." *Id.* (citation omitted). Cautioning again against the consideration of extraneous documents, this Court reversed the district court's dismissal for having "improperly considered the representations in defendants' filings for the truth of their assertions." *Id.* at 510-11; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1018 (9th Cir. 2018) (rebuking and reversing the district court for its improper consideration of extrinsic materials submitted with defendants' motion to dismiss).

So too here, the district court erred in crediting the Nektar Slide as a conclusive fact as to a uniform industry usage (or lack thereof) of the relevant terms at issue. The Nektar Slide is not an SEC-filed document as to which there can be "no serious question" as to its authenticity; rather, it is a single page from an apparently much lengthier slide presentation, which was not prepared or filed by any of the parties and which Defendants conspicuously refused to provide in entirety. But even if this Court considers this single, out-of-context slide to be incorporated into the Complaint (which it was not), binding Circuit precedent forbade the district court from considering it at this stage "for the truth" of Defendants' assertions. *Id.* Accordingly, reversal of dismissal is required.

In addition to relying on the Nektar Slide in error, the district court drew conclusions unsupported from the face of the document. At best, an unbiased view of the Nektar Slide shows that it simply compares "diagnostic" assays purportedly "in development" by various companies, including Bristol-Myers. JA-1934. As the Complaint explains, the development of diagnostic assays that determine how much PD-L1 expression a patient's cell sample demonstrates is related to, but distinct, from the "cutoff" ultimately used in a clinical trial, which is a choice in the design of a study with respect to which patients to target. JA-753(¶98). The Complaint explains further that Merck and Bristol-Myers "collaborated with the same company, Dako, to develop the diagnostic assays that each company used to evaluate

PD-L1 expression for their respective studies." *Id*. If the Nektar Slide is probative of anything, it is not Bristol-Myers' definition of "strong" expression in Checkmate-026 (about which it says nothing) but of the conceptions of Dako and the various other "diagnostic partner[s]" of the diagnostic definition of PD-L1 positivity. JA-1934.

## E. The District Court Erred In Dismissing Purportedly Protected Forward-Looking Statements Or Opinions.

In one brief paragraph, the district court further rejects Defendants' statements about the design of Checkmate-026 as "non-actionable forward-looking statements or opinions." SPA-29. The district court does not specify the statements to which it refers. In any event, the district court's reasoning fails.

First, statements expressing "confidence" in Checkmate-026 and stating that the study had been well-designed to quickly bring Opdivo to market were not opinions (JA-1811-24) because Plaintiffs allege that Defendants concealed information concerning the true cutoff that rendered Checkmate-026 exponentially riskier than the industry understood. JA-780-96(¶¶166-205). As this Court recently held in the context of misrepresentations concerning a clinical trial, "[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *Newlink*, 965 F.3d at 177. The district court's citation to *Kleinman*, 706 F.3d at 154-55, is thus misplaced: unlike in *Kleinman*, "[t]he allegations . . . do not involve

46

differing <u>interpretations</u> of disclosed data, but rather ***data that was not disclosed*** . . . that would cast [the statements] in a more negative light." *See In re Delcath Sys. Inc., Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (distinguishing *Kleinman*).

Second, the district court erroneously gave safe harbor protection to unspecified "statements that express an optimism about the future of BMS's business." SPA-29. None of the statements at issue are the sorts of "predictions about future revenue" that qualify as "forward-looking," but instead reflect historical and present facts and opinions, such as the Checkmate-026 cutoff and Defendants' design choices for the ongoing study. Moreover, even ***if*** considered "forward-looking," such statements are only protected when "accompanied by cautionary language." SPA-29 (quoting *In re Sanofi-Aventis Sec. Litig.*, Nos. 07–cv–10279 (GBD), 08–cv–00021 (GBD), 2009 WL 3094957, at \*4 (S.D.N.Y. Sept. 25, 2009)). The district court does not point to any even arguably applicable cautionary language here, nor could it: "cautionary language is meaningful only when it discloses the known risks," and Defendants here indisputably refused to provide Checkmate-026's 5% PD-L1 expression cutoff. *See In re ITT Educ. Servs. Sec. Litig.*, 34 F. Supp. 3d 298, 305 (S.D.N.Y. 2014).

## F. The District Court Erred In Concluding That The Complaint Did Not Plead Scienter.

The Complaint describes numerous indicia of scienter that, taken together, raise a cogent and compelling inference that Defendants engaged in an aggressive

gamble while competing against their primary competitor within a multi-billion dollar market—and lied about it to investors. As set forth above, the district court erred in demanding incontrovertible proof of an "industry standard," an ultimate determination that belongs to the trier of fact, and in so doing, rejected and discounted Plaintiffs' well-pled allegations and accepted as true Defendants representations concerning Defendants' awareness of this industry usage. Further, as set forth below, this Court may infer Defendants' knowledge or recklessness through their own prior statements about expressor cutoffs, their awareness of the clinical trial design, their involvement in and awareness of the universal industry usage of relevant terms, their appreciation of the market's understanding of the trial, and the substantial stock profits earned by certain individual Defendants during the fraud.

Under the guise of the "law of the case,"[6] the district court ignored the vast majority of these allegations. In so doing, it flagrantly disregarded the most fundamental principle in evaluating scienter: "whether *all* of the facts alleged, *taken collectively,* give rise to a strong inference of scienter, not whether any individual

---

[6] The District Court wrongly construed the "law of the case" doctrine, which is a discretionary "practice of courts generally not to reconsider that which has already been decided"—*not* "a legally binding limitation on the court's authority to reconsider such matters." *Rezzonico v. H. & R Block*, 182 F.3d 144, 142 (2d Cir. 1999). In any event, the "law of the case doesn't bind an appellate court even as to final orders." *Id.*

allegation, scrutinized in isolation, meets that standard. *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also Blanford*, 794 F.3d at 305 ("A court . . . must assess the complaint in its entirety, and not scrutinize each allegation."). As described below, once properly considered in totality, it is "at least as compelling as any opposing inference one could draw from the facts alleged" that Defendants acted with recklessness at a minimum. *Tellabs*, 551 U.S. at 324.

### 1. Defendants' Admissions That Checkmate-026 Was Not Designed To Target High Expression Is Compelling Evidence Of Scienter.

Multiple admissions by Defendants that Checkmate-026 was not designed to target "high" expression is sufficient evidence of scienter. *See*, *supra*, Facts, §III(B). For example:

- During the Class Period, an analyst asked Defendant Namouni to correct whether Checkmate-026 used a 50% cutoff, but Namouni stated in response only that the study "has been well-designed and well-powered to detect the difference in . . . what we define [as] the high positives." JA-756(¶106). However, on November 8, 2016—after the truth was revealed—Namouni remarkably admitted the opposite: Checkmate-026 did *not* target "the smaller subgroup of . . . **high** expression of PD-L1." JA-801(¶¶218-219).

- On June 2, 2017—nearly one year after first revealing the truth about the expression cutoff—the Company's new Chief Scientific Officer Lynch (who had been a member of the Bristol-Myers Board of Directors during the Class Period) admitted that the choice of a "lower cutoff" (i.e., what Defendants had refused to disclose and falsely described as "strong") was the cause of Checkmate-026's failure. JA-774(¶155).

- Shortly thereafter, on June 26, 2017, Bristol-Myers tried to rewrite history by altering their ClinicalTrials.gov description of Checkmate-026's

Case 20-3716, Document 48, 02/04/2021, 3030369, Page61 of 119

"Primary Outcome." JA-775(¶156). That important metric was transformed from "Progression-Free Survival (PFS) . . . in subjects with strongly Programmed death-ligand 1+ (PD-L1+) tumor expression" to "Progression-Free Survival in Participants With PD-L1 Expression >= 5%." *Id.* In other words, Defendants finally came clean that 5% was not "strongly Programmed death-ligand 1+ (PD-L1+) tumor expression." *Id.*

These are precisely the sort of "direct[] and cogent[]" admissions that support the inference of scienter, which the district court inexplicably declined to acknowledge. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (crediting an "inference of intentional deception" in part based on "post-period admissions").

### 2. Former Employees Demonstrate Defendants' Awareness Of Relevant Facts.

Former employees demonstrate Defendants' awareness of facts that show Defendants knew or should have known that their statements were falsely and misleadingly inconsistent with the industrywide consensus. For example, FE-1 personally co-chaired and participated in meetings with Defendants Giordano and Namouni that discussed Merck's use of a 50% PD-L1 expression level and what was a "good" PD-L1 expression. JA-741(¶71). Likewise, FE-2 explained how Bristol-Myers executives (including Namouni specifically) learned of Merck's PD-L1 thresholds. JA-742(¶72). Other former employees corroborate these accounts and confirm that discussions about Checkmate-026's PD-L1 expression cutoff went "all the way up" to Cuss, Namouni, Giordano, and Caforio. *See* JA-746-50(¶¶86-90).

50

Notably, the district court did not find any "problem" with "the reliability of the sources [i.e., the former employees]," and instead ruled that they affirmed that "BMS was aware of Merck's operating definitions and that BMS would have incorporated that information into 'forecasting to understand the market.'" SPA-21. However, again improperly drawing adverse inferences *against* Plaintiffs, the district court narrowly construed the former employees' information as proving only Defendants' knowledge of *Merck's* definition, and ruling that "even if BMS executives were aware of Merck's thresholds, they used a different definition in an attempt to reach a broader segment of cancer patients." *Id*.

This ruling too narrowly construes this information: because Merck was the primary other participant in the market, the reasonable inference is that Defendants were paying attention to Merck's public definitions and terminology, *which aligned with the universal industry understanding*,[7] because the scope and success of the clinical trial was an issue of paramount importance to the Company. The district court's conclusion ignores that Defendants also knew—as they oversaw the Checkmate program—that Bristol-Myers historically defined 5% to denote mere positivity. Considered together (Defendants' knowledge of the industry usage of

---

[7] The discussion in Argument, §§I(B) and (C), which addresses why the universal industry usage of "strong," "weak," and "minimal," would have been notorious to Defendants as to establish their knowledge or recklessness of the relevant terms, is incorporated herein.

51

both 5% and "strong") leads to only one reasonable inference: that Defendants knew calling 5% PD-L1 expression "strong" created a risk of confusion "so obvious that the defendant must have been aware of it." *See, e.g.*, *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) (inferring scienter where the reporting issue was "so important to the health of the company" that it was likely the defendant "was paying close attention"); *Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 215 (2d. Cir. 2020) (finding scienter where the defendants "had to know that revealing the full extent" of information would impact investors); *In re Mylan Sec. Litig.*, 2018 WL 1595985, at \*12 (S.D.N.Y. Mar. 28, 2018) (scienter where defendants "knew facts or had access to information suggesting that their public statements . . . were not accurate" (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

### 3. Defendants Were Involved In Developing The Industry Standards At Issue.

Defendants' involvement in developing industry standards should have alerted Defendants to the fact that their statements were inconsistent with the industrywide consensus.

As discussed above, Defendants were instrumental in developing the industry understanding of PD-1 checkpoint inhibitors generally and specifically of PD-L1 expression. *See supra*, Facts, §II(A)-(B). For example, Bristol-Myers' historical and even ongoing trials overwhelming used a 5% expression level as the bare minimum

for PD-L1 positivity; discussing one of these studies, Checkmate-012, Defendant Namouni had even specifically explained on June 2, 2014 that the use of 5% as the threshold for mere positivity was appropriate because "PDL-1 is a very ubiquitous protein"—in other words, determining which subjects actually *expressed* PD-L1 had to be distinguished from the common presence of the protein. JA-736-37(¶58); JA-809-810(¶239). Yet Namouni and the other Defendants falsely and misleadingly omitted that they used that same minimal 5% level as the purportedly "strong" primary cutoff in Checkmate-026.

