# 20-3716-cv

## United States Court of Appeals

*for the*

## Second Circuit

───────◆───────

ARKANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM,
LOUISIANA SHERIFFS PENSION & RELIEF FUND, ERSTE-SPARINVEST
KAPITALANLAGEGESELLSCHAFT MBH,

*Plaintiffs-Appellants,*

JENNIFER TUNG, Individually and on behalf of all others similarly situated,
METZLER ASSET MANAGEMENT GMBH,

*Plaintiffs,*

– v. –

BRISTOL-MYERS SQUIBB COMPANY, MICHAEL GIORDANO,
FOUAD NAMOUNI, FRANCIS M. CUSS, GIOVANNI CAFORIO,
LAMBERTO ANDREOTTI, CHARLES A. BANCROFT,

*Defendants-Appellees.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

YOSEF J. RIEMER, P.C.
MATTHEW SOLUM, P.C.
DANIEL R. CELLUCCI
KIRKLAND & ELLIS LLP
*Attorneys for Defendants-Appellees*
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Bristol-Myers Squibb Company hereby states that it is a publicly held corporation (NYSE: BMY) with no parent corporation or publicly held corporation owning 10% or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

PRELIMINARY STATEMENT ...................................................................... 1

STANDARD OF REVIEW ........................................................................... 5

STATEMENT OF THE CASE ......................................................................... 6

I.   FACTUAL BACKGROUND.................................................................. 6

    A.   Checkpoint Inhibitors. ................................................................ 6

    B.   Opdivo and CM-026. .................................................................. 7

    C.   Merck's KN-024 ........................................................................ 9

    D.   CM-026's Results. .................................................................... 10

II.  TWO DISTRICT JUDGES ISSUE THOROUGH AND
    WELL-REASONED OPINIONS DISMISSING PLAINTIFFS'
    CASE. ............................................................................................ 11

    A.   Judge Oetken Dismisses the First Amended Complaint. ................. 11

    B.   Judge Vyskocil Dismisses This Case for the Second Time. ............. 14

SUMMARY OF THE ARGUMENT ................................................................. 16

ARGUMENT .............................................................................................. 18

I.   THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS
    DID NOT PLEAD AN ACTIONABLE MISSTATEMENT OR
    OMISSION. ..................................................................................... 18

    A.   Applicable Law. ........................................................................ 18

    B.   The SAC Does Not Sufficiently Plead That Defendants' Use of
        the Term "Strong" PD-L1 Expression Was False or Misleading. ...... 19

        1.   *The District Court Correctly Held That Plaintiffs Were*
            *Required to Plead Adequately that Defendants' Use of*
            *"Strong" was False or Misleading.* ................................... 20

2. *The District Court Correctly Concluded that the SAC Does Not Contain Non-Conclusory Allegations of an Industry Standard.* ........................................................................24

    a. Plaintiffs Fail to Plead Adequately a Generally-Accepted Definition for "Strong" or "Weak" PD-L1 Expression. ............................25

    b. The District Court Properly Held That Blum's Opinion Added Nothing. ........................29

    c. Plaintiffs Waived Any Objection to the District Court's Consideration of the Nektar Presentation and, in Any Event, the District Court Did Not Abuse Its Discretion in Considering It. ......................................32

C. Plaintiffs Failed to Plead an Actionable Omission. ............................38

D. Many Statements Are Non-actionable as a Matter of Law. ................41

III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS DID NOT PLEAD THE STRONG INFERENCE OF SCIENTER REQUIRED TO MAINTAIN THIS ACTION. ...........................................42

A. Applicable Law. ................................................................................43

B. Plaintiffs' Insider Trading Allegations Do Not Support a Strong Inference of Scienter. .........................................................................45

C. Plaintiffs' Circumstantial Allegations of Conscious Misbehavior or Recklessness, Considered Separately or Together, Were Insufficient to Give Rise to a Strong Inference of Scienter. .......................................................................................50

1. *Defendants' Post-Class Period Statements Do Not Support a Strong Inference of Scienter.* ....................................51

2. *Plaintiffs' Former Employee Allegations Do Not Support a Strong Inference of Scienter.* ................................................52

3. *Plaintiffs Conceded That Blum's Supposed Opinion Cannot Be Imputed to Defendants.* ...........................................53

4.   *The Departures of Defendants Cuss and Giordano Do Not Support a Strong Inference of Scienter.* ............................54

5.   *Plaintiffs' Conclusory Allegations That Defendants Were Involved in Developing an Industry Standard Do Not Support a Strong Inference of Scienter.* ....................................55

6.   *Analyst Statements Cannot Support an Inference of Scienter.* ......................................................................................56

D.   Defendants' Competing Inference of Non-Fraudulent Intent Is Substantially More Compelling. ..........................................................57

IV.   PLAINTIFFS FAILED TO PLEAD LOSS CAUSATION. .........................61

V.   PLAINTIFFS FAILED TO STATE A CLAIM FOR VIOLATIONS OF SECTIONS 20(a) AND 20A. .................................................................62

CONCLUSION ......................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health*,
   685 F.3d 174 (2d Cir. 2012) ...............................................................35

*Abely v. Aeterna Zentaris Inc.*,
   2013 WL 2399869 (S.D.N.Y. May 29, 2013) .......................................19, 21, 22

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) ...............................................................28

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) .....................................................................47

*In re Adolor Corp. Securities Litigation*,
   616 F. Supp. 2d 551 (E.D. Pa. 2009)...................................................22

*In re Advanced Battery Techs., Inc.*,
   781 F.3d 638 (2d Cir. 2015) ...............................................................29

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ............................................................46

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011) .................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...........................................................passim

*Avon Pension Fund v. GlaxoSmithKline PLC*,
   343 F. App'x 671 (2d Cir. 2009) .........................................................36

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
   215 F.3d 219 (2d Cir. 2000) ..........................................................33, 34

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................46

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ........................................................................52

*Chill v. Gen. Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ................................................................57

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ................................................................35

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ........................................56, 58, 59, 60

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ................................................................39

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ..............................................................5

*Dolgaleva v. Virginia Beach City Pub. Sch.*,
    364 F. App'x 820 (4th Cir. 2010) ........................................................38

*In re Dynagas LNG Partners LP Sec. Litig.*,
    2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020) ....................................23

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase
    Co.*,
    553 F.3d 187 (2d Cir. 2009) ......................................................*passim*

*Fin. Acquisition Partners LP v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006) ........................................................29, 30

*Fishbaum v. Liz Claiborne, Inc.*,
    189 F.3d 460 (2d Cir. 1999) ................................................................48

*Friedl v. City of New York*,
    210 F.3d 79 (2d Cir. 2000) ................................................................38

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................53

*Gross v. GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ..........................................................42

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   1998 WL 283286 (S.D.N.Y. June 1, 1998) ........................................................48

*In re Hertz Glob. Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018) ...................................................................54, 55

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ...............................................................................40

*Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*,
   445 F. App'x 368 (2d Cir. 2011) .......................................................................50

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
   564 U.S. 135 (2011)...............................................................................33, 40, 61

*Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2009) ....................................................................43, 48, 49

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...............................................................................44

*Kapitalforeningen Laegernes Inv. v. United Techs. Corp.*,
   779 F. App'x 69 (2d Cir. 2019) .........................................................................53

*Kelly v. Elec. Arts, Inc.*,
   2015 WL 1967233 (N.D. Cal. Apr. 30, 2015)...................................................22

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
   2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ..............................................19, 45

*Keshner v. Nursing Personnel Home Care*,
   794 F.3d 232 (2d Cir. 2015) ...............................................................................33

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................................47

*Kleinman v. Elan Corp., Plc.*,
   706 F.3d 145 (2d Cir. 2013) .......................................................................19, 39

*Koncelik v. Savient Pharm., Inc.*,
   2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 448 F. App'x
   154 (2d Cir. 2012)...............................................................................................31

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ...............................................................36

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ...............................................................61

*In re Liberty Tax, Inc. Sec. Litig.*,
  828 F. App'x 747 (2d Cir. 2020) ........................................................37

*Loc. No. 28 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  430 F. App'x 63 (2d Cir. 2011) ..........................................................52

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) .............................................45, 51

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. July 26, 2007), *aff'd*, 312 F. App'x
  400 (2d Cir. 2009)...............................................................................49

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ..............................................................36

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011)........................................................................60

*Micholle v. Ophthotech Corp.*,
  2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019) ...................................28

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10, 14 (2d Cir. 2011) ....................................................56

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) (Br. ) .................................................56

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas
  Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir.
  2019) ...................................................................................................20

*Onel v. Top Ships, Inc.*,
  806 F. App'x 64 (2d Cir. 2020) ..........................................................62

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018) ................................................29

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) .............................................................47

*Reliance Ins. Co. v. Polyvision Corp.*,
  474 F.3d 54 (2d Cir. 2007) ................................................................38

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .............................................................19

*Roy v. Contra Costa Cty.*,
  694 F. App'x 536 (9th Cir. 2017) ......................................................34

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ................................................................44

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip
  Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 2006) ..........................................................47, 51

*Shumay v. United Parcel Service, Inc.*,
  118 F.3d 60 (2d Cir. 1997) ..................................................................5

*Springer v. Wells Fargo Bank, N.A.*,
  784 F. App'x 721 (11th Cir. 2019) ....................................................34

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
  467 F.3d 107 (2d Cir. 2006) ..............................................................22

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
  467 F.3d 107 (2d Cir. 2006) (Br. ) ....................................................23

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ..............................................................10

*Stern v. Leucadia Nat. Corp.*,
  844 F.2d 997 (2d Cir. 1988) ..............................................................54

*Stiel v. Heritage Numismatic Auctions, Inc.*,
  816 F. App'x 888 (5th Cir. 2020) ......................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................24, 49, 57

*Trump v. Vance*,
    977 F.3d 198 (2d Cir. 2020) ............................................................35

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) .............................................54

**Statutes**

15 U.S.C. § 78u-4................................................................................43

15 U.S.C. § 78u-5................................................................................41

PSLRA ................................................................................*passim*

**Rules**

Fed. R. App. P. 32(a)(5)(A) ..............................................................64

Fed. R. App. P. 32(a)(6) ....................................................................64

Fed. R. App. P. 32(a)(7) ....................................................................64

**PRELIMINARY STATEMENT**

Although two District Court judges have issued thoughtful and well-reasoned opinions dismissing their complaints, Plaintiffs now appeal those rulings in hopes of using the securities laws to pursue their hindsight critique of the design of a clinical trial.  In January 2014, Bristol-Myers Squibb Company ("BMS") launched a clinical trial called Checkmate-026 ("CM-026") to test the efficacy of a cutting-edge immunotherapy drug, Opdivo, as a first-line treatment for non-small cell lung cancer ("NSCLC").   Opdivo is part of what Plaintiffs concede was a "new, rapidly evolving" class of novel drugs called PD-1 checkpoint inhibitors that seek to treat certain cancers by harnessing the body's immune system.  (SAC ¶ 232.)[1]  The primary endpoint for CM-026—the measure of the trial's main objective—was progression-free survival for patients with ≥5% expression of a protein called "PD-L1."

Like many pharmaceutical companies, BMS chose not to disclose the precise cut-off for its primary endpoint for legitimate competitive reasons.  BMS repeatedly told investors that the cutoff would not be disclosed.  Instead, Defendants explained that the trial would focus on individuals with "strong" PD-L1 expression.

---

[1]     "Br." refers to Plaintiffs' Opening Brief; "JA" refers to the Joint Appendix; "SPA" refers to the Special Appendix; and "SAC" refers to the operative complaint (District Court Dkt. #67).  Except where noted, citations, subsequent history, internal quotation marks and alterations have been omitted, and emphases have been added.

Ultimately, when results became available, BMS announced in August 2016 that CM-026 did not meet its primary endpoint, while also disclosing the full trial parameters, including that "strong" PD-L1 expression denoted ≥5% PD-L1 expression.