The most compelling inference is that Defendants deliberately designed their statements to be deceptive so as to surprise Merck and the industry at large if their undisclosed gamble worked—and the fact that it failed "is not inconsistent with its having been a considered, though because of the risk a reckless, gamble" that Defendants had failed to disclose. *See Tellabs II*, 513 F.3d at 710.

### 4. Defendants Knew That Investors And Analysts Focused On "Strong" PD-L1 Expressions And Failed To Correct Any Misconceptions.

Investors and analysts were focused on Checkmate-026 and its PD-L1 expression cutoff, and questioned Defendants on this subject throughout the Class Period JA-755-(¶¶101-02); JA-792(¶193); JA-805-06(¶229). *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14 (2d Cir. 2011) (inference of defendants' scienter reinforced by questions raised by analysts and investors).

Further, the level of the PD-L1 expression cutoff in Checkmate-026 was so important because it was critical to understanding Checkmate-026's odds of success. One analyst had determined that the PD-L1 expression cutoff determined whether Checkmate-026 was a "certain" success or an almost-guaranteed failure. JA-763(¶124). Similarly, another analyst wrote that they were "completely puzzled by Bristol's decision to evaluate . . . at a threshold this low [i.e., 5%], particularly given that the trial description indicated patients would be strongly expressing PD-L1"—as a result, the report continued, the analyst, "*and probably most of the market, thought the threshold was at least 10%*, and therefore expected that the trial had a reasonably high probability of success. . . ." JA-763(¶123); JA-815(¶254).

Yet the district court did not consider the inference of scienter from the stunned reactions of these or other similarly exasperated analysts. This error is particularly egregious because Defendants knew about analyst impressions of the clinical trial, but refused to provide information on the primary endpoint and instead aggravated inaccurate market assumptions when they chose to speak on the topic. *See, e.g.*, JA-759-60(¶114), JA-756-57(¶¶105-06). Indeed, after the truth was revealed, noted market commentator Jim Cramer remarked that, when it came to Opdivo, Defendants had been "*the exact opposite*" of "a company that gives you a very clear narrative about what can happen." JA-824(¶275). *See Billhofer v. Flamel*

54

*Tech.*, 663 F. Supp. 2d 288, 303 (S.D.N.Y. 2009) (finding scienter where Defendants were "[un]willing[] to be forthcoming in matters concerning its flagship drug").

### 5. The Suspicious Resignations Of Cuss And Giordano Further Support Scienter.

Finally, the resignations of Defendants Cuss in March 2017 and Giordano in July 2016 support an inference of scienter. *See* JA-825-26(¶¶279-80). In ruling that these resignations were merely "in the normal course of business" (SPA-23), the district court improperly disregarded allegations linking these departures to the fraud, including their timing, Giordano's return to active employment shortly after his purported "retirement," and that industry observers linked Cuss's exit to Checkmate-026's "*unexpected* and brutal failure." JA-825-26(¶¶279-80). *See, e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y 2017) (an inference of scienter may be drawn from the "timing and circumstances of individual defendants' resignations").

### 6. The Significant Stock Sales And Profits Reaped By Certain Individual Defendants Raise A Sufficient Inference of Scienter.

Finally, scienter can be demonstrated "when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *See, e.g.*, *In re Scholastic*, 252 F.3d at 74. Here, the Complaint pleads numerous stock sales revealing insider net profits of nearly $55 million, made while the market misunderstood the heightened risks facing Checkmate-026 because

55

Defendants refused to provide the Checkmate-026 primary cutoff—sufficiently unusual facts to alone warrant an inference of scienter. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) ("Insider sales have been found unusual based on a variety of factors, including the amount of profit from sales." (citing *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (finding that a $78 million profit is "massive by any measure"))).

The district court agreed with Plaintiffs "that certain of [Defendants'] trades stand out" for their timing close to allegedly false statements, that "Defendants Andreotti, Bancroft, and Caforio all sold significantly greater numbers of shares than previously had been their practice," that "[n]one of these trades were made pursuant to a Rule 10b5-1 plan," and that "[t]he trades came at a pivotal time during the CM-026 trial, after again describing the trial to the public, but shortly before the results were revealed." SPA-26. Nevertheless, the district court erroneously disregarded its own conclusions. For example, the district court found that "while executives experienced greater profits from stock sales, these were a result of Defendants receiving more shares as compensation overall during the class period and not opportunistic trading, since the same proportion was sold." SPA-25. This is simply unsupported by the record. *See* JA-817-24(¶¶260-74).

The Complaint further details that many of these sales were made "at conveniently opportune times," which the district court acknowledged (SPA-26).

"That the Complaint does not tether every single trade to a fraud-related event is not fatal to an inference of scienter." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018). Defendant Andreotti sold \$5.5 million in stock just *after* the start of the Class Period (JA-822(¶269); Defendant Cuss sold \$7.7 million in stock just *after* a medical journal discussed Bristol-Myers' use of a 5% PD-L1 cutoff in Checkmate-063 based on findings in Bristol-Myers' other studies (JA-822(¶270)); and Defendants Andreotti, Bancroft, and Caforio sold tens of millions of dollars in stock shortly *after* falsely assuring the market that Defendants were still "very comfortable about the design of our trial," including specifically the Checkmate-026 cutoff. JA-805-06(¶229); JA-817-24(¶¶260-274). *None* of these sales were made pursuant to a Rule 10b5-1 trading plan, which further strengthens the inference of scienter. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) (inferring scienter where "the vast bulk of the sales were not made pursuant to any Rule 10b5–1 trading plan"). The district court's holding that Defendants' "uniform trading pattern" and partial use of 10b5-1 plans "defeats any inference that Defendants were motivated by profits, then, is contrary to the well-pled allegations in the Complaint as well as the law supporting the suspicious nature of those sales. SPA-25-26, citing JA-1002-03.

The district court's holding that Defendants failed to plead scienter because Defendants apparently "sold the same overall percentage" of stock before and during

57

the Class Period (SPA-25-26, citing JA-1002-03) is irrelevant to this analysis. Defendants did not make any open-market purchases at artificially inflated prices during the Class Period, but only acquired shares at reduced prices through previously-granted stock options. JA-819-20(¶¶262-63). These "acquisitions" through options do not contradict scienter; if anything, they demonstrate motive because Defendants exercised these options at conversion prices set before their fraud had artificially inflated the price of Bristol-Myers stock. *Id. See Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17 CV 5753 (JGK), 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019) (retention of a large position after realizing profit from stock sales does not vitiate insider trading liability).

Finally, the absence of allegations of insider sales made by Defendants Giordano or Namouni does not weaken the inference of scienter as to the other Defendants. *Cf.* SPA-26. Unlike the other Defendants, Giordano and Namouni were not mandatory reporters, so their selling is not publicly known. JA-823(¶271). Notably, Defendants did not affirmatively argue below that Giordano or Namouni did *not* make any insider sales. In any event, absent discovery, this "factual information . . . peculiarly within the defendant's knowledge or control" should not be held against Plaintiffs. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Taken collectively and accepted as true, "[t]here were plainly substantial stock sales during the class period for a substantial amount of money," *Tableau*, 2019 WL 2360942, at \*6, giving rise to a strong inference of scienter from the Individual Defendants' more than $55 million in profit from sales made while they knowingly or recklessly misrepresented the risks of Checkmate-026.

### G. Defendants' Fraudulent Intent Is The More Compelling Inference.

Based on its flawed and selective analysis, the district court erroneously found that Plaintiffs' allegations "are less convincing than Defendants' inference that even if Bristol-Myers executives were aware of Merck's thresholds, they used a different definition in an attempt to reach a broader segment of cancer patients" and "in the normal course of business." SPA-21, SPA-23. But the Complaint is not about Defendants' strategic choice of cutoff, but their misrepresentations about the cutoff, which misled investors. That Defendants "used a different definition in an attempt to reach a broader segment of cancer patient," SPA-21, *confirms* scienter because, considering the Complaint's allegations holistically, "[i]t is exceedingly unlikely" that Defendants' false and misleading statements "were the result of merely careless mistakes at the management level . . . rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." *Tellabs II,* 513 F.3d at 709.

The Supreme Court's scienter analysis in *Matrixx* is on point. There, the Supreme Court affirmed the Ninth Circuit's reversal of the district court, ruling that

59

allegations of deliberate action to hide adverse information from investors adequately pleaded "'a cogent and compelling' inference that Matrixx elected not to disclose the reports of adverse events not because it believed they were meaningless, but because it understood their likely effect on the market." 563 U.S. at 49-50. The same is true here: as a critical variable and material fact, Defendants had a duty to disclose the primary cutoff—and if Defendants truly believed that 5% PD-L1 expression was consistent with "strong" expression (contrary to all indication of how the industry understood and used these terms), there is no reasonable non-culpable explanation for Defendants' *refusal* to tell the market. *See also Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 216 (2d Cir. 2020) (ruling that defendants' incomplete disclosures "support a finding of recklessness here as they strongly suggest that Defendants sought to use [their incomplete disclosures] to express optimism and underrepresent the extent of those very problems").

## II.     The Complaint Adequately Alleges Loss Causation.

The district court did not reach the issue of loss causation, but for the reasons briefed below, the Complaint readily pleads loss causation with allegations that "'the available public information regarding the company's financial condition [was] corrected,' and that the market reacted negatively," through two corrective disclosures. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d

227, 232-33 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). *See* JA-828(¶288); JA-831(¶297); JA-833(¶302).

First, on August 5, 2016, Bristol-Myers announced that Checkmate-026's purportedly "strong" focus was in reality on patients with a weak 5% PD-L1 expression and, as a result, the study failed to meet its endpoint, causing the stock price to fall $12.04 (16%) in one day. JA-764-65(¶129); JA-797-98(¶209). Second, on October 9, 2016, Bristol-Myers revealed that—despite having left open for months the possibility that the full results could provide usable subgroup data relating to "strong" PD-L1 expressors—the choice to focus on 5% expressors rendered Defendants unable to extract any positive data for "strong" PD-L1 patients, making Checkmate-026 a complete failure and causing the stock price to fall another $5.62 (10%). JA-768-69(¶138); JA-798(¶210). Such allegations are sufficient. *See Newlink*, 965 F.3d at 180 n. 17 (finding loss causation when plaintiffs alleged that "the risk of Defendants' alleged improper enrollments materialized when the Phase 3 trial failed"); *see also Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities LLC*, 797 F.3d 160, 187 (2d Cir. 2015) ("Plaintiffs' burden is not a heavy one" in pleading loss causation).

## III. The Complaint Pleads Violations Of Sections 20(a) And 20A.

As the district court's dismissal of these claims relied entirely on its ruling concerning §10(b), their dismissal should be vacated for the reasons stated above.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Opinion and

Judgment be reversed, and this matter be remanded for further proceedings.