The crux of Plaintiffs' grievance is their belief that CM-026 failed because BMS did not define "strong" PD-L1 expression as ≥50%, as did Merck & Company, Inc. ("Merck") in a later-announced clinical study that was ultimately successful. But Merck's use of the term "strong" PD-L1 expression in a single clinical trial for Merck's drug did not somehow codify that meaning of the term "strong" for anyone else or for trials of other immuno-oncology drugs. In fact, BMS made clear that BMS's use of "strong" PD-L1 was different than Merck's by telling investors that CM-026's cut-off was "lower than 50%." (SAC ¶ 112.)

As both Judge Oetken and Judge Vyskocil correctly held, Plaintiffs failed to plead that Defendants' use of the term "strong" PD-L1 expression to describe a 5% cutoff was fraudulent. Simply put, Plaintiffs do not adequately allege any generally-accepted meaning for "strong" PD-L1 expression that was inconsistent with Defendants' use. Far from it, the complaint is riddled with different supposed "understandings" of "strong" PD-L1 expression—ranging from 50% to 10% expression. Plaintiffs also quote and incorporate many sources that contradict Plaintiffs' case, including articles reporting that the "best cut-off percentage of

2

scored cells to determine PD-L1 positivity … *remains an unresolved question*" (SAC ¶ 54) and that "*there is no consensus about the definition of positivity of PD-L1*" (JA-1256). Even assuming the existence of a common understanding, both Judge Oetken and Judge Vyskocil correctly held that Plaintiffs failed to allege that Defendants knew of this supposed standard, foreclosing an inference of scienter.

Plaintiffs' arguments on appeal are meritless. With respect to falsity, Plaintiffs claim that the District Court erred by "requiring definitive proof of an industry standard definition of strong expression." (Br. at 34.) This mischaracterizes the opinions below. Plaintiffs tried to plead securities fraud based on BMS's use of the term "strong" PD-L1 expression, but failed to allege adequately a generally-accepted meaning of that term foreclosing Defendants' usage. The District Court simply held Plaintiffs accountable for not pleading their claim with the specificity required by the PSLRA.

Plaintiffs' sole new argument (which was waived as Plaintiffs failed to raise it below) is that the District Court erred by considering the contents of a presentation that Plaintiffs discussed in the SAC that they filed after Judge Oetken dismissed the earlier complaint. Judge Vyskocil explained that the presentation showed that, "almost two years into the CM-026 trial, the industry had not yet settled on any standard" for "strong" PD-L1 expression. (SPA-24.) The doctrine of incorporation by reference exists to safeguard against plaintiffs selectively omitting portions of

3

their own sources that doom their claims.  Further, the presentation is just one of *many* allegations and incorporated sources contradicting Plaintiffs' conclusory allegations.

With respect to scienter, Plaintiffs' arguments on appeal fare no better. Plaintiffs point to stock sales as indicative of motive.  But only some Defendants traded during the putative class period, and those that did trade generally increased their holdings and traded in a manner entirely consistent with their past practices. These, among other reasons, confirm that Plaintiffs failed to allege motive adequately.

Plaintiffs' arguments as to their circumstantial allegations of scienter fail too. Plaintiffs cite the same supposed "admissions" that the District Court reviewed and properly concluded were not admissions of contemporaneous falsity.  Plaintiffs also claim to have spoken with five former employees of BMS, but none is alleged to have mentioned "strong" PD-L1 expression to any of the Defendants, never mind suggested that Defendants' use of that term was inappropriate.  Plaintiffs' remaining circumstantial scienter arguments—that two Defendants departed BMS and that analysts asked about BMS's trial design—fail to plead the required strong inference of scienter.

Only one strong inference emerges from Plaintiffs' allegations:  BMS designed a clinical trial it felt was supported by the science and chose not to disclose

the precise parameters of that trial for legitimate competitive reasons. Defendants routinely told investors that information was being kept confidential. Unfortunately, the trial was unsuccessful, but that is not securities fraud. This Court should affirm.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011). This Court may "affirm the judgment of the district court on any ground appearing in the record." *Shumay v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). Appellate review of a district court's decision that a document is incorporated by reference is for abuse of discretion. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1159-60 (9th Cir. 2012).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and [Federal Rule of Civil Procedure] 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Specifically, plaintiffs are required to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" to satisfy the PSLRA. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99-100 (2d Cir. 2007).

5

## STATEMENT OF THE CASE

## I.   FACTUAL BACKGROUND.

BMS is a global pharmaceutical company that develops, manufactures, and distributes pharmaceutical products in a variety of therapeutic areas, including cancer, HIV/AIDS, cardiovascular disease, and psychiatric disorders.  (SAC ¶ 25.)

### A.   Checkpoint Inhibitors.

Immuno-oncology is a "rapidly-evolving field of cancer research and treatment" that aims to utilize the body's immune system to fight cancer.  (SAC ¶ 36.)  One area of research concerns the use of PD-1 "checkpoint inhibitors" to target the PD-L1 protein.  (*Id.* ¶ 38.)  Many tumors produce the PD-L1 protein, which binds with PD-1 proteins existing on the surface of immune system cells, preventing those cells from attacking cancerous tumors.  (*Id.*)  Checkpoint inhibitors were developed to interrupt this process and allow the body's immune system to fight against cancer.  (*Id.*)  Plaintiffs claim that the immuno-oncology industry had settled understandings in this field but concede that "at all relevant times, the industry for PD-1 checkpoint inhibitors was new, rapidly evolving" (*id.* ¶ 232), "developing" (*id.* ¶ 56), and "nascent" (*id.* ¶¶ 45, 63).

In fact, throughout the Class Period,[2] the industry had not settled on a common understanding of PD-L1 positivity and its clinical significance. For example, Plaintiffs admit that the industry had not even "refine[d] or standardize[d] their PD-L1 testing." (*Id.* ¶ 98) Numerous publications incorporated into the SAC directly contradict Plaintiffs' conclusory allegation that the industry had settled understandings concerning PD-L1 expression. For example:[3]

- Paraphrasing Dr. Richard Pazdur (Director of the FDA Oncology Center), Reuters explained that "there is still a great deal of uncertainty about how to best measure for PD-L1." (JA-1228.)

- One scientific journal reported that the "best cut-off percentage" for "PD-L1 positivity … remains an unresolved question." (JA-1242.)

- Another article cited by Plaintiffs explained that "variable definition of a positive PD-L1 stain" was one of the "problematic issues with existing data." (JA-1269.)

- Yet another article Plaintiffs relied on explained that "there is no consensus about the definition of positivity of PD-L1." (JA-1256.)

## B. Opdivo and CM-026.

Opdivo is a PD-1 checkpoint inhibitor marketed by BMS to treat patients with certain cancers. (SAC ¶ 39.) In January 2014, BMS announced on *ClinicalTrials.gov* that it would be conducting a Phase III clinical trial, CM-026, to

---

[2] Plaintiffs have not moved to certify any class but define the putative class period as January 27, 2015 to October 9, 2016 (the "Class Period"). (SAC at 1.)

[3] These publications are incorporated by reference into the SAC (*e.g.*, SAC ¶¶ 54, 66, 98, 237) and should be considered. *ATSI*, 493 F.3d at 98.

test whether Opdivo would outperform chemotherapy as a first-line treatment for NSCLC. (*Id.* ¶ 77.) At the time, there was no FDA-approved checkpoint inhibitor for first-line treatment for NSCLC. (*Id.*) CM-026 recruited NSCLC patients who were PD-L1 "positive," which BMS defined to mean patients with ≥1% PD-L1 expression. (*Id.* ¶ 79.) The primary endpoint for CM-026 was progression-free survival for patients with ≥5% PD-L1 expression; BMS described that level of PD-L1 expression as "strong." (*Id.*)

BMS chose not to disclose—and made clear that it would not disclose—the PD-L1 cutoff for its primary endpoint until BMS announced CM-026's results. (*Id.* ¶ 93.) For example, in response to an analyst's question about CM-026's PD-L1 cutoff in July 2016, Defendant Cuss said, "I will say again, we're not going to talk about the high [expressive] cutoff at this point. [Y]ou will have an opportunity to see that when we talk about the data…." (*Id.* ¶ 114.)

Pharmaceutical companies often do not disclose all aspects of clinical trial designs for legitimate competitive reasons. Primary endpoints selected for a trial can have important implications for patient eligibility. For example, 55% of NSCLC patients have PD-L1 expression of ≥5%, while 25% have PD-L1 expression of ≥50%. (*Id.* ¶ 161.) Thus, as the PD-L1 cutoff increases, the number of eligible patients after approval decreases. (*Id.* ¶ 188.)

Throughout the Class Period, there was no common understanding of the term

"strong" PD-L1 expression. There was no FDA or other government guidance on the term, no industry publications defining "strong" PD-L1 expression, nor had BMS defined the term previously. Indeed, Plaintiffs allege throughout the SAC different supposed understandings of "strong" or "high" PD-L1 expression prior to and during the Class Period, ranging from 50% (*e.g.*, *id.* ¶ 161), to 25% (*id.* ¶¶ 108-109, 121), to "at least 20%" (*id.* ¶ 244), to "at least 10%" (*id.* ¶¶ 113, 233-254). This variability is unsurprising: the checkpoint inhibitor industry was "new" and "rapidly evolving." (*Id.* ¶ 232.)

### C. Merck's KN-024.

In May 2014—approximately five months after BMS announced CM-026—Merck announced on *ClinicalTrials.gov* its own clinical trial, named Keynote-024 ("KN-024"), to test Merck's PD-1 checkpoint inhibitor drug, Keytruda, as a first-line treatment for NSCLC. (*Id.* ¶¶ 85, 96.) Like BMS, Merck initially did not disclose the PD-L1 cutoff for KN-024. (*Id.* ¶ 96.)

In February 2016—over 20 months after Merck first announced KN-024 and 4 months before it announced the results of KN-024—Merck disclosed that KN-024 defined "strong" PD-L1 expression to mean ≥50%. (*Id.* ¶ 96.) Shortly thereafter, BMS disclosed that CM-026's cut-off for "strong" PD-L1 expression was lower than Merck's, but reiterated that BMS would not disclose its cut-off until BMS announced CM-026's results. (*Id.* ¶ 112.)

9

During the Class Period, the market speculated on the PD-L1 cutoffs used by BMS and Merck, making clear that there was no settled understanding of the term "strong" PD-L1 expression.  (*E.g.*, SAC ¶ 93.)  Multiple highly respected analysts correctly estimated that CM-026's cutoff for "strong" PD-L1 would be 5%.  For example, Alliance Bernstein reported that its "understanding has been that the [PD-L1] cut-off [for CM-026] is 5%" (JA-1282), as did Goldman Sachs in three separate reports (JA-1296; JA-1303; JA-1313).[4]

On June 16, 2016, Merck announced that KN-024 had met its primary endpoint by outperforming chemotherapy in NSCLC patients with ≥50% PD-L1 expression.  (SAC ¶ 113.)

### D.   CM-026's Results.

On August 5, 2016, BMS announced that CM-026 did not meet its primary endpoint—that is, Opdivo did not outperform chemotherapy when looking at progression-free survival rates in patients with ≥5% PD-L1 expression.  (SAC ¶ 11.) BMS simultaneously disclosed that it had used a 5% cutoff to define "strong" PD-L1 expression for CM-026.  (*Id.*)

---

[4]   This Court may take judicial notice of these reports for what they say, *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008), which is particularly appropriate here because Plaintiffs presented a self-serving collection of other contemporary analyst reports (*e.g.*, SAC ¶¶ 12, 94, 105, 108, 113, 123-27).

On October 9, 2016, BMS announced that, after an in-depth review of the data from CM-026, it was unable to draw conclusions about the efficacy of Opdivo relative to chemotherapy in patients with ≥50% expression. (SAC ¶ 13.)