DATED: February 4, 2021          Respectfully submitted,

/s/ Salvatore J. Graziano

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Lauren A. Ormsbee
Jesse L. Jensen
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
sgraziano@blbglaw.com
lauren@blbglaw.com
jesse.jensen@blbglaw.com

*Counsel for Lead Plaintiffs
Arkansas Public Employees
Retirement System and the
Louisiana Sheriffs' Pension &
Relief Fund, and Lead Counsel for
the Class*

**BLEICHMAR FONTI & AULD
LLP**
Javier Bleichmar, Esq.
7 Times Square
New York, New York 10036
Tel: 212-789-1341
jbleichmar@bfalaw.com

*Additional Counsel for Lead
Plaintiffs*

**MOTLEY RICE LLC**

William H. Narwold
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 882-1681
Fax: (860) 882-1682
bnarwold@motleyrice.com

*Counsel for Named Plaintiff Erste Asset Management GmbH (formerly d/b/a Erste Sparinvest Kapitalanlagegesellschaft mbH)*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON, P.A.**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Tel.: 954-916-1202
Fax.: 954-916-1232
bob@robertdklausner.com

*Liaison Counsel for co-Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund*

## **STATEMENT OF COMPLIANCE**

This brief complies with the Second Circuit Local Rule 32.1(a)(4) which requires that the principal brief contain no more than 14,000 words because it contains 13,820 words, exclusive of the sections that do not count towards the limitation pursuant to Fed. R. App. P. 32(f). This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Lauren A. Ormsbee*

64

**SPECIAL APPENDIX**

**CASE NO. 20-3716**

**INDEX TO DOCUMENT REFERENCES IN SPECIAL APPENDIX**

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Opinion & Order** (September 30, 2019)................................................. | **R.66** | **SPA-1** |
| **Opinion & Order Granting Motion to Dismiss** (September 30, 2020)................................... | **R.82** | **SPA-13** |
| **Judgment** (September 30, 2020)................................... | **R.83** | **SPA-31** |
| **15 U.S.C. § 78j Manipulative and deceptive devices**................................................. | | **SPA-33** |
| **15 U.S.C. § 78t Liability of controlling persons and persons who aid and abet violations**........................... | | **SPA-35** |
| **15 U.S.C. § 78t-1 Liability to contemporaneous traders for insider trading**............................................. | | **SPA-37** |
| **17 C.F.R. § 240.10b-5 Employment of manipulative and deceptive devices**........................... | | **SPA-39** |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER TUNG et al.,

Plaintiffs,

-v-

BRISTOL-MYERS SQUIBB
COMPANY et al.,

Defendants.

18-CV-1611 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In 2014, Defendant Bristol-Myers Squibb Company announced a clinical trial to test the
efficacy of one of its newest anticancer drugs. The trial failed, which precipitated a drop in the
company's stock price. Plaintiffs now bring this putative shareholder class action, alleging that
public statements by Bristol-Myers and its officers mischaracterized the experimental design of
the trial, thereby overstating the likelihood of the trial's success. The plaintiffs bring claims
under Rule 10b-5 and Sections 10(b), 20(a), and 20A of the Securities Exchange Act. For the
reasons that follow, the claims are dismissed.

I.      **Background**

The following facts are taken from the operative complaint and, for purposes of this
motion to dismiss, are assumed to be true.

Defendant Bristol-Myers Squibb Company is a pharmaceutical company whose product
portfolio includes anticancer drugs. (Dkt. No. 44 ("Compl.") ¶ 24.) During the relevant class
period — January 27, 2015 to October 9, 2016 (Compl. at 1) — the company's officers included
Defendants Michael Giordano, Fouad Namouni, Francis M. Cuss, Giovanni Caforio, Lamberto
Andreotti, and Charles A. Bancroft (Compl. ¶¶ 25–29, 32).

1

Prior to and during the class period, Bristol-Myers began focusing significant attention on immuno-oncology, a relatively new field of cancer research that explores the ability of the body's own immune system to fight cancer. (Compl. ¶ 35.) In particular, Bristol-Myers began developing the drug Opdivo (also called nivolumab), which belongs to a class of immunotherapy drugs known as "checkpoint inhibitors." (Compl. ¶¶ 38, 42.) Immune "checkpoints" are cellular mechanisms that prevent the body's immune system from attacking healthy cells. (Compl. ¶ 37.) One particular immune checkpoint centers around PD-L1, a protein that, when present on healthy cells, prevents the immune system from attacking them (specifically, by binding to PD-1, a protein present on the immune system's T-cells, which are attack cells). (*Id.*) But cancer cells can take advantage of this checkpoint by themselves expressing the PD-L1 protein, which disables the body's immune system from attacking and allows the cancer to grow unchecked. (*Id.*) PD-1 checkpoint inhibitors are drugs that inhibit cancer cells from doing so, causing the immune system to attack the cancer cells. (*Id.*)

It follows that the efficacy of PD-1 checkpoint inhibitors depends in part on the level at which a patient's cancer cells express PD-L1. (Compl. ¶ 49.) The lower the natural rate of PD-L1 expression by cancer cells, the less likely it is that a drug inhibiting PD-L1 expression will make any difference. (*See* Compl. ¶¶ 48–49.) Thus, when designing a study to test the efficacy of a PD-1 checkpoint inhibitor, a company must first determine how high a patient's expression of PD-L1 must be to qualify for inclusion in the study. In doing so, the company faces a trade-off: The higher the cut-off, the more likely that the study will yield positive results. (*See, e.g.*, Compl. ¶ 81.) But the lower the cut-off, the more patients are opened up for potential treatment. (*See, e.g.*, Compl. ¶ 98.)

In January 2014, Bristol-Myers announced a new clinical trial, Checkmate-026, that sought to determine whether Opdivo would outperform chemotherapy as a treatment for non–small cell lung carcinoma, the most common type of lung cancer. (Compl. ¶¶ 61–62.) An initial description stated that "the purpose of this study is to show that [Opdivo] will improve [outcomes] in subjects with *strongly* Stage IV or Recurrent PD-L1+ non-small cell lung cancer when compared to chemotherapy." (Compl. ¶ 64 (emphasis omitted).) Similar representations were made elsewhere. (*See, e.g.*, Compl. ¶¶ 125–30.) Bristol-Myers did not, however, clarify how much PD-L1 expression was required for a patient to "strongly" express PD-L1. (*See* Compl. ¶ 71.)

In May 2014, Merck, a rival pharmaceutical company, published a study (called Keynote-024) testing the efficacy of its own PD-1 checkpoint inhibitor drug, Keytruda. (Compl. ¶¶ 67–68.) Merck limited Keynote-024's eligibility to those patients with "PD-L1 *strong* expressing tumor." (Compl. ¶ 68 (emphasis added).) Merck disclosed that its definition of "strong" included only those patients in which at least 50% of tumor cells expressed PD-L1. (*Id.*)

On August 5, 2016, Bristol-Myers announced that Checkmate-026 had failed to demonstrate that Opdivo outperformed chemotherapy. (Compl. ¶ 92.) Bristol-Myers also revealed that the cut-off for the targeted patient population — *i.e.*, patients that "strongly" expressed PD-L1 — was 5%. (*Id.*) In response to this news, Bristol-Myers's stock price dropped approximately 16% from August 4 to August 5. (Compl. ¶ 100.)

On October 9, 2016, Bristol-Myers further revealed that the study's design precluded the researchers from reaching any conclusions about the efficacy of Opdivo for patients whose expression of PD-L1 were higher than 5%. (Compl. ¶ 105.) As a result, Bristol-Myers "had no

means under accepted statistical methodologies of finding a significant difference between the performance of Opdivo and chemotherapy." (Compl. ¶ 108.) In response to this news, Bristol-Myers's stock price dropped more than 10% from October 7 (the nearest trading day) to October 10. (Compl. ¶ 110.)

Lead Plaintiff Arkansas Public Employees Retirement System is a public pension fund that provides retirement benefits for qualified public employees of the state of Arkansas. (Compl. ¶ 21.) Lead Plaintiff Louisiana Sheriffs Pension & Relief Fund is a governmental retirement plan providing benefits to active and retired employees of the sheriff's offices of Louisiana. (Compl. ¶ 22.) Both lead plaintiffs purchased Bristol-Myers common stock during the class period and suffered losses. (Compl. ¶¶ 21–22.)[1]

Plaintiffs bring suit against Bristol-Myers and various of its officers, alleging violations of section 10(b) of the Securities Exchange Act and Rule 10b-5. (Compl. ¶¶ 225–32.) Based on that alleged primary violation, Plaintiffs also allege that certain officers violated sections 20(a) and 20A of the Act. (Compl. ¶¶ 233–47.)

## II. Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the well-pleaded factual allegations of the complaint, presumed true, permit the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

---

[1] The original plaintiff, Jennifer Tung, was not certified as a class representative. (*See* Dkt. No. 42 at 2.)

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737.  A securities fraud complaint based on misrepresentations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted).

Plaintiffs have alleged violations of section 10(b) of the Securities Exchange Act, Rule 10b-5, and sections 20(a) and 20A of the Act.  For the reasons that follow, each of the claims is dismissed.[2]

## A.      Claims Under Section 10(b) and Rule 10b-5

To state a claim under section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The requisite scienter is "an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)).  Further — because a complaint asserting securities fraud must comply with the

---

[2] Because the motion to dismiss is granted, Defendants' motion for oral argument on the motion to dismiss (Dkt. No. 64) is denied as moot.

heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the

Private Securities Litigation Reform Act — a plaintiff stating a claim under section 10(b) and

Rule 10b-5 must raise a "strong inference" of scienter by alleging facts showing either "(1) that

defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Trust*

*of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Here, Plaintiffs have not shown either to be true. Thus, Plaintiffs have failed adequately

to plead scienter, which means that their claims under section 10(b) and Rule 10b-5 must be

dismissed.

### 1.     Fraudulent Motive and Opportunity

In order to raise a "strong inference" of scienter under the "motive and opportunity"

prong, the plaintiffs must allege that Bristol-Myers or its officers stood to "benefit[] in some

concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08

(2d Cir. 2000). Crucially, "[m]otives that are common to most corporate officers, such as the

desire for the corporation to appear profitable and the desire to keep stock prices high to increase

officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at

198.

Plaintiffs adduce two motives to commit fraud, but neither suffices. The first is

Defendants' motive "to protect competitively sensitive information." (Dkt. No. 57 at 29.) But

the protection of proprietary information is the quintessence of a "generalized" business motive.

*See Chill v. Gen. Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Plaintiffs allege no "concrete

benefits" that would accrue to the Defendants beyond "maintain[ing] the appearance of corporate

profitability[] or of the success of an investment." *Id.* If scienter could be pleaded on this basis

alone, "virtually every company in the United States that experiences a downturn in stock price

could be forced to defend securities fraud actions." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

The second is the Defendants' motive to sell stock "while the price was artificially inflated as a result of [their] intentional manipulation of the market[]." (Dkt. No. 57 at 29.) As evidence, the complaint cites stock sales by Defendants Andreotti, Bancroft, Caforio, and Cuss. (Compl. ¶ 214.) Such allegations, however, can establish fraudulent motive only if Plaintiffs first demonstrate that the stock sales were "unusual" or suspicious. *Acito*, 47 F.3d at 54. They have not done so. As an initial matter, the complaint entirely fails to allege that Defendants Giordano or Namouni sold any shares during the relevant period (*see* Compl. ¶ 214), which substantially undermines Plaintiffs' claim that Defendants were motivated by an intent to engage in insider trading, *see Acito*, 47 F.3d at 54; *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *In re eSpeed, Inc. Sec. Lit.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period.").

And even for the Defendants who did sell shares, the complaint lists only stock sales while excluding stock purchases. (*See* Compl. ¶ 215.) As a result, Plaintiffs have "demonstrate[d] only gross proceeds without identifying net profits." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011). And "proceeds alone say nothing about a seller's motive." *Id.*; *see also In re eSpeed*, 457 F. Supp. 2d at 290 (finding complaint deficient because it "d[id] not disclose whether [defendants] made any *profit* from the sales"). Moreover, each of these Defendants kept constant or *increased* his ownership of Bristol-Myers during the class

7

period. (Dkt. No. 52 at 29 & nn.39–40.) The fact that the Defendants "*increased* their [stock] holdings during the Class Period [is] wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

In light of these considerations, the Court concludes that Plaintiffs have failed to adequately allege a fraudulent motive.