## II. TWO DISTRICT JUDGES ISSUE THOROUGH AND WELL-REASONED OPINIONS DISMISSING PLAINTIFFS' CASE.

### A. Judge Oetken Dismisses the First Amended Complaint.

On July 16, 2018, Plaintiffs filed the First Amended Complaint ("FAC"). (JA-19–120.) The FAC alleged that Defendants' statements describing CM-026 as focusing on patients with "strong" PD-L1 expression were false or misleading because the immuno-oncology industry allegedly uniformly agreed that "strong" PD-L1 expression meant ≥50%. (*Id.* ¶¶ 67-68.) Plaintiffs also alleged that Defendants made false or misleading statements when expressing confidence in the trial design and prospects for CM-026. (*E.g.*, *id.* ¶¶ 75-83.)

Plaintiffs attempted to plead scienter based on legally deficient allegations of motive and weak, self-contradictory circumstantial allegations. With respect to motive, Plaintiffs pointed to certain stock sales by Defendants Andreotti, Bancroft, Caforio, and Cuss (FAC ¶ 214), and Defendants' alleged motive "to protect competitively sensitive information" (SPA-6). Plaintiffs also relied on circumstantial allegations that (1) publications purportedly showed an "ordinary industry understanding" of "strong" PD-L1 expression (FAC ¶¶ 195-205), even though the articles did not support this proposition; (2) BMS had used a 5% cutoff

11

to denote PD-L1 positivity in prior trials with different clinical focuses for different cancers (*id.* ¶ 198); (3) Defendants supposedly were aware that Merck defined "strong" PD-L1 expression as ≥50% for KN-024 (*id.* ¶ 202); (4) Defendants were "experts in the field of immuno-oncology" (*id.* ¶ 203); (5) CM-026 was purportedly a core operation for BMS and the level of PD-L1 expression was important to CM-026's success (*id.* ¶¶ 206-213); (6) Defendants allegedly made "admission[s]" after the Class Period (*id.* ¶¶ 185, 210), which were just post-hoc comparisons of CM-026 and KN-024; and (7) Defendant Cuss left BMS in March 2017 (*id.* ¶ 224).

On September 30, 2019, Judge Oetken dismissed the FAC without prejudice, holding that Plaintiffs had failed to plead scienter adequately. Judge Oetken rejected Plaintiffs' motive allegations, finding that the general motive to "protect competitively sensitive information" did not support an inference of scienter (SPA-6–7), and that Plaintiffs had failed to demonstrate any stock sales were unusual or suspicious (SPA-7–8). Judge Oetken next held that Plaintiffs' circumstantial allegations fell "far short." (SPA-8.) The Court found that BMS's prior trials were unavailing because "Plaintiffs [did] not allege that [BMS] took the categorical position, in any prior study, that the term 'strong' compelled a cut-off of more than 5%." (SPA-9–10.) In addition, Judge Oetken concluded that Defendants' knowledge of Merck's definition of "strong" PD-L1 for KN-024 could have "informed Defendants only of Merck's definition of 'strong' PD-L1 expression, and

only in the context of a particular study." (SPA-10.) Next, Judge Oetken concluded that allegations "about [Defendants'] leading position in the immuno-oncology market" were insufficient because "[c]onclusory allegations of a[] … defendant's skill or experience do not suffice." (SPA-8–9.) Judge Oetken also held that scienter could not be inferred from Defendants' post-Class Period statements because, among other things, those statements were made "long after the alleged misrepresentations." (SPA-10.) Judge Oetken also held that Cuss's departure did not support a strong inference of scienter because Plaintiffs "pleaded no specific 'facts [that] indicate that the resignation was somehow tied to the fraud alleged.'" (SPA-10–11 n.4.) Finally, Judge Oetken rejected Plaintiffs' core operations theory because Plaintiffs did not allege that Opdivo was "essential to [BMS's] survival." (SPA-9 n.3.)

Importantly, Judge Oetken held that "[e]ven if the Court assumes the existence of a fixed usage of 'strong'" PD-L1 expression, Plaintiffs failed to plead a strong inference of scienter. (SPA-8.) Judge Oetken explained that Plaintiffs cited "no publication, guidance, communication, document, or other specific source of information that could have alerted Defendants, at the time of the alleged misrepresentations, to an industrywide consensus that 'strong' PD-L1 expression was inconsistent with a 5% cut-off." (SPA-8–11.)

13

**B.      Judge Vyskocil Dismisses This Case for the Second Time.**[5]

On October 29, 2019, Plaintiffs filed the SAC.  The SAC alleged the same misstatements but added a few new allegations to try to plead scienter.  First, the SAC included the opinion of a purported expert, Dr. Ronald Blum, who conclusorily asserted that there existed an "industrywide consensus" as to "strong" PD-L1 expression based on his experience and articles cited in the SAC.  (SAC ¶¶ 85, 97, 116-121, 137, 192.)  Second, Plaintiffs attributed allegations to supposed former BMS employees, who did not even mention the term "strong" PD-L1 expression.  (*Id.* ¶¶ 52, 71-72, 87-88, 90.)  Third, Plaintiffs cited additional BMS trials aimed at treating different cancers that used different PD-L1 cutoffs than CM-026.  (*Id.* ¶¶ 57, 58, 61, 95.)  Fourth, Plaintiffs newly alleged that other industry participants, such as Nektar, noted Merck's use of "strong" PD-L1 expression.  (*Id.* ¶¶ 65-66, 69.)  Fifth, Plaintiffs calculated net profits for the same stock sales that Judge Oetken held were insufficient.  (*Id.* ¶ 264; SPA-6–8.)  Last, Plaintiffs alleged Defendant Giordano's departure from BMS was "abrupt," without pleading how his departure was linked to the alleged fraud.  (*Id.* ¶ 280.)

Judge Vyskocil dismissed the SAC in full and with prejudice on two independent grounds, holding that Plaintiffs both failed to plead a strong inference of scienter and failed to plead any material misstatement or omission.  (SPA-18, 29.)

---

[5]      The case was reassigned to Judge Vyskocil on February 5, 2020.  (JA-15.)

Judge Vyskocil first rejected Plaintiffs' allegations that certain Defendants' stock sales supported a motive to defraud because the selling Defendants "sold the same overall percentage of the stock they owned before and during the class period" (SPA-25), "the vast majority of the trades in question were made pursuant to Rule 10b5-1 stock plans" (SPA-25), and Plaintiffs "omitted information regarding the Defendants' total holdings" (SPA-26).

Next, Judge Vyskocil rejected Plaintiffs' circumstantial allegations. First, Judge Vyskocil held that the allegations attributed to the former employees did "not add anything new to the case" because those allegations were "insufficient to prove anything other than Merck's definition of 'strong.'" (SPA-21.) Second, Judge Vyskocil found that Plaintiffs' purported expert could not establish an industry standard for "strong" PD-L1 expression because an expert's opinion alone is insufficient to state a claim and Blum's "conclusion may be refuted by other evidence in the [SAC]." (SPA-22.) Judge Vyskocil added that even if Blum's opinion was taken at face value, "Plaintiffs have not alleged how or when an industry understanding reached BMS." (SPA-23.) "Considering all of the allegations together … the [District] Court again conclude[d] that Lead Plaintiffs have not alleged a compelling inference of scienter based on Defendants' conscious misbehavior or reckless conduct." (SPA-24.)

15

The District Court next concluded that Plaintiffs failed to plead an actionable misstatement or omission. At bottom, Judge Vyskocil held that Plaintiffs "have not alleged facts sufficient to suggest that there was an industry standard definition" of "strong" PD-L1 expression that rendered Defendants' statements misleading. (SPA-27–29.) Judge Vyskocil dismissed the SAC with prejudice. (SPA-30.)

## SUMMARY OF THE ARGUMENT

The District Court's decisions dismissing the complaints below should be affirmed. First, the District Court correctly held that Plaintiffs failed to meet the heightened pleading standards under the PSLRA and Rule 9(b), which require Plaintiffs to allege exactly why Defendants' statements were false or misleading, without rely on conclusory or contradictory allegations to do so. Plaintiffs tried (but failed) to allege adequately some industry-wide consensus for "strong" PD-L1 expression that was inconsistent with Defendants' usage. Further, their own allegations confirm that there was no generally-accepted meaning of "strong" PD-L1 expression. (*Infra* I.B.) The District Court also considered and properly rejected Plaintiffs' baseless omissions claims. (*Infra* I.C.) Many of Defendants' statements were otherwise inactionable opinions, puffery, or forward-looking statements. (*Infra* I.D.)

Second, Plaintiffs' pleadings failed to raise the required strong inference of scienter. Plaintiffs' allegations that certain stock sales support Defendants' motive

to defraud are wholly wanting. Plaintiffs do not allege any stock sales by two of the six Individual Defendants, which undermines Plaintiffs' claim that *any* Defendant acted with the requisite intent. Moreover, Defendants' trading before and during the Class Period remained nearly identical, and each of the four Defendants who did trade increased their overall holdings from the start of the Class Period to August 5, 2016 (when BMS disclosed CM-026's cutoff). These, among other reasons, foreclose Plaintiffs' motive allegations. (*Infra* II.A.)

Likewise, Plaintiffs failed to meet the scienter requirement with their efforts to argue conscious misbehavior or recklessness. On appeal, Plaintiffs claim that the District Court failed to consider the post-Class Period statements by Defendants (even though these statements were rejected by Judge Oetken), innocuous former employee testimony, Defendants' alleged involvement in developing supposed industry standards, the market's reaction to the results of CM-026, and the departures of Cuss and Giordano. None of these allegations support an inference that Defendants acted in a "highly unreasonable" manner in describing CM-026's focus on "strong" PD-L1 expression because Plaintiffs fail to plead with particularity facts giving rise to a strong inference that Defendants specifically knew that "strong" PD-L1 expression could not be ≥5%. (*Infra* II.B.)

Considered holistically, the only compelling inference is that Defendants designed CM-026 as they saw fit and "earnestly want[ed the study] to succeed."

17

(SAC ¶ 274.)  Like many pharmaceutical companies, BMS chose not to disclose the primary endpoint of CM-026 for legitimate competitive reasons and told the market as much.  That is not securities fraud.  (*Infra* II.C.)

The District Court's dismissal should be affirmed for these reasons and because Plaintiffs did not sufficiently plead loss causation.  (*Infra* III.)

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS DID NOT PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION.

As the District Court correctly held, Plaintiffs do not allege any generally-accepted meaning for "strong" PD-L1 expression, that BMS's use of a 5% cutoff for CM-026 was inconsistent with any such standard, or any other basis to plead falsity.  (SPA-30.)

### A. Applicable Law.

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and [Rule] 9(b) by stating with particularity the circumstances constituting fraud."  *ECA*, 553 F.3d at 196.  Among other elements, Plaintiffs must adequately allege a misstatement or omission by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  *ATSI*, 493 F.3d at 99.

The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman v. Elan Corp., Plc.*, 706 F.3d 145, 152 (2d Cir. 2013). "It bears emphasis," however, that the securities laws "do not create an affirmative duty to disclose any and all material information." *Id.* Instead, "[d]isclosure is required only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* at 153.

The securities laws are not "a tool to second guess how clinical trials are designed and managed." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *1 (S.D.N.Y. Feb. 14, 2014); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). As such, "[t]he Second Circuit has emphasized that in scrutinizing a section 10(b) claim, a court does not judge the methodology of a drug trial." *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *6 (S.D.N.Y. May 29, 2013) (citing *Kleinman*, 706 F.3d at 154-55).

### B. The SAC Does Not Sufficiently Plead That Defendants' Use of the Term "Strong" PD-L1 Expression Was False or Misleading.