### 2. Conscious Misbehavior or Recklessness

Plaintiffs who have failed to demonstrate fraudulent motive may nonetheless raise a "strong inference" of scienter under the "conscious misbehavior or recklessness" prong, "though the strength of the circumstantial allegations must be correspondingly greater" if there was no underlying motive to commit fraud. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). To survive dismissal, the complaint must plead behavior which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care." *Id.* (quoting *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). In other words, the pleaded facts must indicate "a state of mind approximating actual intent." *Novak*, 216 F.3d at 312 (internal quotation marks omitted).

Plaintiffs' allegations fall far short of that demanding standard. Even if the Court assumes the existence of a fixed usage of "strong" that excluded a PD-L1 expression cut-off of 5%, the complaint still fails to plead facts giving rise to a strong inference that the fixed usage "was either known to the defendants or so obvious that the defendants must have been aware of it" at the time of the alleged misrepresentations. *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308).

As evidence that the Defendants were aware of the industry usage, Plaintiffs first cite general facts about Bristol-Myers's leading position in the immuno-oncology market. (*See* Dkt. No. 57 at 33–34.) Plaintiffs also cite general assurances from various Defendants that Bristol-

Myers had a "depth of understanding" about "the role of PD-L1 expression." (Dkt. No. 57 at

33–34 (quoting Compl. ¶ 160).) And Plaintiffs argue that the Defendants must have been aware

of "industry practices" because they were "inextricably involved in setting" them. (Dkt. No. 57

at 34 n.19.) These allegations do not suffice. "Where plaintiffs contend defendants had access

to . . . facts [contradicting their public statements], they must specifically identify the [source of]

this information." *Novak*, 216 F.3d at 309. "Conclusory allegations of a[] . . . defendant's skill

or experience" do not suffice "unless it is specifically shown how or why the [defendant] should

have believed the [misrepresentations] to be inaccurate." *O'Brien v. Price Waterhouse*, 740 F.

Supp. 276, 282 (S.D.N.Y. 1990). Plaintiffs' conclusory allegations of knowledge do not suffice.[3]

Plaintiffs next argue that Bristol-Myers's conduct proves that Defendants were aware of

the industry standard. Plaintiffs cite prior studies in which Bristol-Myers employed a 5% cut-off

to define mere "positive" expression. (Dkt. No. 57 at 27 (citing Compl. ¶ 198).) These prior

studies, they argue, contradict Bristol-Myers's current position that a 5% cut-off can be used to

---

[3] In dueling footnotes (*see* Dkt. No. 52 at 34 n.45; Dkt No. 57 at 32 n.17; Dkt. No. 62 at 19 n.59), the parties dispute the applicability of the core operations doctrine, which permits an inference of scienter when "[a] defendant ma[k]es false or misleading statements" if "those statements concern[] the core operations of the company." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

As an initial matter, it is "questionable" whether the core operations doctrine is good law after the enactment of the Private Securities Litigation Reform Act. *Glaser*, 772 F. Supp. 2d at 596 n.17; *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.) (calling the doctrine's future "tenuous"). Nor can the doctrine, standing alone, support an inference of scienter. The doctrine only "bolsters the strength of the inference of scienter when plaintiff has already adequately alleged facts indicating that defendants might have known their statements were false." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011); *see also In re eSpeed*, 457 F. Supp. 2d at 294.

In any event, the doctrine has no application here. "[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter," and Plaintiffs do not allege, as they must, that Opdivo was "essential to [Bristol-Myers's] survival." *Tyler*, 814 F. Supp. 2d at 343. In fact, Plaintiffs expressly acknowledge that "CM-026's failure did not threaten [Bristol-Myers's] existence." (Dkt. No. 57 at 35.)

define "strong" PD-L1 expression.  Plaintiffs also cite post-study statements from Bristol-Myers officers "admitt[ing] that . . . a 5% PD-L1 expression cutoff was not 'high.'"  (*Id.* (emphasis omitted) (citing Compl. ¶ 205).)  Such conduct, however, is consistent with Bristol-Myers's current position.  After all, the Plaintiffs do not allege that Bristol-Myers took the categorical position, in any prior study, that the term "strong" *compelled* a cut-off of more than 5%.  And the statements from Bristol-Myers officers are similarly unhelpful.  They were made in October and November of 2016 — long after the alleged misrepresentations were initially made — and they did not even employ the terms "strong" or "strongly." (*See* Compl. ¶ 205.)  Thus, these statements cannot convincingly demonstrate that the Defendants were aware of an industrywide use of the term "strong" at the time the alleged misrepresentations were made.

Finally, Plaintiffs argue that the Defendants had knowledge of industry norms "based on their knowledge that Merck . . . had defined 'strong' to mean PD-L1 expressions of 50% or greater" in its Keynote-024 study.  (Dkt. No. 57 at 34–35.)  This argument, too, founders. Plaintiffs do not allege, as they must, that the Merck study indicated that "strong" *must* mean, as a matter of industry practice, a cut-off greater than 5%.  At best, the Merck study could have informed Defendants only of *Merck's* definition of "strong" PD-L1 expression, and only in the context of a particular study.

At bottom, Plaintiffs cite no publication, guidance, communication, document, or other specific source of information that could have alerted Defendants, at the time of the alleged misrepresentations, to an industrywide consensus that "strong" PD-L1 expression was inconsistent with a 5% cut-off.[4]  *Sans* specific evidence, Plaintiffs cannot demonstrate that the

---

[4] Plaintiffs also argue that Defendant Cuss's "unexpected" departure from Bristol-Myers in March 2017 (Compl. ¶ 224) provides support for scienter (Dkt. No. 57 at 28).  While resignations can sometimes support an inference of scienter, they must be "highly unusual and

Defendants used the term "strong" with a state of mind "approximating actual intent" to defraud. *Novak*, 216 F.3d at 312; *see also In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13-CV-755, 2014 WL 585658, at *12 (S.D.N.Y. Feb. 14, 2014) ("Failure to follow industry standards — without more — is not itself sufficient to support scienter.").

Accordingly, Plaintiffs' claims under section 10(b) of the Securities Exchange Act and Rule 10b-5 fail as a matter of law.

## B.     Claims Under Sections 20(a) and 20A

Plaintiffs also allege control-person liability under sections 20(a) and 20A of the Securities Exchange Act.  To establish a prima facie case of control-person liability, a plaintiff must successfully allege a primary violation.  *See ATSI*, 493 F.3d at 108.  Plaintiffs have failed to allege any primary violation; thus, they cannot establish control-person violation.  Their claims under sections 20(a) and 20A are dismissed.

## C.     Leave to Amend

In the event of dismissal, the plaintiffs have requested leave to amend the complaint. (Dkt. No. 57 at 37.)  Under Federal Rule of Civil Procedure 15(a), leave to amend shall be freely granted "when justice so requires."  Typically, district courts "grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."  *ATSI*, 493 F.3d at 108 (2d Cir. 2007).  Accordingly, leave to amend is granted.

---

suspicious" to do so.  *Glaser*, 772 F. Supp. 2d at 598 (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)).  Plaintiffs have pleaded no specific "facts [that] indicate that the resignation was somehow tied to the fraud alleged . . . or that defendants' scienter was otherwise evident."  *Id.*  Absent such evidence, Cuss's departure does not suffice to support a strong inference of scienter.

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Defendants' motion for oral argument on the motion to dismiss is DENIED as moot. Plaintiffs are granted leave to amend their complaint within thirty days of this Opinion and Order.

The Clerk of Court is directed to close the motion at Docket Numbers 51 and 64.

SO ORDERED.