Plaintiffs claim that Defendants' statements describing CM-026's focus on "strong" PD-L1 expression were false or misleading because the 5% cutoff that BMS used for CM-026 was inconsistent with a generally-accepted meaning of that term. (SAC ¶ 8; Br. at 30.) The District Court correctly held that Plaintiffs failed to plead

sufficiently any such common definition. (SPA-27.) Plaintiffs' arguments on appeal fail.

1. *The District Court Correctly Held That Plaintiffs Were Required to Plead Adequately that Defendants' Use of "Strong" was False or Misleading.*

The District Court correctly concluded that Plaintiffs failed to plead adequately that the term "strong" PD-L1 expression was inconsistent with a 5% cutoff. Contrary to what Plaintiffs would have this Court believe (Br. at 37), the District Court did not invent some new pleading requirement. Instead, Plaintiffs were held to the same standard as all securities fraud plaintiffs: under the rigorous standards of the PSLRA and Rule 9(b), they had to plead exactly why Defendants' statements were false. Plaintiffs did not come close to meeting that standard.

Plaintiffs did not allege that Defendants' use of the term "strong" PD-L1 expression was false based on a theory that Defendants themselves had "define[d] [strong PD-L1 expression] in such a way as to exclude" Defendants' definition of that term in discussing CM-026. *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 571 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019). As Judge Oetken correctly held, "Plaintiffs d[id] not allege that Bristol-Myers took the categorical position, in any prior study, that the term 'strong' *compelled* a cut-off of more than 5%." (SPA-10 (emphasis original); *see also* SPA-27 (Plaintiffs failed to

allege that Defendants "agreed with Plaintiffs' supposed definition before speaking").)

Unable to allege that Defendants' use of the term "strong" PD-L1 expression in CM-026 contravened Defendants' definition of that term, Plaintiffs attempted to plead falsity by claiming that "strong" PD-L1 expression meant something specific to the industry that was inconsistent with BMS's definition in CM-026. Under this theory, Plaintiffs needed to adequately allege the existence of a generally-accepted definition for "strong" PD-L1 expression and that Defendants' statements contradicted that standard.

For example, in *In re Eros International Securities Litigation*, the plaintiffs argued that a company's statements claiming growth of its "registered users" were misleading. 2017 WL 6405846, at *4 (S.D.N.Y. Sept. 22, 2017), *aff'd sub nom. Eisner v. Eros Int'l PLC*, 735 F. App'x 15, 16 (2d Cir. 2018). Judge Nathan dismissed the complaint, holding that those statements were not actionable because, in part, plaintiffs failed to plead "a shared definition of the term 'registered users.'" *Id.* at *5.[6] Similarly, the plaintiffs in *Abely* challenged the defendants'

---

[6]     Plaintiffs argue that *Eros* is inapposite because "the court's dismissal did not turn on resolving [any] 'semantic battle.'" (Br. at 36.) True, the *Eros* court did not decide the correct definition for "registered users." But Plaintiffs miss the point: the court in *Eros* held that the plaintiffs failed to plead a misstatement precisely because they failed to allege adequately a standard definition of the term. *Eros*, 2017 WL 6405846, at *5.

characterization of a clinical trial as "double-blind." *Abely*, 2013 WL 2399869, at *6. Judge Castel dismissed the complaint because, without allegations that the defendants' use of the phrase "double-blind" contravened "a generally accepted standard," defendants' statements "could not have been false or misleading when made." *Id.* at *7-8; *In re Adolor Corp. Securities Litigation*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009) (same); *see also Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *8 (N.D. Cal. Apr. 30, 2015) (dismissing securities claim based on supposed industry meaning of "de-risk" where "the articles plaintiffs cite[d] in support of their definition contradict the assertion that the term 'de-risk' has a precise meaning").

Having failed to plead adequately a generally-accepted definition for "strong" PD-L1 expression, Plaintiffs argue that "trade usage" "is a question of fact, to be determined by the trier of fact." (Br. at 39.) This argument is unsupported by the one case Plaintiffs cite, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107 (2d Cir. 2006) (Br. at 39), and, if accepted, would eviscerate Congress's carefully crafted pleading standards set forth in the PSLRA.

Plaintiffs' reliance on *SR International* is misplaced. First, that case was a contract dispute concerning the meaning of the term "occurrences" in certain insurance contracts. *Id.* at 113. Contract disputes require interpretation of each relevant contractual term; at the pleading stage, courts either interpret those terms as a matter of law or find them ambiguous and interpret the terms with extrinsic

evidence later on. But this is a securities fraud action. The Court need not interpret the precise meaning of "strong" PD-L1 expression, nor does contract law apply. Instead, to survive dismissal, *Plaintiffs* needed to plead adequately why Defendants' use of that term was false under the heightened pleading standards. Plaintiffs failed to do so.

Second, even if contract law were relevant here (it is not), *SR International* does not stand for the proposition that all industry usage issues must be submitted to a trier of fact. Instead, this Court recognized that, "[a]s is the case with all factual questions[,] evidence of the existence of custom and usage can be insufficient to warrant submission of the question to the jury." *SR Int'l*, 467 F.3d at 113. *In re Dynagas LNG Partners LP Sec. Litig.*, 2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020), is instructive. There, the court dismissed a securities claim predicated on defendants' use of the term "cash flow," which plaintiffs claimed was "inconsistent with common usage." *Id.* at *15. The plaintiffs argued that common usage was "not appropriately decided on a motion to dismiss," but the court was not swayed: plaintiffs' allegations of fact were insufficient to survive dismissal. *Id.* Here too, under the searching standards of the PSLRA, the District Court correctly concluded that Plaintiffs failed to allege facts sufficient to support their conclusory assertion that Defendants' use of "strong" PD-L1 expression contradicted some generally-understood meaning of that term.

Pragmatic considerations confirm that Plaintiffs' argument is meritless. Congress enacted the PSLRA's heightened pleading standards "to curb perceived abuses of the § 10(b) private action." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007). If securities plaintiffs could survive dismissal and get a jury trial merely by making conclusory allegations that a term used by the defendant had some other generally-understood meaning contradicting defendants' usage, then the PSLRA pleading standard would be for naught. That is not the law, and for good reason.

Finally, Plaintiffs argue that the District Court erred in demanding "uncontroverted proof of an industry standard." (Br. at 24; *see also id.* at 37, 48.) Plaintiffs do not cite to any portion of the District Court's opinion requiring such "proof." The District Court found that Plaintiffs alleged an industry standard "only through Dr. Blum" and held that the "[f]ailure to provide some other industry publication, guidance, or other evidence of such a standard, in addition to the expert testimony, is legally insufficient." (SPA-22.) Without more, the District Court could not conclude that the SAC satisfied applicable pleading standards.

2. *The District Court Correctly Concluded that the SAC Does Not Contain Non-Conclusory Allegations of an Industry Standard.*

Plaintiffs allege that by the beginning of the Class Period, "the industry understood that (i) 'strong' was ≥50% expression; [and] (ii) 5% was weak, minimally positive expression." (Br. at 30.) After considering Plaintiffs' allegations

24

as a whole, the District Court correctly found that Plaintiffs failed to plead that a 5% cutoff was inconsistent with any supposed industry consensus.  (SPA-27–28.)

> a.  Plaintiffs Fail to Plead Adequately a Generally-Accepted Definition for "Strong" or "Weak" PD-L1 Expression.

Plaintiffs throw a scattershot of allegations against the wall in an attempt to demonstrate a consensus that "5% PD-L1 expression was weak, or minimal positivity of PD-L1 expression, and that 50% PD-L1 expression was 'strong' PD-L1 expression."  (SAC ¶ 66.)  However, as the District Court correctly held, the Complaint alleges nothing more than that Merck defined "strong" as ≥50% PD-L1 expression in Merck's KN-024 trial.  (SPA-21, 28.)

First, Plaintiffs' conclusory allegations that "the 'strong' 50% level used by Merck [was] adopted by the industry, and co-opted by Defendants" lack factual support.  (Br. at 30; SAC ¶¶ 10, 65.)  BMS's use of "strong" PD-L1 expression with regard to CM-026 *predated* Merck's announcement of its KN-024 trial by about four months, so BMS could not have "co-opted" Merck's definition.  And BMS went a step further by informing investors during the Class Period that CM-026's definition of "strong" PD-L1 expression was different from, and lower than, Merck's KN-024 definition once Merck announced its cutoff for KN-024.  (SAC ¶ 112.)  More fundamentally, Plaintiffs do not allege with particularity how Merck's definition in one clinical trial for its own drug dictated industry standards.  Nor do Plaintiffs allege that Defendants acknowledged Merck's definition as controlling.  As Judge Oetken

found, "[a]t best, the Merck study could have informed Defendants only of *Merck's* definition of 'strong' PD-L1 expression, and only in the context of a particular study." (SPA-10 (emphasis original).) That is not enough to state a claim.

Second, the SAC cites to select articles and other clinical trials to allege an industry-wide standard for PD-L1 "strong" and "weak" or "positivity." (SAC ¶¶ 108, 159, 237.) But many of these articles contradict Plaintiffs' allegation of an industry standard, and none support Plaintiffs' claim. For example, Plaintiffs' own source—published nearly 16 months after the start of the Class Period—acknowledges that the "best cut-off percentage" for "PD-L1 positivity ... ***remains an unresolved question***." (*Id.* ¶ 54.) Another article from March 2015, also cited by Plaintiffs, reported that "***there is no consensus about the definition of positivity of PD-L1***." (JA-1256; *supra* p. 7 (additional contradictions).) And contrary to Plaintiffs' claim that BMS "established the industry standard of 5% PD-L1 expression as the bare minimum for positivity" (SAC ¶ 56), the SAC alleges that BMS defined PD-L1 positivity at lower cutoffs, including using 1% to define PD-L1 positivity in CM-026 (*id.* ¶¶ 108, 159; *see also id.* ¶¶ 55, 95 (BMS studies defining PD-L1 positivity as ≥1%)), and BMS never used the term "mere," "minimal," or "weak" positivity to describe 5% expression.

Importantly, not one of the publications Plaintiffs cite to indicates that "strong" PD-L1 expression compelled a cutoff of 50%, or that "strong" PD-L1

expression could not mean 5% expression.  At best, the sources cited by Plaintiffs note Merck's use of 50% to define "strong" PD-L1 in the KN-024 trial.[7]

As the District Court recognized, Plaintiffs' allegations tend to "defeat[]" Plaintiffs' arguments.  (SPA-28.)  Plaintiffs allege that, "at all relevant times, the industry for PD-1 checkpoint inhibitors was new, [and] rapidly evolving."  (SAC ¶ 232.)  This is inconsistent with Plaintiffs' allegation that an industry standard was established "[b]y the start of the Class Period."  (*Id.* ¶ 63; Br. at 3.)  Indeed, Plaintiffs themselves cannot make up their mind on what "strong" PD-L1 expression meant even after Merck announced the cutoff for KN-024, shifting from alleging that "strong" PD-L1 meant a 50% cutoff (*e.g.*, SAC ¶¶ 3, 8), to "at the very least, levels above 25%" (*id.* ¶¶ 108, 121), and to "at least 10%" (*id.* ¶¶ 113, 123).

Plaintiffs also contradict themselves by pleading that Defendants planned to "participate in the efforts to harmonize PD-L1 expression assays" during the Class Period.  (*Id.* ¶ 233.)  If industry participants could not agree on the methodology for measuring PD-L1 expression at the time of the alleged misstatements, there could

---

[7]    (*See* SAC ¶ 65 ("[D]escrib[ing] Merck's findings as concerning 'patients with strong PD-L1 expression (≥50% staining)'"); JA-1262 (cited in SAC ¶ 66) (describing "strong expression (staining ≥50%)" for Merck's "MK3475" study); JA-1270 (cited in SAC ¶ 67) (noting that Merck's Keytruda trial defined "strong" as greater than 50% and "weak" as 1-49%); JA-1937 (cited in SAC ¶ 68) (discussing "weak" and "strong" expression as used in a Merck Keytruda study).)

be no industry consensus concerning the meaning of "strong" or "positive" PD-L1 expression. (SPA-23.)