Dated: September 30, 2019
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

**SPA-12**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: 9/30/2020            │
└─────────────────────────────────┘
```

JENNIFER TUNG, individually and on behalf of all others similarly situated,

Plaintiff,

-against-

BRISTOL-MYERS SQUIBB COMPANY, MICHAEL GIORDANO, FOUAD NAMOUNI, FRANCIS M. CUSS, GIOVANNI CAFORIO, LAMBERTO ANDREOTTI, and CHARLES A. BANCROFT,

Defendants,

1:18-cv-01611 (MKV)

**OPINION AND ORDER
GRANTING MOTION TO
DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

This is a securities class action seeking damages for alleged misstatements made by Defendant Bristol-Myers Squibb Company ("BMS") and its executives concerning a clinical trial for a drug called Opdivo. In short, Plaintiffs accuse BMS of misleading the market about who was eligible for the trial by defining eligibility criteria without regard for a purported industry standard understanding of certain terms. It is alleged that as a result the market was led to believe the trial was substantially more likely to succeed than in reality. After the trial failed, BMS revealed to the market the full contours of the clinical trial, at which time some market analysts and investors expressed surprise at BMS's decisions regarding who was eligible for the trial. This lawsuit soon followed. Following appointment of Lead Plaintiffs in this case, and an initial round of briefing on a motion to dismiss, Lead Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") was dismissed for failure to plead scienter. Lead Plaintiffs were granted leave to amend, and thereafter filed a Consolidated Second Amended Class Action

Complaint ("SAC").[1]  Defendants again moved to dismiss.  For the reasons that follow, and for substantially the same reasons warranting dismissal of Lead Plaintiffs' CAC, Defendants' motion is GRANTED.

## BACKGROUND

The facts of this dispute are laid out in detail in the SAC, ECF #67, and in the opinion by Judge Oetken granting Defendants' motion to dismiss the previous complaint, ECF #66 ("CAC Opinion").  The facts as stated herein are drawn from the SAC and are assumed true for the purpose of this motion.  *See Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) ("At the motion to dismiss stage, we accept these allegations as true and draw all inferences in [Plaintiff's] favor.").

BMS is a pharmaceutical company.  SAC ¶ 25.  During the relevant class period—January 27, 2015 to October 9, 2016—the company was led by executives including Defendants Michael Giordano, Fouad Namouni, Francis M. Cuss, Giovanni Caforio, Lamberto Andreotti, and Charles A. Bancroft.  SAC ¶¶ 26-33.

Plaintiff's allegations concern BMS's development of the drug Opdivo, and specifically the development of its use to treat non-small cell lung cancer ("NSCLC").  SAC ¶¶ 3-4, 7, 75.  Opdivo is a "checkpoint inhibitor."  SAC ¶¶ 39.  Immune "checkpoints" are cellular mechanisms that prevent the body's immune system from attacking healthy cells.  SAC ¶ 38.  To treat NSCLC, Opdivo targets the checkpoint protein PD-L1, which is expressed by cells in the body to prevent the immune system from attacking them.  SAC ¶ 38.  Specifically, PD-L1 binds with the "PD-1" protein on T-cells to prevent the T-cell from attacking the PD-L1 expressing cell.  SAC ¶¶ 38.  However, cancer cells can also express the PD-L1 protein, thereby preventing the body's

---

[1] By order dated May 16, 2018, the Arkansas Public Employees Retirement System and the Louisiana Sheriffs' Pension and Relief Fund were appointed Lead Plaintiffs in this action.

immune system from attacking the cancer cells.  SAC ¶ 39.  By targeting cancer cells that are expressing the PD-L1 protein, Opdivo allows the body's immune system to attack the cancer cells.  SAC ¶ 38.  Using the body's own immune system to target and kill cancer cells in this way is the goal of the burgeoning field of "immuno-oncology."  SAC ¶ 36.

The effectiveness of Opdivo and other checkpoint inhibitors depends on the level of PD-L1 expression in a patient's cancer cells (*i.e.* the share of cancer cells expressing the protein), commonly expressed as a percentage.  SAC ¶¶ 49-51.  Generally, the greater a patient's expression of PD-L1, the more likely treatment with a checkpoint inhibitor will be effective.  SAC ¶ 3.  It is estimated that approximately 70% of NSCLC patients exhibit some expression of PD-L1 on cancer cells, while approximately 25% of NSCLC patients exhibit a 50% or higher PD-L1 expression.  SAC ¶ 3, 161.  When developing trials to test the effectiveness of a PD-1 checkpoint inhibitor like Opdivo, companies like BMS have to determine a minimum expression level a patient must exhibit to be included in the study.  SAC ¶¶ 77, 79.  In making this decision, companies face a trade-off: the higher you set the cut-off, the more likely the trial will be successful, but the lower the cut-off, the more patients who are eligible for the trial and, ultimately, for any approved drug.   SAC ¶¶ 10-11.

In January 2014, BMS announced a Phase III clinical trial for Opdivo called Checkmate-026 ("CM-026").  SAC ¶ 77.  The goal of CM-026 was to determine whether Opdivo outperformed chemotherapy in treatment of NSCLC.  SAC ¶ 77.  If successful, CM-026 would have been the last step before BMS could seek approval to market Opdivo for use to treat NSCLC.  SAC ¶¶ 75-77.  BMS described that the purpose of CM-026 was "to show that [Opdivo] will improve [outcomes] in subjects with strongly Stage IV or Recurrent PD-L1+ non-small cell lung cancer when compared to chemotherapy." (emphasis omitted).  SAC ¶ 79.  While the trial was ongoing, in numerous statements, BMS also described the eligible class of

3

**SPA-15**

participants as exhibiting "strong" expressions of PD-L1. SAC ¶¶ 158-65. However, BMS also repeatedly stated throughout the class period that it would not provide any further information about its working definition of "strong." *See, e.g.*, SAC ¶¶ 93, 114.

Eventually, on August 5, 2016, BMS announced that CM-026 had failed to demonstrate that Opdivo was more effective than chemotherapy. SAC ¶ 11. The same day, BMS acknowledged for the first time that participants in CM-026 (*i.e.* those exhibiting "strong" expressions of PD-L1) only needed to exhibit expressions of 5% or higher. SAC ¶ 164. The price of BMS's common stock fell approximately 16% from August 4 to August 5, 2016. SAC ¶ 209. About two months later, on October 9, 2016, BMS announced that the data from CM-026 was unable to provide any statistically significant conclusions whatsoever about the effectiveness of Opdivo on NCSLC patients with expressions above 5%. SAC ¶ 13. On the next day of stock trading, the price of BMS's common stock fell approximately 10%. SAC ¶ 210.

This lawsuit was initiated in February 2018. *See* ECF #1. After Lead Plaintiffs were appointed, the Parties briefed Defendants' motion to dismiss the CAC. *See* ECF #51-53, 57, 62-63. The CAC was dismissed by Judge Oetken, to whom this case was previously assigned, based on Lead Plaintiffs' failure to plead scienter. *See* CAC Opinion at 5-11. Lead Plaintiffs were granted leave to amend and then filed the SAC. *See* ECF #67. The SAC seeks damages on behalf of a class of investors in BMS's common stock for BMS's alleged misrepresentations about the CM-026 trial targeting "strong" expressions of PD-L1. SAC ¶¶ 283-84. Lead Plaintiffs suggest that applying the label "strong" to participants with only a 5% expression contravened an industry standard understanding that an expression that low was understood to be among the lowest "merely positive" expressions, and was certainly not a "strong" expression. SAC ¶¶ 283-84. In support of this allegation, Plaintiffs point to previous studies, including a

roughly simultaneous clinical trial by BMS competitor Merck, which defined "strong" expression as 50% expression. *See* SAC ¶¶ 85, 96.

Defendants again moved to dismiss the SAC. Defendants argue that Lead Plaintiffs do not adequately allege scienter under the securities laws. *See* Memorandum in Support of Motion to Dismiss SAC, ECF #72 ("Def. Br."), at 8-20. This was the sole basis for Judge Oetken's previous dismissal of the CAC. The Defendants also argue here, however, that Lead Plaintiffs have not identified a false or misleading statement of fact, *see* Def Br. at 20-24, and that loss causation is not established. *See* Def. Br. at 24-25. Lead Plaintiffs opposed the current motion. *See* Memorandum in Opposition to Motion to Dismiss the SAC, ECF #74 ("Pl. Opp."). Defendants then filed a Reply. *See* Reply Memorandum in Support of Motion to Dismiss, ECF #76. The Court held oral argument on the motion on June 25, 2020. For the reasons that follow, the Motion to Dismiss is granted.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Here, Lead Plaintiffs assert claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"). "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*

*Commc'ns, Inc.*, 493 F.3d at 99.  The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA").  Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading."  *See* 15 U.S.C. § 78u-4.  He or she must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"— *i.e.* the intent "to deceive, manipulate, or defraud"—with respect to each act or omission.  *Id.*

"In a typical Section 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Relevant here, a plaintiff can prove scienter by showing either "(1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Emps. Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99).  "For an inference of scienter to be strong [as required], 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (2d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (alteration in original)).

## ANALYSIS

A.    *Lead Plaintiffs Fail To Plead Scienter*

In his opinion dismissing the CAC, Judge Oetken ruled that Lead Plaintiffs failed adequately to allege scienter under either theory.  *See* CAC Opinion at 6-11.  First, he held that the motives alleged by Lead Plaintiffs for the alleged fraud were not sufficient to prove scienter.

*Id.* at 6-7. In short, the Court ruled, a desire to "protect competitively sensitive information" was ruled to be a non-actionable "generalized business motive." *Id.* Judge Oetken also ruled that any allegation that Defendants committed fraud "to sell stock while the price was artificially high" failed because Lead Plaintiffs had not alleged sufficient facts to lead to that inference. *Id.* at 7. Second, Judge Oetken also held that Lead Plaintiffs had not alleged "conscious misbehavior or recklessness" because "[e]ven if the Court assume[d] the existence of a fixed usage of 'strong' that excluded a PD-L1 expression cut-off of 5%, the complaint still fail[ed] to plead facts giving rise to a strong inference that the fixed usage 'was either known to the defendants or so obvious that the defendants must have been aware of it' at the time of the alleged misrepresentations." *See id.* at 8 (citing *ECA*, 553 F.3d at 198).

In the SAC, Lead Plaintiffs abandon any argument that scienter is proven by Defendants' motive to protect competitive information. Instead, Lead Plaintiffs focus their allegations on attempting to prove the existence of an industry-wide consensus on the meaning of "strong" in the context of PD-L1 expression. *See* Pl. Opp. at 9-15. They also argue briefly that motive can be inferred from the insider trading allegations in the SAC regarding stock trades by BMS executives. *See* Pl. Opp. at 15-17. Each of these arguments fails.

      *i.*     *Conscious Misbehavior Or Reckless Conduct*

Judge Oetken held, and, thus, it is law of the case that, Lead Plaintiffs cannot prove the existence of an industry standard simply by pointing to the definition of "strong" used by Merck, BMS's competitor who was running a simultaneous PD-L1 checkpoint inhibitor study. *See* CAC Opinion at 10; *see also Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.

2002))).  Judge Oetken found that, at best, such allegations could prove that "Merck's definition of 'strong'" was greater than 5%, but that it did not determine any industrywide definition.  *Id.* He stated that Lead Plaintiffs would need to cite a "publication, guidance, communication, document, or other specific source of information that could have alerted Defendants, at the time of the alleged misrepresentations, to an industrywide consensus that 'strong' PD-L1 expression was inconsistent with a 5% cut-off."  *Id.*  Only if an industry standard were established, could Plaintiff's cogently allege Defendants' conscious misbehavior or recklessness sufficient to establish scienter.

In response to that instruction, Lead Plaintiffs added three types of allegations to the SAC.  First, Lead Plaintiffs have included statements and conclusions from a purported expert witness, Ronald H. Blum, a medical oncologist and researcher who has "participated in the independent oversight of late phase clinical trials, including clinical trials examining PD-L1 checkpoint inhibitors."  SAC ¶ 9.  Dr. Blum states that by the start of the class period in this case (January 27, 2015), there was an industry-wide consensus that 5% expression of PD-L1 was "low or minimal" and that 50% expression was "strong."  SAC ¶ 9.  Second, the SAC includes statements from a series of confidential witnesses who were former employees at BMS.  The former employees explain that BMS executives were aware of Merck's usage of a 50% threshold as "strong" and that BMS was using a different number.  SAC ¶¶ 71-72, 86-90.  Finally, the SAC also includes certain other circumstantial evidence of wrongdoing that Lead Plaintiffs claim lead to an inference of scienter, such as BMS's stated intent to "harmonize PD-L1 assays" and the departure from BMS of certain individual Defendants.  SAC ¶¶ 233, 279-80.  Each of these new pieces of information is insufficient to remedy the deficiency in the scienter charge identified in Judge Oetken's opinion.