On appeal, Plaintiffs argue that the District Court erred by "not cit[ing] any record evidence showing there was no industry understanding" and not "cit[ing] any facts contradicting the expert opinions of Dr. Blum." (Br. at 37-38.) As discussed above, the SAC and materials it incorporates contradict Plaintiffs' purported expert, so this is inaccurate. But Plaintiffs have it backward. The District Court was not required to find the absence of an industry standard in order to conclude that Plaintiffs failed to plead falsity. Nor was the District Court required to accept the opinion of a purported expert in lieu of well-pleaded facts. (*Infra* I.B.2.b.) Instead, it is Plaintiffs' burden to plead adequately why Defendants' use of the term "strong" PD-L1 expression was false or misleading. Plaintiffs failed to do so.[8]

---

[8]      *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) and *Micholle v. Ophthotech Corp.*, 2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019) are inapposite. (Br. at 30-31.) In *Newlink*, this Court found that the defendants' "categorical proposition" that pancreatic cancer patients do not have survival rates longer than 20 months, which *defendants* represented was based on "'all the major [American] studies' from 'the last 30 years,'" was false because, among other things, there were "'major' studies … includ[ing] six American studies that showed survival rates" exceeding 20 months. 965 F.3d at 172. Here, Defendants never took any categorical position on PD-L1 expression levels or claimed that BMS's definition of "strong" PD-L1 was based on "all the major [American] studies." *Id.* Rather, Defendants made clear that BMS was using its own definition for CM-026, which definition was different from Merck's. (*E.g.*, SAC ¶ 189.) In *Ophthotech*, the plaintiff alleged that defendants changed the key enrollment criteria for a clinical trial despite publicly claiming they had "changed nothing." 2019 WL 4464802, at *11-12. Nothing similar is alleged here.

b.  The District Court Properly Held That Blum's Opinion Added Nothing.

In the SAC, Plaintiffs added allegations from a purported expert who asserted that, "[b]ased on his review of source documents referenced in the Complaint" and his "practical and academic expertise," the industry viewed 5% PD-L1 expression as "low or minimal PD-L1 expression" and used "'strong expression' to denote a level closer or equal to 50% expression."  (Br. at 14.)  But Plaintiffs cannot circumvent the PSLRA pleading standard by relying only on a purported expert's opinion.  *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 645 (2d Cir. 2015) (affirming dismissal of securities claim bolstered only by an "expert's conclusory statement" as to the existence of an industry practice); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (expert opinions "cannot substitute for facts under the PSLRA"); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 223 (S.D.N.Y. 2018) (same).[9]  As the District Court correctly found, Plaintiffs allege the existence of a generally-accepted meaning of "strong" PD-L1 expression "only through Dr. Blum," which is insufficient under the PSLRA.  (SPA-22.)

---

[9]     Not one of Plaintiffs' cited cases—each concerning the *admissibility* of expert opinions on "practices and usage of a trade"—addresses the sufficiency of a purported expert's opinion at the pleadings stage in a case like this governed by the heightened pleading standards of the PSLRA and Rule 9(b).  (Br. at 38-39.)

On appeal, Plaintiffs claim that the District Court "erred as a matter of law in discounting Plaintiffs' expert's conclusions" and in doing so "erected a heightened pleading standard." (Br. at 38.) Of course, Congress erected the heightened pleading standard applicable to Plaintiffs' claims by enacting the PSLRA, and the District Court correctly applied that standard. Plaintiffs' arguments to the contrary have no merit.

The District Court did not erroneously fail to consider Blum's opinion (Br. at 39) but instead correctly held that such allegations alone are insufficient. As discussed above, expert opinions cannot substitute for well-pleaded factual allegations under the PSLRA. *Blackwell*, 440 F.3d at 285-86. Otherwise, securities plaintiffs could survive dismissal by hiring a purported "expert" to rehash their legal theory. Applying the correct standards here, the District Court held that, "even accepting as true [Blum's] assertion that such a standard existed," Plaintiffs alleged evidence of an industry standard "only through Dr. Blum," and the "[f]ailure to provide some other industry publication, guidance, or other evidence of such standard, in addition to expert testimony, is legally insufficient." (SPA-22.)[10]

---

[10] As discussed below, Plaintiffs concede that Blum's opinion cannot be imputed to Defendants (*see* JA-1797); thus, even assuming Blum alone could support Plaintiffs' allegations of an industry-wide standard, Blum cannot support Plaintiffs' allegations of Defendants' scienter. (*Infra* II.)

The District Court also correctly found that Blum's "conclusion may be refuted by other evidence in the [SAC]." (SPA-22); *see Koncelik v. Savient Pharm., Inc.*, 2010 WL 3910307, at *5 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 448 F. App'x 154 (2d Cir. 2012) ("[P]laintiff cannot premise their claims on allegations flatly contradicted by such incorporated documents."). As explained above, numerous allegations in the SAC directly contradict the supposed industry-wide consensus that Blum claimed to identify, as do multiple sources incorporated by reference into the SAC. Notably, Plaintiffs do not identify a single source affirmatively describing an industry-wide definition of "strong" PD-L1 expression contradicting BMS's usage.[11] After considering all of Plaintiffs' allegations—including Blum's opinion—the District Court appropriately dismissed this case.

---

[11] Notably, Blum's opinion is based on his "review of the documents cited in the [SAC]." (Br. at 28.) Because, at best, Plaintiffs' articles cited in the SAC merely discuss Merck's definition of "strong" PD-L1 expression (*infra* n.7), Blum's opinion adds nothing.

c.     <u>Plaintiffs Waived Any Objection to the District Court's Consideration of the Nektar Presentation and, in Any Event, the District Court Did Not Abuse Its Discretion in Considering It.</u>

The October 8, 2015 Nektar Presentation, incorporated by reference into the

SAC (SAC ¶¶ 69, 246), compared five companies' checkpoint inhibitor drugs:

| | MERCK | Bristol-Myers Squibb | AstraZeneca MedImmune | Roche | Pfizer MERCK |
|---|---|---|---|---|---|
| **Lead Rx asset** | Pembrolizumab KEYTRUDA (anti-PD-1) | Nivolumab OPDIVO (anti-PD-1) | Durvalumab (anti-PD-L1) | Atezolizumab (anti-PD-L1) | Avelumab (anti-PD-L1) |
| **Diagnostic partner** | Dako | Dako | Ventana | Ventana | Dako |
| **Clones** | 22C3 | 28-8 | SP263 | SP142 | ? |
| **Machines Utilized** | Link 48 | Link 48 | BenchMark ULTRA | BenchMark ULTRA | ? |
| **Compartment** | TM | TM | TM | TC/IC | ? |
| **Variables** | % of cells | % of cells | % of cells | % of cells | ? |
| **Definition of positive** | PD-L1(+): >1% Strong(+): >50% | PD-L1(+): >1% Strong(+): >5% | PD-L1(+): ≥25% | TC / IC 3(+) TC / IC 2(+) TC / IC 1(+) TC / IC 0(−) | ? |
| **Approved** | | | | | |

(JA-1934.)

Consistent with many other allegations and materials incorporated by

reference into the SAC, the Nektar Presentation contradicts Plaintiffs' case.  Nektar

noted Merck's definition of "strong" PD-L1 expression as 50% alongside BMS's

definition of that same term as 5%.  As the District Court recognized, that supports

the inference that "almost two years into the CM-026 trial, the industry had not yet

settled on any standard" for "strong" or "positive" PD-L1 expression.  (SPA-24.)

32

And while Plaintiffs allege that "5% expression represented the minimum level of positivity" (Br. at 11)—the Nektar Presentation shows that even Merck defined PD-L1 positive as 1% for some purposes.[12]

For the first time on appeal, Plaintiffs argue that the District Court erred in considering the Nektar Presentation because Plaintiffs now claim that it was evidence beyond the SAC (Br. at 41) and that the District Court considered it "for the truth" (*id.* at 45). These arguments fail.

*First*, as a threshold matter, Plaintiffs waived any argument that the Nektar Presentation should not be considered. "[A]n appellate court will not consider an issue raised for the first time on appeal." *Keshner v. Nursing Personnel Home Care*, 794 F.3d 232, 234-35 (2d Cir. 2015). Here, Plaintiffs did not object to Defendants' use of the Nektar Presentation before Judge Vyskocil despite having ample opportunity to do so. While the Nektar Presentation was submitted as an exhibit on reply, it was incorporated into the SAC so is properly considered part of Plaintiffs' complaint and, further, Defendants were responding to Plaintiffs' opposition arguments relying on Nektar's presentation.[13] (JA-1906 (quoting JA-1792); *see also*

---

[12]    Plaintiffs argue that the Nektar Presentation only concerns "diagnostic assays." (Br. at 45.) But those assays are "used to evaluate PD-L1 expression for [BMS's] studies," so this is not a meaningful distinction. (*Id.* at 45-46.)

[13]    "[R]eply papers may properly address new material issues raised in the opposition papers…." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000).

JA-1788 (Plaintiffs arguing that "other BMS competitors"—i.e., Nektar—purportedly "adopt[ed] Merck's definition" (citing SAC ¶ 69)), JA-1805 (similar).) If Plaintiffs took issue with consideration of the presentation, Plaintiffs needed to raise that argument below, which they could have done easily by asking for leave to file a sur-reply (or moving to exclude Defendants' exhibit). *Bayway*, 215 F.3d at 227 (by not moving "for leave to file a sur-reply," appellant "failed to seek a timely remedy for any injustice" caused by consideration of reply affidavit). Plaintiffs also did not object to consideration of the Nektar Presentation months later at oral argument, during which Defendants discussed the Presentation again. (JA-1998-99.) After oral argument, Plaintiffs wrote to Judge Vyskocil regarding purported supplemental authority (JA-15), but again made no mention of the Nektar Presentation. Simply put, Plaintiffs had ample notice of Defendants' use of the Nektar Presentation and did not object below. Thus, the argument was waived. *E.g.*, *Springer v. Wells Fargo Bank, N.A.*, 784 F. App'x 721, 726 (11th Cir. 2019) (appellants' argument that the court "improperly took judicial notice of [certain] documents [wa]s waived because they failed to object" below); *Roy v. Contra Costa Cty.*, 694 F. App'x 536, 537 (9th Cir. 2017) (same).

Although Plaintiffs now claim that "there is a dispute regarding the 'authenticity[, relevance,] or accuracy of the document,' which the district court could not resolve" (Br. at 44), Plaintiffs' waiver is the reason it was not resolved

below. Plaintiffs did not raise any such argument with the District Court, and thus any authenticity dispute was also waived. *Stiel v. Heritage Numismatic Auctions, Inc.*, 816 F. App'x 888, 892 (5th Cir. 2020). Regardless, the Nektar table is clearly relevant and there is no serious dispute as to the Presentation's authenticity; it remains available on Nektar's website at https://ir.nektar.com/static-files/df53a5b3-3b93-4b51-a684-f8b62548549a.[14]

*Second*, the District Court did not abuse its discretion finding the Nektar Presentation was incorporated by reference into the SAC. For a document to be incorporated by reference, the complaint must make a "clear, definite and substantial reference" thereto. *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020).[15] Here, the SAC makes a "clear, definite and substantial reference to" the Nektar Presentation. *Id.*; SAC ¶¶ 69, 246 ("[I]n a presentation on October 8, 2015, competitor Nektar spoke about Keytruda's application for the 'subset of high PD-L1 expression of more than 50%.'"). This was no mere passing reference; it was one of Plaintiffs' few substantive additions to the SAC after Judge Oetken dismissed the FAC and was relied on in Plaintiffs' opposition briefing. (*E.g.*, JA-1788; JA-1792,

---

[14]    Given that the Nektar Presentation is publicly available on Nektar's website, judicial notice is also appropriate. *23-34 94th St. Grocery Corp. v. New York City Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012).