8

**SPA-20**

It is settled in this Circuit that plaintiffs may rely on testimony of confidential witnesses to bolster their complaint, provided that the witnesses are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Lead Plaintiffs' confidential sources are clearly described with sufficient detail in the SAC, which notes their roles at BMS and to which of the Defendants each spoke. *See* SAC ¶¶ 71-72, 87-90. However, Lead Plaintiffs' problem is not with the reliability of the sources but with what information they provide. The former employees claim only that BMS was aware of Merck's operating definitions and that BMS would have incorporated that information into "forecasting to understand the market." SAC ¶ 72. This information does not add anything new to the case. Lead Plaintiffs previously alleged in the CAC that BMS was aware of Merck's definition, and Judge Oetken held that knowledge was insufficient to prove anything other than Merck's definition of "strong." *See* CAC Opinion at 10.

The inference of scienter urged by Lead Plaintiffs is not "cogent" or "at least as compelling" as the opposing inference urged by Defendants. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs' unsupported allegations of BMS's knowledge and disregard of an industry standard are less convincing than Defendants' inference that even if BMS executives were aware of Merck's thresholds, they used a different definition in an attempt to reach a broader segment of cancer patients. Importantly, none of Lead Plaintiffs' sources can verify that BMS believed that Merck's thresholds represented an "industry standard" definition. Contrary to Lead Plaintiffs' contentions, *see* Pl. Opp. at 10-11, requiring proof from the confidential sources of BMS's direct knowledge of an alleged industry standard is not "smoking gun" evidence beyond what they are required to provide. *See Tellabs*, 551 U.S. at 324. Rather,

that missing information is necessary to support Lead Plaintiffs' suggested inference that Defendants were anything more than negligent in their design and execution of the CM-026 trial.

Plaintiff's reliance on Dr. Blum's testimony fares no better. A plaintiff can rely on expert testimony to bolster the factual allegations of its complaint, but the Court may not consider any legal conclusions offered by the expert. *See, e.g.*, *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018) (striking legal conclusions about Defendant's misrepresentations but considering expert's testimony about industry practices). Here, Dr. Blum's conclusions are proper except to the extent he opines that Defendants' statements were, in fact, misleading. *See* SAC ¶¶ 120-21, 137.

Dr. Blum concludes that an industry standard definition of "strong" and "low" PD-L1 expression existed by the beginning of the class period. *See* SAC ¶ 9. Leaving aside that his conclusion may be refuted by other evidence in the SAC, *see infra* at 12, and even accepting as true his assertion that such a standard existed in some or all of the immuno-oncology field, Plaintiff has provided evidence of that standard only through Dr. Blum. Failure to provide some other industry publication, guidance, or other evidence of such a standard, in addition to the expert testimony, is legally insufficient and requires that the Court not rely on Dr. Blum's testimony at all. *See Ong*, 394 F. Supp. 3d at 223 ("'[E]ven if non-opinion portions of an expert's affidavit constitute an instrument pursuant to Rule 10, opinions cannot substitute for facts under the [PSLRA].'" (quoting *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006))); *accord In re CommVault Sys. Inc. Sec. Litig.*, No. 14-cv-5628 (PGS), 2016 WL 5745100, at *4-7 (D.N.J. 2016) (considering expert testimony only when plaintiff "d[id] not rely exclusively" on the expert) (cited at Pl. Opp. at 12).

The critical deficiency in Lead Plaintiffs' case is that even if the Court were to consider Dr. Blum's testimony, he states nothing that allows an inference that BMS executives had

10

**SPA-22**

knowledge of a new industry standard definition. Dr. Blum does nothing to bring his claim of an industry standard home to BMS. Instead, the SAC makes the conclusory allegation that Dr. Blum's understanding of an industry standard "should be imputed to Defendants." SAC ¶ 16. As Defendants' explain, Lead Plaintiffs have not alleged how or when an industry understanding reached BMS. *See* Def Br. at 13. This is particularly important since no one has suggested that that Dr. Blum has ever worked at BMS or is familiar with its procedures and practices. Without more, the Court cannot find that Dr. Blum's testimony establishes the existence of an industry standard or, more importantly, knowledge of such a standard at BMS. As a result, Defendants cannot be said to have knowingly or recklessly made statements which contradicted the putative standard.

The other information added to the SAC is circumstantial evidence that does nothing to further an inference of scienter. Lead Plaintiffs' note, for example, that BMS, in June 2015, committed that they "will participate in the efforts to harmonize PD-L1 expression assays." SAC ¶ 233. This statement actually supports the inference that no industry standard definitions existed in June 2015, as BMS was committing to "harmonize" approaches at that time, and not recognizing that they had already done so. As another example, Lead Plaintiffs bolstered their allegations regarding the "suspicious departures" of Defendants Cuss and Giordano from BMS. *See* SAC ¶¶ 279-80. Judge Oetken previously dismissed these allegations as not sufficient to plead scienter on their own. *See* CAC Opinion at 10 n.4. Because none of the new allegations add anything to the scienter analysis, the allegations remain insufficient. They hardly give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference" offered by Defendants, *Tellabs, Inc.*, 551 U.S. at 324, who persuasively argue that the departures were in the normal course of business and that BMS otherwise was not contradicting as-yet-undeveloped industry-wide understanding of PD-L1 expressions.

Finally, the SAC incorporates by reference at least one document that seems to contradict Lead Plaintiff's arguments about the existence of an industry standard.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.").  Specifically, in support of the argument that other industry participants adopted the 50% definition of "strong" expression of PD-L1, the SAC references industry presentations by BMS competitors and other groups using that terminology. *See* SAC ¶ 246.

In particular, the SAC mentions an October 8, 2015 presentation by Nektar, a pharmaceutical research company, at an industry conference in which the company "spoke about [Merck's PD-L1 inhibitor's] application for the 'subset of high PD-L1 expression of more than 50%.'" SAC ¶ 246.  Defendants submitted with their motion papers a slide from that presentation, which occurred almost two years after CM-026 began and almost one year into the class period.  *See* Reply Declaration of Matthew Solum in Support of Motion to Dismiss, ECF #76, Ex. 27 (the "Nektar Slide") at 3.  That slide includes four different definitions of PD-L1 "positive" and two different definitions of "strong."  *See* Nektar Slide at 3.  Far from supporting the inference that an industry standard existed before the class period, the slide supports Defendants' argument that almost two years into the CM-026 trial, the industry had not yet settled on any standard, and thus that Defendants could not have knowingly misrepresented that its trial conformed to such a standard.  Considering all of the allegations together, *Tellabs, Inc.*, 551 U.S. at 323, the Court again concludes that Lead Plaintiffs have not alleged a compelling inference of scienter based on Defendants' conscious misbehavior or reckless conduct.

ii.  *Fraudulent Motive And Opportunity*

While Lead Plaintiffs largely devote their scienter arguments to proving "conscious misbehavior or recklessness," they have included some additional allegations of insider trading in the SAC, in an effort to prove Defendants had a fraudulent motive to mislead investors. While Judge Oetken previously rejected a version of this argument, *see* CAC Opinion at 6-8, the SAC adds new allegations about the trades. In particular, Lead Plaintiffs now allege that the Individual Defendants, most notably Andreotti, sold shares of BMS common stock before the failure of CM-026 was disclosed, resulting in a total profit of over $55 million. SAC ¶ 264. Even with the additions, however, these allegations do not rise to a level sufficient to lead to a strong inference of scienter.

Insider trading activity proves motive if the executive, who possesses information that the market does not, makes "unusual" trades in a way to avoid the ultimate loss due to the public disclosure of that information. *See In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Unusual trades occur when an executive profits highly from sales, sells a large portion of his or her stock holdings, or trades drastically more stock during the class period than he or she did before. *Id.* at 7475. Here, Defendants convincingly argue, *see* Def. Br. at 9-10, that BMS executives sold the same overall percentage of the stock they owned before and during the class period. *See* Def. Br. at 9-10. Defendants further clarify that while executives experienced greater profits from stock sales, these were a result of Defendants receiving more shares as compensation overall during the class period and not opportunistic trading, since the same proportion was sold. *See id.* This uniform trading pattern, along with the fact that the vast majority of the trades in question were made pursuant to Rule 10b5-1 stock plans, defeats any inference that Defendants were motivated by profits. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("Trades made

13

pursuant to a Rule 10b5-l trading plan do not give rise to a strong inference of scienter.").
Finally, Lead Plaintiffs have omitted information regarding the Defendants' total holdings. That
omission is fatal to establishing scienter based upon trading activity. *See In re eSpeed, Inc. Secs.
Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006).

Lead Plaintiffs are correct, however, that certain of the trades stand out. Namely, in May
2016, about two months after Defendants again claimed that CM-026 participants had a "strong"
PD-L1 expression, Defendants Anderotti, Bancroft, and Caforio all sold significantly greater
numbers of shares than previously had been their practice. *See* SAC ¶ 261. None of these
trades were made pursuant to a Rule 10b5-1 plan. SAC ¶ 261. The trades came at a pivotal time
during the CM-026 trial, after again describing the trial to the public, but shortly before the
results were revealed. At argument, counsel for Defendants attempted to distinguish these trades
on the basis that the results of CM-026 were not yet known. *See* Tr. of June 25, 2020 Oral
Argument at 14:23-16:16.

While these trades are notable, in light of Lead Plaintiffs' pleading failures outlined
previously, they cannot by themselves give rise to a strong inference of scienter. *See Tellabs,
Inc.*, 551 U.S. at 324. This is especially true since the SAC alleges only three of the Individual
Defendants made trades at that time, as Judge Oetken previously noted. *See* CAC Opinion at 7
(collecting cases); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip
Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell
their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding
motive."). In short, Lead Plaintiffs have not provided sufficient facts to support a strong
inference of scienter based on motive and opportunity to commit the fraud. As a result, Lead
Plaintiffs' claims cannot stand.

14

B.     *Lead Plaintiffs Also Fail To Plead A Material Misstatement Or Omission*

While Judge Oetken's CAC Opinion did not consider whether Lead Plaintiffs adequately pleaded false or misleading statements or omissions, the Court also concludes that the statements in the SAC are not material misrepresentations or omissions required for Section 10(b) liability. *See Stoneridge Inv. Partners, LLC*, 552 U.S. at 157 ("In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant . . ."). As Lead Plaintiffs describe it, the SAC alleges three types of misstatements or omissions: (1) claims that CM-026 focused on "strong" PD-L1 expressions, when it did not, (2) failure to state exactly what the cutoff for CM-026 was, despite BMS noting from the outset that it would not do so, and (3) statements about BMS's confidence in the success of CM-026. *See generally* SAC ¶¶ 166-205. None of these types of statements are actionable.