[15]    Contrary to Plaintiffs' claim (Br. at 42), the document need not be attached to a complaint to be incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

JA-1805.)

Plaintiffs argue that, despite explicitly referring to Nektar's "presentation on October 8, 2015" in SAC ¶¶ 69 and 246, the referenced quotation therein was from a "transcript of remarks made at the [investor] conference where the Nektar [Presentation] was purportedly used." (Br. at 44.) Again, Plaintiffs waived any such argument. In any event, Plaintiffs' effort to separate what they now characterize as a transcript from the slides used in what was being transcribed makes no sense, as the former would be part and parcel of the latter. The purpose of the doctrine of incorporation by reference is to prevent plaintiffs from "quot[ing] only selected and misleading portions" of materials referenced in the complaint. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). By citing Nektar's October 5, 2018 presentation as one of the few new allegations in the SAC, Plaintiffs incorporated the presentation into the SAC. Plaintiffs cannot preclude the Court from considering its full contents. *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 674 n.2 (2d Cir. 2009) (hearing statement and testimony "incorporated by reference" where complaint referred to hearing).

*Third*, Plaintiffs claim that the District Court erred in considering the Nektar Presentation for "the truth." (Br. at 45.) But incorporated materials are considered "part of the complaint"; district courts "may assume that [their] contents are true for purposes of a motion to dismiss." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.

2006); *see also, e.g.*, *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750 (2d Cir. 2020) (considering contents of "documents incorporated by reference" to reach conclusion on purpose of company's task force). Even if the District Court considered the Nektar Presentation for the truth of its contents, that was not inappropriate.

In fact, the District Court did not consider the Nektar Presentation for "the truth" of its contents. The Nektar Presentation relayed different industry definitions for "strong" and "positive" PD-L1 expression. (JA-1934.) The District Court did not decide which was correct. Instead, Judge Vyskocil recognized the Nektar Presentation for what it was: that industry participants discussed different cutoffs for PD-L1 expression, which "seems to contradict … Plaintiffs' arguments about the existence of an industry standard." (SPA-24.) The District Court considered the table "to determine what the documents stated." (Br. at 44.)[16]

Finally, even if the District Court erred in considering the Nektar Presentation (which it did not), any such error was harmless. This Court may affirm even if a district court improperly considered extrinsic material where the complaint does not

---

[16] The District Court did not, as Plaintiffs claim, "credit[] the Nektar Presentation as a conclusive fact." (Br. at 45.) Rather, after considering all of the SAC's allegations, the District Court correctly held that "Plaintiffs have not alleged facts sufficient to suggest that there was an industry standard definition" of "strong" or "positive" PD-L1. (SPA-27.)

37

otherwise state a claim. *Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) ("Even if we found error" in the district court's consideration of allegations outside complaint, "the error would not disadvantage [appellant].");[17] *see also Dolgaleva v. Virginia Beach City Pub. Sch.*, 364 F. App'x 820, 826 (4th Cir. 2010) (reliance on materials outside the pleadings is "harmless … if the complaint would not have withstood the motion to dismiss on its face"). Here, setting aside the Nektar Presentation, Plaintiffs' own allegations and numerous other materials incorporated into the SAC (whose incorporation is not challenged) contradict Plaintiffs' conclusory assertion of an industry standard. (*E.g.*, *supra* p. 7.) Even excluding the Nektar Presentation, Plaintiffs' case falls far short.

## C.   Plaintiffs Failed to Plead an Actionable Omission.

The District Court correctly held that Defendants did not have a duty to disclose the PD-L1 cutoff for CM-026. (SPA-28–29.) On appeal, Plaintiffs argue that withholding the specific cutoff for CM-026 is an actionable omission because "the market understood ['strong'] to mean something far different" than 5%. (Br.

---

[17]   In *Reliance Insurance*, this Court distinguished Plaintiffs' authority, *Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) (Br. at 43), for many of the same reasons consideration of the Nektar Presentation does not warrant vacatur here. For example, both here and in *Reliance Insurance*, the appellant "knew" the supposedly "additional factual considerations were being considered," had an opportunity to respond, and "did not object." 474 F.3d at 57.

at 32.)   That argument fails because Plaintiffs failed to plead a common understanding for "strong" PD-L1 expression.  (*Supra* I.B.2.)

Defendants also did not have a duty to disclose the cutoff for CM-026 in the first place.  Defendants are not required to disclose a fact "merely because a reasonable investor would very much like to know that fact."  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014).  Instead, liability for not disclosing the cutoff only could accrue if there was an independent duty to disclose.  *Kleinman*, 706 F.3d at 153.  No such obligation existed.  Defendants made clear throughout the Class Period that they would not disclose the specific cutoff for "strong" PD-L1 expression (SAC ¶¶ 136, 198) and, after Merck disclosed its PD-L1 definition for KN-024 in February 2016, Defendants informed the market that CM-026's cutoff for "strong" PD-L1 was "lower than 50%" (*id.* ¶ 112).  Reasonable investors would have understood Defendants' statements to mean what they said:  Defendants were not going to disclose how BMS was defining "strong" PD-L1 expression for CM-026, but the cutoff was less than 50%.

Plaintiffs argue that "Defendants here did not tell the 'whole truth'" because, according to Plaintiffs, "[i]nvestors reasonably understood … that 'strong' meant at least more than the most commonly understood bare minimum" for PD-L1 expression, and "did not dramatically depart from the definition widely promulgated by ... Merck."  (Br. at 35.)   Plaintiffs fail to allege sufficiently either of those

39

supposed factual bases.  As Judge Vyskocil explained, because Plaintiffs "failed to allege [] an industry standard" for "strong" PD-L1 expression, "no reasonable investor would have any particular understanding of those terms in light of Merck's usage."  (SPA-28; *supra* I.B.2.)

Defendants also did not incur a duty to update or correct their statements. Such duties may apply where subsequently discovered information, or subsequent events, render a prior statement false or misleading.  *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109-10 (2d Cir. 1998).  Statements describing CM-026's primary focus on "strong" PD-L1 expressers were not false or misleading when made, and no subsequent information or event rendered such statements false or misleading. Merck's announcement of KN-024's cutoff did not render Defendants' prior statements about the BMS trial false or misleading (Br. at 32); Defendants specifically told the market that BMS's definition was lower than Merck's (SAC ¶ 112).  And again, Plaintiffs fail to allege that Merck's definition somehow dictated industry standards.  (SPA-28.)

Plaintiffs are also wrong in claiming that Defendants were required to disclose the cutoff for CM-026 in order "to correct analysts."  (Br. at 32.)  There is no duty to correct predictions made by third-party analysts.  *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011) (liability only extends to the "maker of a statement").  If Plaintiffs' view of the law were correct (it is not), analysts could

40

force disclosure of confidential information through mere speculation. Moreover, other analysts like Alliance Bernstein (JA-1282) and Goldman Sachs (JA-1296, JA-1303, JA-1313) correctly predicted the PD-L1 cutoff for CM-026, belying Plaintiffs' allegation that Defendants' statements created a "false impression" (Br. at 16).

### D. Many Statements Are Non-actionable as a Matter of Law.

The District Court correctly held that many challenged statements were "non-actionable forward looking statements or opinion." (SPA-29.)

First, forward-looking statements are protected where accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5. Yet Plaintiffs challenged numerous forward-looking statements concerning CM-026's likelihood of success (SAC ¶¶ 173, 179, 186, 189, 193), even though they were accompanied by meaningful cautionary language. For example, BMS warned:

> The announcement of data from our clinical studies … related to our late-stage immuno-oncology compounds, such as [Opdivo], is likely to cause significant volatility in our stock price. [T]he announcement of any negative or unexpected data [for] our key immuno-oncology compounds[] … will likely cause our stock price to decline significantly.…

(JA-1566.) Plaintiffs argue that Defendants' warnings were insufficient because they did not disclose the known risk of "[CM-026's] 5% PD-L1 expression cutoff." (Br. at 47.) But the "risk" was that CM-026 may not be successful, not the trial's parameters. The risk of trial failure was disclosed, and there is no allegation the Defendants knew CM-026 would fail until the data was released in August 2016.

Second, Plaintiffs also challenged inactionable corporate optimism. (SAC ¶¶ 166, 170, 172, 173, 179, 183, 186, 189, 193, 202.) For example, the statement that "we feel very good about how [CM-026] was designed" (*id.* ¶ 183) is inactionable because it is a "vague and indefinite expression[] of corporate enthusiasm." *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019).

Third, the District Court correctly rejected Plaintiffs' challenges to mere opinions. (SAC ¶¶ 166, 170, 172-73, 179, 183, 189, 193, 202.) Plaintiffs claim these opinions were actionable because the 5% cutoff was undisclosed, which "rendered [CM-026] exponentially riskier than the industry understood." (Br. at 46.) But Plaintiffs did not adequately allege that the market understood these opinions to convey specific, contradictory facts about CM-026's design, as required to render such opinions actionable. (SPA-29.)

## III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS DID NOT PLEAD THE STRONG INFERENCE OF SCIENTER REQUIRED TO MAINTAIN THIS ACTION.

The District Court correctly dismissed the SAC for the independent reason that "[t]he inference of scienter urged by Lead Plaintiffs is not 'cogent' or 'at least as compelling' as the opposing inference urged by Defendants." (SPA-21.) On appeal, Plaintiffs argue that the District Court failed to consider the SAC in its entirety and that, "[u]nder the guise of the 'law of the case,' ... ignored the vast

majority of [their] allegations."[18]  (Br. at 48-49.)  As explained below, the District Court "[c]onsider[ed] all of the allegations together" and appropriately concluded that "Plaintiffs have not alleged a compelling inference of scienter.  (SPA-24.) Plaintiffs' arguments to the contrary fail.

## A.    Applicable Law.

The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind," i.e., the intent "to deceive, manipulate, or defraud."  15 U.S.C. § 78u-4.  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *ATSI*, 493 F.3d at 98.

Plaintiffs can satisfy this element by alleging adequately "(1) that the defendants ha[d] motive and opportunity to commit the fraud; or (2) strong

---

[18]    Plaintiffs claim that Judge Vyskocil "wrongly construed the 'law of the case' doctrine" as mandatory.  (Br. at 48 n.6.)  This argument was waived.  At oral argument, when Judge Vyskocil noted that she planned to adhere to Judge Oetken's rulings as the "law of the case," Plaintiffs agreed this was appropriate.  (JA-1981 31:6-9, 14 (Court: "I am not going to revisit any findings made by Judge Oetken or any rulings made by him.  That's the law of the case."  Plaintiffs' Counsel: "Absolutely, your Honor.").)  Moreover, this Court has explained that, where "'a court has ruled on an issue, that decision should generally be adhered to … in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'"  *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (SPA-19–20). Plaintiffs did not then—nor do they now—raise any "cogent" or "compelling" reason to depart from Judge Oetken's rulings.

circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 99. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [Defendants] 'benefitted in some concrete and personal way from the purported fraud.'" *ECA*, 553 F.3d at 198.

Under the "conscious misbehavior" prong, Plaintiffs must allege "reckless conduct" by Defendants, which means "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). And in the absence of a concrete and personal motive to defraud, "the strength of the[se] circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. This Court has emphasized that the recklessness required to state a Section 10(b) claim is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

Ultimately, Plaintiffs' "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 111.

**B.    Plaintiffs' Insider Trading Allegations Do Not Support a Strong Inference of Scienter.**

The District Court correctly held that Plaintiffs' insider trading allegations lacked "sufficient facts to support a strong inference of scienter." (SPA-26.) Plaintiffs' arguments on appeal fail.