First, BMS's decision to describe CM-026 as "strong" was not misleading. As described above, Lead Plaintiffs have not alleged facts sufficient to suggest that there was an industry standard definition of that term. Without such a definition, or indication that Defendants themselves agreed with Lead Plaintiffs' supposed definition before speaking, the statements are not actionable. *See, e.g.*, *In re Eros Int'l Secs. Litig.*, No. 15-cv-8956 (AJN), 2017 WL 6405846, at *5 (S.D.N.Y. Sept. 22, 2017) ("In the absence of a shared definition of the term . . . Plaintiffs must identify affirmative statements made by Defendant . . . that can plausibly be construed as false or misleading."). And, as Lead Plaintiffs themselves allege, throughout the class period, BMS declined to offer publicly any definition of the term "strong" as used in reference to the CM-026 clinical trial. SAC ¶¶ 93, 114. Moreover, the Nektar Slide discussed above indicates that in October 2015, industry sources both were aware that BMS's definition of "strong" was greater than five percent and that no industry standard definition of the term otherwise existed.

15

**SPA-27**

This defeats any argument that Defendants' use of "strong" to refer to PD-L1 expression in CM-026 participants was false in light of a supposed industry standard.

Second, Defendants' failure to disclose the actual cutoff for CM-026 also is not actionable. Lead Plaintiffs argue that this omission is actionable only because it would lead investors to believe that BMS was targeting a different category of patients than they actually were. Pl. Opp. at 20. However, this argument also depends on the existence of a purported industry standard understanding of "strong" when used in reference to the expression of PD-L1. Simply, if no industry-wide understanding exists, there is no reasons for investors to conclude anything in particular about CM-026. As discussed, Lead Plaintiffs have failed to allege such an industry standard. Lead Plaintiffs also assert that "Defendants' adoption of 'the exact same terms (e.g. 'strong' and 'high') used by Merck . . . was 'highly unusual and misleading' and 'disingenuous.'" Pl. Opp. at 20 (quoting SAC ¶¶ 80-81, 97). However, in the absence of an industry standard definition, no reasonable investor would have any particular understanding of those terms in light of Merck's usage, and Lead Plaintiffs certainly have not alleged particularized reasons why those descriptions would be materially misleading.

Lead Plaintiffs also assert that, even if Defendants had no duty to disclose the true cutoff for CM-026 at its onset, a duty to disclose developed during the trial. *See* Pl. Opp. at 23-24. In support of this assertion, Lead Plaintiffs note that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016). Unlike the *Menaldi* case, however, Lead Plaintiffs have not alleged that Defendants gave any incomplete statements. Indeed, BMS fully described CM-026 using the terms as BMS understood them. No industry standard existed before the class period

16

here, and Lead Plaintiffs do not attempt to argue that an industry standard emerged during the class period.[2]

Finally, the other statements alleged in the SAC are non-actionable forward-looking statements or opinion. The Second Circuit has been clear that courts should not engage in *post hoc* analysis of a company's optimistic statements, but instead should look to whether plaintiff pleads facts sufficient to allege that the optimism was misleading. *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154–55 (2d Cir. 2013). Here, Lead Plaintiffs have failed to allege an industry standard understanding of "strong" that would have been inherent in any BMS executive's representations about the likelihood of success of CM-026. Instead, Lead Plaintiffs take issue only with statements that express an optimism about the future of BMS's business. Those are not actionable. *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *4 (S.D.N.Y. Sept. 25, 2009) ("It is well settled that most forward-looking statements, such as predictions about future revenue, accompanied by cautionary language are not actionable under Rule 10b-5.").

In sum, largely for the same reasons that Lead Plaintiffs have not alleged scienter— because they have failed to establish an inference that there existed an industry standard understanding of a "strong" PD-L1 expression—the statements Lead Plaintiffs identify in the SAC are not actionable for Section 10(b) purposes.

C.      *Lead Plaintiffs' Claims Pursuant to Sections 20(a) and 20A Also Must Be Dismissed*

The SAC includes two causes of action against the Individual Defendants, alleging control-person liability under Sections 20(a) and 20A of the Exchange Act. To establish a *prima facie* case of control-person liability however, a plaintiff must successfully allege a primary violation.

---

[2] The Court once again notes that the Nektar Slide, which was used at an industry conference in October 2015, almost two years into CM-026 and almost one year into the class period, stated that Merck and BMS had different definitions of "strong" and that the industry as a whole had no settled definition of PD-L1 positivity, with at least three different definitions reflected on that slide. *See* Nektar Slide at 3. Lead Plaintiffs assert that an industry standard was developed before the class period began, but the Nektar Slide alone demands a different conclusion.

*See ATSI Commc'ns, Inc.*, 493 F.3d at 108.  Because the Court concludes that Lead Plaintiffs' have not alleged scienter or a false statement, essential elements of a 10(b) claim, they have failed to allege any primary violation.  As a result, the claims under Sections 20(a) and 20A also fail to state a claim and, accordingly, are dismissed.

## CONCLUSION

Following dismissal of the First Amended Consolidated Class Action Complaint, Lead Plaintiffs' attempted to remedy the specific deficiencies identified in the Dismissal Order.  Those efforts, as described herein, fall short.  The Second Amended Complaint suffers from the same deficiencies as the first.  Namely, Lead Plaintiffs have not alleged sufficient particularized facts to lead the Court to a strong inference of scienter as required by the PSLRA.  The complaint fails to establish the existence of an industry standard definition relating to PD-L1 expression, as would be required to find that Defendants knowingly or recklessly disregarded the standard.  Moreover, Lead Plaintiffs' allegations of insider trading, while in one small part notable, are collectively not sufficient to establish an inference of motive to commit fraud.

Additionally, Lead Plaintiffs' failure to allege the existence of an industry standard definition means that they also have failed to allege any materially misleading statement or omission.

As such, Defendants' Motion to Dismiss the Second Amended Consolidated Complaint is GRANTED and the complaint is DISMISSED WITH PREJUDICE.  The Clerk of Court respectfully is requested to close the case.

**SO ORDERED.**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**

**Date:  September 30, 2020**
**New York, NY**

18

SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JENNIFER TUNG, on behalf of all others
Similarly situated,

                 Plaintiff,

     -against-                               18 **CIVIL** 1611 (MKV)

                                            **JUDGMENT**

BRISTOL-MYERS SQUIBB COMPANY,
MICHAEL GIORDANO, FOUAD NAMOUNI,
FRANCIS M. CUSS, GIOVANNI CAFORIO,
LAMBERTO ANDREOTTI, and CHARLES A.
BANCROFT,

                 Defendants.
--------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 30, 2020, following dismissal of the First

Amended Consolidated Class Action Complaint, Lead Plaintiffs' attempted to remedy the specific

deficiencies identified in the Dismissal Order. Those efforts, as described herein, fall short. The

Second Amended Complaint suffers from the same deficiencies as the first. Namely, Lead

Plaintiffs have not alleged sufficient particularized facts to lead the Court to a strong inference of

scienter as required by the PSLRA. The complaint fails to establish the existence of an industry

standard definition relating to PD-L1 expression, as would be required to find that Defendants

knowingly or recklessly disregarded the standard. Moreover, Lead Plaintiffs' allegations of insider

trading, while in one small part notable, are collectively not sufficient to establish an inference of

motive to commit fraud. Additionally, Lead Plaintiffs' failure to allege the existence of an industry

standard definition means that they also have failed to allege any materially misleading statement

or omission. As such, Defendants' Motion to Dismiss the Second Amended Consolidated

Complaint is GRANTED and the complaint is DISMISSED WITH PREJUDICE; accordingly,

this case is closed.

**Dated:** New York, New York

    September 30, 2020

                                                    **RUBY J. KRAJICK**
                                                    _____
                                                       **Clerk of Court**
                                        **BY:**    *K. Mango*
                                                    _____
                                                       **Deputy Clerk**

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
Title 15. Commerce and Trade
Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78j

§ 78j. Manipulative and deceptive devices [Statutory Text & Notes of Decisions subdivisions I to XI]

Currentness

<Notes of Decisions for 15 USCA § 78j are displayed in multiple documents.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(a)(1)** To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Paragraph (1) of this subsection shall not apply to security futures products.

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(c)(1)** To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of Title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities.

Judicial precedents decided under section 77q(a) of this title and sections 78i, 78*o*, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

## CREDIT(S)

(June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891; Pub.L. 106-554, § 1(a)(5) [Title II, § 206(g), Title III, § 303(d)], Dec. 21, 2000, 114 Stat. 2763, 2763A-432, 2763A-454; Pub.L. 111-203, Title VII, § 762(d)(3), Title IX, §§ 929L(2), 984(a), July 21, 2010, 124 Stat. 1761, 1861, 1932.)

Notes of Decisions (4786)

## Footnotes

1       So in original. Probably should be followed by a comma.

15 U.S.C.A. § 78j, 15 USCA § 78j

Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.                              2

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78t

§ 78t. Liability of controlling persons and persons who aid and abet violations

Effective: July 16, 2011

Currentness

**(a) Joint and several liability; good faith defense**

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**(b) Unlawful activity through or by means of any other person**

It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

**(c) Hindering, delaying, or obstructing the making or filing of any document, report, or information**

It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information.

**(d) Liability for trading in securities while in possession of material nonpublic information**

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provisions of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, privilege or security-based swap agreement with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

**(e) Prosecution of persons who aid and abet violations**

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

**(f) Limitation on Commission authority**

The authority of the Commission under this section with respect to security-based swap agreements shall be subject to the restrictions and limitations of section 78c-1(b) of this title.

## CREDIT(S)

(June 6, 1934, c. 404, Title I, § 20, 48 Stat. 899; May 27, 1936, c. 462, § 6, 49 Stat. 1379; Pub.L. 88-467, § 9, Aug. 20, 1964, 78 Stat. 579; Pub.L. 98-376, § 5, Aug. 10, 1984, 98 Stat. 1265; Pub.L. 104-67, Title I, § 104, Dec. 22, 1995, 109 Stat. 757; Pub.L. 105-353, Title III, § 301(b)(12), Nov. 3, 1998, 112 Stat. 3236; Pub.L. 106-554, § 1(a)(5) [Title II, § 205(a)(3), Title III, § 303(i), (j)], Dec. 21, 2000, 114 Stat. 2763, 2763A-426, 2763A-456; Pub.L. 111-203, Title VII, § 762(d)(6), Title IX, §§ 929O, 929P(c), July 21, 2010, 124 Stat. 1761, 1862, 1865.)

Notes of Decisions (720)

15 U.S.C.A. § 78t, 15 USCA § 78t
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**SPA-36**

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78t-1

§ 78t-1. Liability to contemporaneous traders for insider trading

Currentness

**(a) Private rights of action based on contemporaneous trading**

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

**(b) Limitations on liability**

**(1) Contemporaneous trading actions limited to profit gained or loss avoided**

The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.

**(2) Offsetting disgorgements against liability**

The total amount of damages imposed against any person under subsection (a) shall be diminished by the amounts, if any, that such person may be required to disgorge, pursuant to a court order obtained at the instance of the Commission, in a proceeding brought under section 78u(d) of this title relating to the same transaction or transactions.

**(3) Controlling person liability**

No person shall be liable under this section solely by reason of employing another person who is liable under this section, but the liability of a controlling person under this section shall be subject to section 78t(a) of this title.

**(4) Statute of limitations**

No action may be brought under this section more than 5 years after the date of the last transaction that is the subject of the violation.

**(c) Joint and several liability for communicating**

Any person who violates any provision of this chapter or the rules or regulations thereunder by communicating material, nonpublic information shall be jointly and severally liable under subsection (a) with, and to the same extent as, any person or persons liable under subsection (a) to whom the communication was directed.