The District Court correctly concluded that use of 10b5-1 plans for the vast majority of their alleged trades and Defendants' uniform trading patterns "defeat[] any inference that Defendants were motivated by profits." (SPA-25.)  Plaintiffs concede that the vast majority of trades were made pursuant to 10b5-1 plans (SAC ¶ 261), which "do not give rise to a strong inference of scienter," *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014); (SPA-25–26).  Even those trades that were not pursuant to 10b5-1 trading plans are not suspicious. Specifically, the Form 4s reflecting Andreotti's January 29, 2015, August 3, 2015, and May 2, 2016 sales, and each of the challenged sales by Cuss and Caforio were made, in whole or in part, to "cover the exercise price and taxes in accordance with broker's procedure." (JA-1326–1466.)  Such trades—procedural byproducts of stock acquisitions—are "not indicative of fraud." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014).

Plaintiffs also do not dispute that Defendants' Class Period stock sales were consistent with their prior trading practices.  Insider trades can support an inference of scienter only when they are "dramatically out of line with prior trading practices."

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989); *see also In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005) (same). Form 4s demonstrate that each of the Defendants who did sell stock sold about the same or a smaller percentage of their total shares transacted during the Class Period than each did before the Class Period. (*See* JA-1326–1466.) The table summarizing these trading practices before and during the Class Period is reproduced below:

| Defendant | Pre-Class Period (May 15, 2013 - January 26, 2015) | Class Period (January 27, 2015 - October 9, 2016) |
|---|---|---|
| **Mr. Andreotti** (*see* **Ex. 11**) | *Total number of shares transacted*: 1,615,021<br><br>*Number of shares sold*: 586,075 (SAC ¶ 266)<br><br>*% of shares sold*: 36.29% | *Total number of shares transacted*: 2,990,509<br><br>*Number of shares sold*: 939,966 (SAC ¶ 261)<br><br>*% of shares sold*: 31.43% |
| **Mr. Bancroft** (*see* **Ex. 14**) | *Total number of shares transacted*: 415,518<br><br>*Number of shares sold*: 145,584<br><br>*% of shares sold*: 35.04% | *Total number of shares transacted*: 329,513<br><br>*Number of shares sold*: 30,201 (SAC ¶ 261)<br><br>*% of shares sold*: 9.17% |
| **Mr. Cuss** (*see* **Ex. 12**) | *Total number of shares transacted*: 314,484<br><br>*Number of shares sold*: 93,467<br><br>*% of shares sold*: 29.72% | *Total number of shares transacted*: 373,214<br><br>*Number of shares sold*: 114,666 (SAC ¶ 261)<br><br>*% of shares sold*: 30.72% |
| **Mr. Caforio** (*see* **Ex. 13**) | *Total number of shares transacted*: 236,179<br><br>*Number of shares sold*: 105,439<br><br>*% of shares sold*: 44.64% | *Total number of shares transacted*: 305,471<br><br>*Number of shares sold*: 46,634 (SAC ¶ 261)<br><br>*% of shares sold*: 15.27% |

(JA-1027.) In addition, as the District Court concluded, "Plaintiffs have omitted information regarding the Defendants' total holdings," which is "fatal to establishing scienter based upon trading activity." (SPA-26.)

Further, Defendants generally increased their stockholdings throughout the Class Period (*see* JA-1026), which is "wholly inconsistent" with fraudulent intent, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003). Plaintiffs argue that Defendants' stock acquisitions are irrelevant because Defendants "acquired shares at reduced prices through previously-granted stock options." (Br. a 58.) Courts reject this distinction; no matter how shares were acquired, when defendants increase their holdings through alleged corrective disclosures, they stand "to lose a lot of money if the value of [the Company's] stock fell." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008).

The SAC also fails to allege that Defendants Namouni and Giordano sold any shares during the relevant period. This Court has consistently held that a lack of stock sales by some defendants substantially undermines an inference of scienter as to defendants who did trade. *E.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 2006) ("[T]hat other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same). Plaintiffs argue that this failure "does not weaken

the inference of scienter" because Namouni and Giordano "were not mandatory reporters." (Br. at 58.) But it is black letter law that ***Plaintiffs*** must plead facts to substantiate their claims. *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at \*6 (S.D.N.Y. June 1, 1998) ("[P]laintiffs bear the burden of showing that [Defendants'] sales are in fact unusual.").

Despite the foregoing, Plaintiffs argue that the District Court's conclusion cannot stand because they alleged that certain sales not made pursuant to a 10b5-1 plan "were made 'at conveniently opportune times.'" (Br. at 56-57.) For example, Plaintiffs claim that Cuss's stock sale on March 16, 2015 was suspicious because he traded two weeks "after a medical journal discussed [BMS's] use of a 5% PD-L1 cutoff in Checkmate-063" (*id.* at 57). But the timing of insider sales must "closely coincide with alleged false statements ... to give rise to a suspicion of fraud." *Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999). That is not what is alleged here: the medical journal was discussing a different BMS trial, is not alleged to have been false, and was not a statement made by Defendants. Plaintiffs' attempts to manufacture suspicion fails.

Although the District Court did note that trades made in May 2016 by Andreotti, Bancroft, and Caforio "stand out" (SPA-26),[19] those sales were made

---

[19] Specifically, Andreotti traded on May 2, May 4, and May 5, 2016. (SAC ¶ 261.) Bancroft sold stock on May 20, 2016 and Caforio traded on May 3, 2016. (*Id.*)

more than two months before August 5, 2016 when the 5% cutoff for CM-026 was disclosed. A two-month gap between stock sales and a putative corrective disclosure is not indicative of scienter. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 154 n.24 (D. Conn. July 26, 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). This is critical here, because there is no allegation that Defendants knew CM-026's results in May 2016. Moreover, as Judge Vyskocil correctly noted, "the SAC alleges only three of the [six] Individual Defendants made trades" in May 2016, which "undermine[d] plaintiffs' claim regarding motive." (SPA-26.) In any event, the Court appropriately considered Plaintiffs' allegations holistically and held that the May 2016 sales "cannot by themselves give rise to a strong inference of scienter" in light of the lack of other particularized allegations supporting scienter. (*Id.*)

The District Court "[c]onsider[ed] all of the allegations together, *Tellabs, Inc.*, 551 U.S. at 323, [and] conclude[d] that Lead Plaintiffs have not alleged a compelling inference of scienter." (SPA-24.) This Court should do the same.

---

Although Andreotti's May 4 and May 5 trades were not designated 10b5-1 sales in the applicable Form 4s, the SAC gives rise to a strong inference that they were 10b5-1 trades. As Plaintiffs alleged, Andreotti's 10b5-1 plan provided for the sale of 23,200 shares each month. (SAC ¶ 261.) The May 4 and May 5 trades totaled 23,200 shares (11,600 shares each) and were Andreotti's only sales totaling that amount in May 2016. (*Id.*) Andreotti's remaining May 2016 trade and Caforio's May 2016 trade were both made to cover the "exercise price and taxes in accordance with broker's procedure." (JA-1328.)

49

### C. Plaintiffs' Circumstantial Allegations of Conscious Misbehavior or Recklessness, Considered Separately or Together, Were Insufficient to Give Rise to a Strong Inference of Scienter.

Because Plaintiffs failed to plead adequately a motive to commit fraud, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. Plaintiffs claim that Defendants were "reckless" because Defendants were supposedly aware of some industry standard for "strong" PD-L1 expression contradicting their public statements. (Br. at 50.) To pursue this theory, Plaintiffs needed to allege with particularity that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," including "specifically identify[ing] the reports or statements containing this information." *Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011). Applying that standard, the District Court correctly held that Plaintiffs had to allege facts not only establishing a common understanding of "strong" PD-L1 expression but also showing that the "fixed usage was 'either known to the defendants or so obvious that the defendants must have been aware of it' at the time of the alleged misrepresentations." (SPA-8.) Plaintiffs failed to do so.

On appeal, Plaintiffs emphasize a series of flimsy circumstantial allegations, which fail to raise a strong inference of scienter.

50

1.    *Defendants' Post-Class Period Statements Do Not Support a Strong Inference of Scienter.*

Plaintiffs claim that, after the Class Period, Namouni and other non-Defendant BMS officers supposedly admitted that CM-026 "was not designed to target 'high' expression." (Br. at 49-50.) But Plaintiffs had to plead that Defendants "knew that their statements were false or misleading ***when made***." *Lululemon*, 14 F. Supp. 3d at 581. As the District Court held, the statements identified by Plaintiffs were made "long after the alleged misrepresentations," so do not speak to the Defendants' knowledge of any supposed contemporaneous falsity. (SPA-10.)

Further, none of the supposed admissions are actually admissions. Instead, Defendants stated what had by then become obvious: that CM-026, which had (as previously disclosed) used a different, lower PD-L1 cutoff than Merck's KN-024, did not meet its primary endpoint while KN-024 did. For example, on November 8, 2016, an analyst asked Namouni what role PD-L1 could have played in the differing results for CM-026 and KN-024. (JA-1943.) Namouni responded that CM-026 "focused on a larger population of biomarker" and "was not designed to look at the smaller subgroup of highly inflamed tumor or high expression of PD-L1" when compared to KN-024. *Id.* (quoted in SAC ¶ 218); *see San Leandro*, 75 F.3d at 808 (courts may consider the full text of documents partially quoted in a complaint). The District Court appropriately considered and rejected Plaintiffs' scienter allegations based on these post-Class Period statements. (SPA-19–20.)

51

2. *Plaintiffs' Former Employee Allegations Do Not Support a Strong Inference of Scienter.*

After Judge Oetken dismissed this case, Plaintiffs added innocuous allegations attributed to five supposed former employees. None even mentioned the term "strong" PD-L1 expression, nor did they claim that any industry-wide consensus of "strong" PD-L1 expression existed, that such consensus was inconsistent with a 5% cutoff, or that any specific information related thereto was communicated to any Defendant. Yet Plaintiffs argue that the District Court "improperly [drew] adverse inferences against Plaintiffs" in considering the former employee allegations by "narrowly constru[ing] the former employees' information as proving only Defendants' knowledge of Merck's definition." (Br. at 51-52.) Plaintiffs' objections are meritless.

First, because Plaintiffs' former employee allegations do not support their theory of fraud, they weigh against scienter. If information provided by a confidential witness does not support Plaintiffs' allegations, the Court is "preclude[d] ... from concluding that an inference of scienter is cogent and at least as compelling as [an] opposing inference." *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216-17 (2d Cir. 2010); *see also Loc. No. 28 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011) (affirming dismissal, highlighting that "not one [confidential witness] can identify a single specific report containing" contradictory facts). Plaintiffs claim the District Court

"narrowly construed" these allegations, but there was nothing further to construe: the former employees did not mention "strong" PD-L1 expression, any industry consensus foreclosing Defendants' usage, or Defendants' knowledge thereof. At best, the former employees suggest that some of the Defendants may have known the PD-L1 cutoff used in CM-026 (SAC ¶¶ 71, 87-88, 90) and Merck's cutoff for KN-024 (*id.* ¶ 72). Putting these two together, however, does not support an inference that Defendants knew that BMS's definition of "strong" PD-L1 expression for CM-026 was inconsistent with some generally-accepted understanding of that term.[20]

### 3. *Plaintiffs Conceded That Blum's Supposed Opinion Cannot Be Imputed to Defendants.*

Plaintiffs' purported expert allegations fail to support a strong inference of scienter. As Plaintiffs appropriately conceded below, Blum's opinion cannot "be imputed to Defendants." (JA-1797.) This, of course, is true. Plaintiffs do not allege any basis to attribute Blum's post-hoc opinion to Defendants. (SPA-23.)

---

[20] Many of the former employee allegations also are deficient because they constitute "conclusory statements that defendants 'were aware' … [or] 'would have' or 'should have' had such knowledge." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011). Moreover, because most former employees are not alleged to have had direct contact with Defendants, their allegations cannot provide "strong circumstantial evidence" of scienter. *Kapitalforeningen Laegernes Inv. v. United Techs. Corp.*, 779 F. App'x 69, 71 (2d Cir. 2019).