**(d) Authority not to restrict other express or implied rights of action**

Nothing in this section shall be construed to limit or condition the right of any person to bring an action to enforce a requirement of this chapter or the availability of any cause of action implied from a provision of this chapter.

**(e) Provisions not to affect public prosecutions**

This section shall not be construed to bar or limit in any manner any action by the Commission or the Attorney General under any other provision of this chapter, nor shall it bar or limit in any manner any action to recover penalties, or to seek any other order regarding penalties.

**CREDIT(S)**

(June 6, 1934, c. 404, Title I, § 20A, as added Pub.L. 100-704, § 5, Nov. 19, 1988, 102 Stat. 4680.)

Notes of Decisions (52)

15 U.S.C.A. § 78t-1, 15 USCA § 78t-1
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

SPA-38

Code of Federal Regulations
  Title 17. Commodity and Securities Exchanges
    Chapter II. Securities and Exchange Commission
      Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
        Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
          Manipulative and Deceptive Devices and Contrivances (Refs & Annos)

17 C.F.R. § 240.10b–5

§ 240.10b–5 Employment of manipulative and deceptive devices.

Currentness

<Notes of Decisions for 17 CFR § 240.10b–5 are displayed in separate documents. Notes of Decisions for subdivisions I to IX are contained in this document. For text of section, and references, see first document for 17 CFR § 240.10b–5. For Notes of Decisions for subdivisions X to end, see documents for 17 CFR § 240.10b–5, post.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

(Authority: Sec. 10; 48 Stat. 891; 15 U.S.C. 78j)

**Credits**

[13 FR 8183, Dec. 22, 1948, as amended at 16 FR 7928, Aug. 11, 1951]

SOURCE: 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20, 1987; 52 FR 9154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, July 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 1991; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR

14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997; 63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5, 2000; 66 FR 21659, May 1, 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9, 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28, 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76596, Dec. 21, 2006; 72 FR 4166, Jan. 29, 2007; 74 FR 68365, Dec. 23, 2009; 75 FR 2794, Jan. 19, 2010; 75 FR 9081, Feb. 26, 2010; 75 FR 54477, Sept. 8, 2010; 75 FR 64653, Oct. 20, 2010; 76 FR 4511, Jan. 26, 2011; 76 FR 6045, Feb. 2, 2011; 76 FR 34363, June 13, 2011; 76 FR 34590, June 14, 2011; 76 FR 41685, July 15, 2011; 76 FR 46620, Aug. 3, 2011; 76 FR 71876, Nov. 21, 2011; 77 FR 30751, May 23, 2012; 77 FR 38454, June 27, 2012; 77 FR 41647, July 13, 2012; 77 FR 48356, Aug. 13, 2012; 77 FR 56362, Sept. 12, 2012; 77 FR 56417, Sept. 12, 2012; 77 FR 66285, Nov. 2, 2012; 77 FR 73305, Dec. 10, 2012; 78 FR 4783, Jan. 23, 2013; 78 FR 42450, July 16, 2013; 78 FR 67633, Nov. 12, 2013; 79 FR 1548, Jan. 8, 2014; 79 FR 39159, July 9, 2014; 79 FR 47369, Aug. 12, 2014; 79 FR 55261, Sept. 15, 2014; 79 FR 57344, Sept. 24, 2014; 80 FR 14550, March 19, 2015; 80 FR 49013, Aug. 14, 2015; 81 FR 8637, Feb. 19, 2016; 81 FR 28705, May 10, 2016; 81 FR 30142, May 13, 2016; 81 FR 70900, Oct. 13, 2016; 82 FR 17555, April 12, 2017; 84 FR 33491, July 12, 2019; 84 FR 33629, July 12, 2019; 84 FR 44041, Aug. 22, 2019; 84 FR 55055, Oct. 15, 2019, unless otherwise noted.

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78*o*, 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, and 7201 et seq., and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub.L. 111–203, 939A, 124 Stat. 1376 (2010); and Pub.L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.; Section 240.3a4–1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as amended;; Section 240.3a12–8 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), and 23(a), 15 U.S.C. 78w(a);; Section 240.3a12–10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12–9 also issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78c(a)(12), 78g(c), 78k(d)(1);; Sections 240.3a43–1 and 240.3a44–1 also issued under sec. 3; 15 U.S.C. 78c;; Sections 3a67–1 through 3a67–9 and 3a71–1 and 3a71–2 are also issued under Pub.L. 111–203, §§ 712, 761(b), 124 Stat. 1841 (2010).; Section 240.3a67–10, 240.3a71–3, 240.3a71–4, 240.3a71–5, and 240.3a71–6 are also issued under Pub.L. 111–203, secs. 712, 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Sections 240.3a71–3 and 240.3a71–5 are also issued under Pub.L. 111–203, sec. 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Section 240.3b–6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b–9 also issued under secs. 2, 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121, as amended (15 U.S.C. 78b, 78c, 78*o*);; Section 240.9b–1 is also issued under sec. 2, 7, 10, 19(a), 48 Stat. 74, 78, 81, 85; secs. 201, 205, 209, 120, 48 Stat. 905, 906, 908; secs. 1–4, 8, 68 Stat. 683, 685; sec. 12(a), 73 Stat. 143; sec. 7(a), 74 Stat. 412; sec. 27(a), 84 Stat. 1433; sec. 308(a)(2), 90 Stat. 57; sec. 505, 94 Stat. 2292; secs. 9, 15, 23(a), 48 Stat. 889, 895, 901; sec. 230(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; sec. 2, 52 Stat. 1075; secs. 6, 10, 78 Stat. 570–574, 580; sec. 11(d), 84 Stat. 121; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 77b, 77g, 77j, 77s(a), 78i, 78*o*, 78w(a);; Section 240.10b–10 is also issued under secs. 2, 3, 9, 10, 11, 11A, 15, 17, 23, 48 Stat. 891, 89 Stat. 97, 121, 137, 156, (15 U.S.C. 78b, 78c, 78i, 78j, 78k, 78k–1, 78*o*, 78q).; Section 240.12a–7 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), 6, 15 U.S.C. 78(f), 11A, 15 U.S.C. 78k, 12, 15 U.S.C. 78(l), and 23(a)(1), 15 U.S.C. 78(w)(a)(1).; Sections 240.12b–1 to 240.12b–36 also issued under secs. 3, 12, 13, 15, 48 Stat. 892, as amended, 894, 895, as amended; 15 U.S.C. 78c, 78*l*, 78m, 78*o*;; Section 240.12b–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.12b–25 is also issued under 15 U.S.C. 80a–8, 80a–24(a), 80a–29, and 80a–37.; Section 240.12g–3 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.12g3–2 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.13a–10 is also issued under secs. 3(a) and 302, Pub.L. 107–204, 116 Stat. 745.; Section 240.13a–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.13a–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13d–3 is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Sections 240.13e–4, 240.14d–7, 240.14d–10 and 240.14e–1 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(d) and 14(e), 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(d) and 78n(e) and sec. 23(c) of the Investment Company Act of 1940, 15 U.S.C. 80a–23(c);; Sections 240.13e–4 to 240.13e–101 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(e), 15(c)(1), 48 Stat. 882, 889,

891, 894, 895, 901, sec. 8, 49 Stat. 1379, sec. 5, 78 Stat. 569, 570, secs. 2, 3, 82 Stat. 454, 455, secs. 1, 2, 3–5, 84 Stat. 1497, secs. 3, 18, 89 Stat. 97, 155; 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(e), 78*o*(c)

sec. 23(c) of the Investment Company Act of 1940; 54 Stat. 825; 15 U.S.C. 80a–23(c);; Section 240.13f–2(T) also issued under sec. 13(f)(1) (15 U.S.C. 78m(f)(1));; Section 240.13p–1 is also issued under sec. 1502, Pub.L. 111–203, 124 Stat. 1376.; Section 240.13q–1 is also issued under sec. 1504, Pub.L. 111–203, 124 Stat. 2220.; Sections 240.14a–1, 240.14a–3, 240.14a–13, 240.14b–1, 240.14b–2, 240.14c–1, and 240.14c–7 also issued under secs. 12, 15 U.S.C. 78l, and 14, Pub.L. 99–222, 99 Stat. 1737,15 U.S.C. 78n;; Sections 240.14a–3, 240.14a–13, 240.14b–1 and 240.14c–7 also issued under secs. 12, 14 and 17, 15 U.S.C. 78l, 78n and 78g;; Sections 240.14c–1 to 240.14c–101 also issued under sec. 14, 48 Stat. 895; 15 U.S.C. 78n;; Section 240.14d–1 is also issued under 15 U.S.C. 77g, 77j, 77s(a), 77ttt(a), 80a–37.; Section 240.14e–2 is also issued under 15 U.S.C. 77g, 77h, 77s(a), 77sss, 80a–37(a).; Section 240.14e–4 also issued under the Exchange Act, 15 U.S.C. 78a et seq., and particularly sections 3(b), 10(a), 10(b), 14(e), 15(c), and 23(a) of the Exchange Act (15 U.S.C. 78c(b), 78j(a), 78j(b), 78n(e), 78*o*(c), and 78w(a)).; Section 240.15a–6, also issued under secs. 3, 10, 15, and 17, 15 U.S.C. 78c, 78j, 78*o*, and 78q;; Section 240.15b1–3 also issued under sec. 15, 17, 15 U.S.C. 78*o*78q;; Sections 240.15b1–3 and 240.15b2–1 also issued under 15 U.S.C. 78*o*, 78q;; Section 240.15b2–2 also issued under secs. 3, 15; 15 U.S.C. 78c, 78*o*;; Sections 240.15b10–1 to 240.15b10–9 also issued under secs. 15, 17, 48 Stat. 895, 897, sec. 203, 49 Stat. 704, secs. 4, 8, 49 Stat. 1379, sec. 5, 52 Stat. 1076, sec. 6, 78 Stat. 570; 15 U.S.C. 78*o*, 78q, 12 U.S.C. 241 nt.;; Section 240.15c2–6, also issued under secs. 3, 10, and 15, 15 U.S.C. 78c, 78j, and 78*o*.; Section 240.15c2–11 also issued under 15 U.S.C. 78j(b), 78*o*(c), 78q(a), and 78w(a).; Section 240.15c2–12 also issued under 15 U.S.C. 78b, 78c, 78j, 78*o*, 78*o*–4 and 78q.; Section 240.15c3–1 is also issued under 15 U.S.C. 78*o*(c)(3), 78*o*–10(d), and 78*o*–10(e).; Section 240.15c3–3 is also issued under 15 U.S.C. 78c–5, 78*o*(c)(2), 78(c)(3), 78q(a), 78w(a); sec. 6(c), 84 Stat. 1652; 15 U.S.C. 78fff.; Section 240.15c3–3a is also issued under Pub.L. 111–203, §§ 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78*o*–7 note).; Section 240.15c3–3(o) is also issued under Pub.L. 106–554, 114 Stat. 2763, section 203.; Section 240.15d–5 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.15d–10 is also issued under 15 U.S.C. 80a–20(a) and 80a–37(a), and secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15*l*–1 is also issued under Pub.L. 111–203, sec. 913, 124 Stat. 1376, 1827 (2010).; Sections 240.15Ba1–1 through 240.15Ba1–8 are also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010).; Section 240.15Bc4–1 is also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010).; Sections 240.15Ca1–1, 240.15Ca2–1, 240.15Ca2–2, 240.15Ca2–3, 240.15Ca2–4, 240.15Ca2–5, 240.15Cc1–1 also issued under secs. 3, 15C; 15 U.S.C. 78c, 78o–5;; Sections 240.15Fh–1 through 240.15Fh–6 and 240.15Fk–1 are also issued under sec. 763, Pub.L. 111–203, 124 Stat. 1376.; Section 240.15Ga–1 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.15Ga–2 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.16a–1(a) is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Section 240.17a–3 also issued under secs. 2, 17, 23a, 48 Stat. 897, as amended; 15 U.S.C. 78d–1, 78d–2, 78q; secs. 12, 14, 17, 23(a), 48 Stat. 892, 895, 897, 901; secs. 1, 4, 8, 49 Stat. 1375, 1379; sec. 203(a), 49 Stat. 704; sec. 5, 52 Stat. 1076

sec. 202, 68 Stat. 686; secs. 3, 5, 10, 78 Stat. 565-568, 569, 570, 580; secs. 1, 3, 82 Stat. 454, 455; secs. 28(c), 3–5, 84 Stat. 1435, 1497; sec. 105(b), 88 Stat. 1503; secs. 8, 9, 14, 18, 89 Stat. 117, 118, 137, 155; 15 U.S.C. 78*l*, 78n, 78q, 78w(a); ; Section 240.17a–4 also issued under secs. 2, 17, 23(a), 48 Stat. 897, as amended; 15 U.S.C. 78a, 78d–1, 78d–2; sec. 14, Pub.L. 94–29, 89 Stat. 137 (15 U.S.C. 78a); sec. 18, Pub.L. 94–29, 89 Stat. 155 (15 U.S.C. 78w);; Section 240.17a–14 is also issued under Public Law 111–203, sec. 913, 124 Stat. 1376 (2010).; Section 240.17a–23 also issued under 15 U.S.C. 78b, 78c, 78*o*, 78q, and 78w(a).; Section 240.17f–1 is also authorized under sections 2, 17 and 17A, 48 Stat. 891, 89 Stat. 137, 141 (15 U.S.C. 78b, 78q, 78q–1);; Section 240.17g–7 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–8 is also issued under sec. 938, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–9 is also issued under sec. 936, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17h–1T issued under 15 U.S.C. 78q.; Sections 240.17Ac2–1(c) and 240.17Ac2–2 also issued under secs. 17, 17A and 23(a); 48 Stat. 897, as amended, 89 Stat. 137, 141 and 48 Stat. 901 (15 U.S.C. 78q, 78q–1, 78w(a));; Section 240.17Ad–1 is also issued under secs. 2, 17, 17A and 23(a); 48 Stat. 841 as amended, 48 Stat. 897, as amended, 89 Stat. 137, 141, and 48 Stat. 901 (15 U.S.C. 78b, 78q, 78q–1, 78w);; Sections 240.17Ad–5 and 240.17Ad–10 are also issued under secs. 3 and 17A; 48 Stat. 882, as amended, and 89 Stat. (15 U.S.C. 78c and 78q–1);; Section 240.17Ad–7 also issued under 15 U.S.C.

78b, 78q, and 78q–1.; Section 240.17Ad–17 is also issued under Pub.L. 111–203, section 929W, 124 Stat. 1869 (2010).; Section 240.17Ad–22 is also issued under 12 U.S.C. 5461 et seq.; Sections 240.18a–1, 240.18a–1a, 240.18a–1b, 240.18a–1c, 240.18a–1d, 240.18a–2, 240.18a–3, and 240.18a–10 are also issued under 15 U.S.C. 78*o*–10(d) and 78*o*–10(e).; Section 240.18a–4 is also issued under 15 U.S.C. 78c–5(f).; Section 240.19b–4 is also issued under 12 U.S.C. 5465(e).; Sections 240.19c–4 also issued under secs. 6, 11A, 14, 15A, 19 and 23 of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*–3, and 78s);; Section 240.19c–5 also issued under Sections 6, 11A, and 19 of the Securities Exchange Act of 1934, 48 Stat. 885, as amended, 89 Stat. 111, as amended, and 48 Stat. 898, as amended, 15 U.S.C. 78f, 78k–1, and 78s.; Section 240.21F is also issued under Pub.L. 111–203, § 922(a), 124 Stat. 1841 (2010).; Section 240.31–1 is also issued under sec. 31, 48 Stat. 904, as amended (15 U.S.C. 78ee).

Notes of Decisions (1564)

Current through January 15, 2020; 86 FR 4873.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.