### 4. *The Departures of Defendants Cuss and Giordano Do Not Support a Strong Inference of Scienter.*

"[P]leading scienter requires more than pleading a link between bad news and an executive's resignation." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018). Rather, Plaintiffs must plead with particularity "factual allegations linking the resignations to the alleged fraud." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011); *Hertz*, 905 F.3d at 119. Here, Plaintiffs fail to plead that Cuss's and Giordano's departures from BMS were linked to the alleged fraud, i.e., the allegedly misleading description of "strong" PD-L1 expression.

With respect to Giordano's departure in July 2016, Plaintiffs do not allege that Giordano—or anyone for that matter—knew in July 2016 that CM-026 would not meet its primary endpoint in August 2016. In any event, CM-026's failure was not fraudulent, it was an unfortunate business development. And Giordano's return to the workforce more than 18 months after his retirement from BMS, which could have been for any number of non-culpable reasons, does not make his departure highly unusual. (SAC ¶ 280.)

As for Cuss, he left BMS in March 2017, seven months after the cutoff for CM-026 had been disclosed. (*Id.* ¶ 279.) Although Plaintiffs claim that an industry observer linked Cuss's exit from BMS to CM-026's failure to meet its primary endpoint (Br. at 55), "[i]t is not enough to quote press speculation about defendants' motives," *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988). And

again, CM-026's trial result is not securities fraud because "pleading scienter requires more than pleading a link between bad news and an executive's resignation." *Hertz*, 905 F.3d at 119. Plaintiffs' allegations concerning the departures of Cuss and Giordano fall far short.

5.     *Plaintiffs' Conclusory Allegations That Defendants Were Involved in Developing an Industry Standard Do Not Support a Strong Inference of Scienter.*

As the District Court recognized, "'[c]onclusory allegations of a[]… defendants' skill or experience' do not suffice" to plead scienter; instead, when "plaintiffs contend defendants had access to facts [contradicting their public statements], they must specifically identify the [source of] this information." (SPA-9.) Plaintiffs' allegation that "Defendants were instrumental in developing the industry understanding ... of PD-L1 expression" (Br. at 52) is unsupported by particularized facts. That BMS had used a 5% cutoff to define PD-L1 "positivity" in other clinical trials for different types of cancers in different patient pools (*e.g.*, SAC ¶ 57) does not demonstrate an industry standard for "strong" PD-L1 expression or Defendants' involvement in setting that supposed standard. As Judge Oetken noted (and was also true of the SAC), "Plaintiffs do not allege that Bristol Myers took the categorical position, in any prior study, that the term 'strong' *compelled* a cut-off of more than 5%." (SPA-10 (emphasis original).) In fact, the SAC concedes BMS had used differing cutoffs to define PD-L1 positivity, including CM-026 for

55

which BMS defined PD-L1 "positivity" at 1%. (*E.g.*, SAC ¶¶ 55, 108, 159.) Notably, these allegations contradict Plaintiffs' theory that "[t]he industry at large adopted Merck's presentation of 'strong' PD-L1 expression." (*Id.* ¶ 246.)

6. *Analyst Statements Cannot Support an Inference of Scienter.*

Plaintiffs are also wrong in arguing that the allegedly "stunned reactions" of analysts to the results of CM-026 and certain analysts' focus on CM-026's PD-L1 cutoff support a finding of scienter. (Br. at 53-54.) First, BMS repeatedly told analysts throughout the Class Period that it was not going to disclose the primary endpoint until it released the data; any assumptions about CM-026's cutoff were mere speculation. (Br. at 54); *see Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("Speculation by investors and subsequent buyers' remorse cannot support an Exchange Act suit alone."). And multiple reputable analysts were not surprised by CM-026's primary endpoint, having accurately predicted that CM-026's PD-L1 cutoff was ≥5%. (JA-1282 (Alliance Bernstein); JA-1296, JA-1303, JA-1313 (Goldman Sachs).)

Second, generalized allegations of the market's interest in CM-026's PD-L1 cutoff do not support scienter.[21] Instead, analysts' questions about the PD-L1 cutoff

---

[21]    Plaintiffs' authority, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (Br. at 53), is inapposite. There, this Court found that plaintiffs raised a strong inference that defendants knew about internal inventory issues because, among other reasons, they spoke with analysts about this. *Celestica*,

for CM-026 show there was no settled meaning for "strong" PD-L1 expression. Similarly, Defendants' decision not to disclose the PD-L1 cutoff for CM-026 (Br. at 54) cannot support an inference of scienter because, as the District Court correctly held, protecting competitively sensitive information is not indicative of fraud. (SPA-6 ("[T]he protection of proprietary information is the quintessence of a 'generalized' business motive") (quoting *Chill v. Gen. Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996)).)

### D. Defendants' Competing Inference of Non-Fraudulent Intent Is Substantially More Compelling.

To state a claim, Plaintiffs "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Tellabs*, 551 U.S. at 328. "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d at 198.

Here, it is substantially more compelling that Defendants made the good-faith business judgment to focus CM-026's primary endpoint on patients with ≥5% PD-L1 expression and, as Plaintiffs admit, Defendants "earnestly want[ed] Checkmate-026 to succeed." (SAC ¶ 274.) BMS did not disclose the specific 5% cutoff while the trial was pending to protect competitively sensitive information.

---

445 F. App'x at 14. Here, Plaintiffs' theory of fraud does not turn on whether Defendants knew of CM-026's cutoff.

Plaintiffs' long-winded and tortured attempt to infer fraudulent intent—that is, that "Defendants deliberately designed their statements to be deceptive" (Br. at 53)—is neither plausible based on the SAC nor as compelling as the opposing inference that Defendants kept confidential the PD-L1 cutoff for legitimate business motivations.

The Fourth Circuit's decision in *Cozzarelli* is directly on point. There, defendants conducted a clinical trial called Study 109 for a drug to treat dry eye disease. *Cozzarelli*, 549 F.3d at 621. As here, defendants in *Cozzarelli* "stated that [they] would not disclose the primary endpoint" for Study 109. *Id.* at 622, 626. Like here, the *Cozzarelli* defendants made "public comments regarding Study 109," and analysts speculated about the primary endpoint and whether that study would meet that endpoint. *Id.* at 622. Ultimately, Study 109 failed to meet its primary endpoint. *Id.* at 621. Plaintiffs then filed a securities lawsuit, alleging that defendants' description of the trial "fraudulently misl[ed] investors as to Study 109's likelihood of success." *Id.* at 622.

The Fourth Circuit affirmed dismissal of the *Cozzarelli* complaint, concluding that defendants' non-culpable inference was "more convincing[] than plaintiffs' tenuous theory of wrongful intent." *Id.* at 626. First, the Fourth Circuit found that "plaintiffs have not alleged the existence of any internal documents from [the company] or other direct statements contradicting the inference that defendants acted with a lawful intent based on their competitive interests." *Id.* Second, the *Cozzarelli*

Court found that the company's decision not to disclose the primary endpoint could be explained with a "perfectly legitimate reason," i.e., the "protection of [defendants'] competitive interests." *Id.* at 627. Third, the Fourth Circuit rejected plaintiffs' argument that insider sales supported an inference of scienter because, "[d]espite the sales, all three [defendants] actually increased their net holdings ... through the acquisition of vested stock options," "hardly suggesting that the defendants sought to dump their shares at an inflated price." *Id.* at 622, 628.

The same reasoning applies here: Plaintiffs do not point to any document—whether internal to BMS or publicly available—or other statements that contradict Defendants' use of the term "strong" PD-L1 expression to describe CM-026's 5% cutoff. *Id.* at 626. As Judge Vyskocil correctly concluded, "Plaintiffs' unsupported allegations of BMS's knowledge and disregard of a[] [supposed] industry standard are less convincing than Defendants' inference that even if BMS executives were aware of Merck's thresholds, they used a different definition in an attempt to reach a broader segment of cancer patients." (SPA-21.) Also, each trading Defendant increased their BMS shareholdings from the start of the Class Period to August 5, 2016 when BMS disclosed the allegedly fraudulent cutoff for CM-026. *Id.* at 622, 628. And Defendants' decision not to disclose the precise cutoff for CM-026 served to protect competitively sensitive information, a legitimate business motive. The

"most persuasive inference is that [D]efendants acted with a lawful intent to protect their competitive interest," not with the intent to deceive. *Id.* at 628.

Plaintiffs' authority, *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) (Br. at 59-60), is unavailing. There, plaintiffs stated a § 10(b) claim for failure to disclose "adverse event reports" linking a company's leading product, Zicam, to loss of smell (anosmia). *Id.* at 1311. Defendants in *Matrixx* argued that the more compelling inference of scienter was that defendants "thought the reports did not indicate anything meaningful" because they did not show statistically significant evidence that Zicam caused anosmia. *Id.* at 1324. The Court found the inference of fraudulent intent more compelling because plaintiffs pleaded with particularity that the company "was sufficiently concerned about the information it received," including specific "reports from medical experts and researchers that plausibly indicated a reliable causal link between Zicam and anosmia," *id.* at 1312, and that the company "hired a consultant to review the product" and planned to participate in animal studies, *id.* at 1324. Nothing similar is alleged here.

The District Court correctly concluded that Plaintiffs failed to raise a strong inference of scienter that is at least as compelling as Defendants' non-fraudulent intent. (SPA-21.)

## IV.  PLAINTIFFS FAILED TO PLEAD LOSS CAUSATION.

Plaintiffs' failure to plead loss causation separately warrants affirmance of the District Court's dismissal.

*First*, with respect to the alleged corrective disclosure on August 5, 2016, BMS announced both that CM-026 had failed to meet its primary endpoint and that the study had used a 5% PD-L1 expression cutoff.  (SAC ¶¶ 129, 209.)   To adequately plead loss causation, Plaintiffs must plead "facts sufficient to support an inference that … defendant's fraud—rather than other salient factors"—caused Plaintiffs' purported losses.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).  Otherwise, Plaintiffs must allege facts sufficient to "apportion the losses between the disclosed and concealed portions of the risk."  *Id.*  Here, the risk that CM-026 may fail was disclosed.  (*Supra* pp. 41-42.)  But Plaintiffs do not allege any basis to apportion loss to the revelation of CM-026's definition of "strong" PD-L1 expression, as opposed to the contemporaneous announcement that CM-026 did not meet its primary endpoint.

*Second*, Plaintiffs fail to allege that any new information, supposedly previously concealed, was disclosed on October 9, 2016.  All information about the allegedly concealed risk—that designing CM-026 to focus on patients with ≥5% expression "created an undisclosed risk that the study would not be powered to detect statistically meaningful results when stratified at higher levels of expression" (SAC

¶ 161)—was disclosed on August 5 when BMS announced the PD-L1 cutoff for CM-026.

## V. PLAINTIFFS FAILED TO STATE A CLAIM FOR VIOLATIONS OF SECTIONS 20(a) AND 20A.

Because Plaintiffs failed to plead a primary violation of § 10(b), their claims under §§ 20(a) and 20A were properly dismissed. *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 69 (2d Cir. 2020).

## <u>CONCLUSION</u>

This Court should affirm the District Court's decision below.

Dated:  May 6, 2021

Respectfully submitted,

*/s/ Yosef J. Riemer*

Yosef J. Riemer, P.C.
Matthew Solum, P.C.
Daniel R. Cellucci
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: yriemer@kirkland.com
        msolum@kirkland.com
        dan.cellucci@kirkland.com

*Attorneys for Defendants-Appellees*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because, as counted by the Microsoft Word word-count tool, this brief contains 14,000 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: May 6, 2021

*/s/ Daniel Cellucci*
Daniel Cellucci
*Attorney for Defendants-Appellees*