# 20-3716

## United States Court of Appeals for the Second Circuit

Arkansas Public Employees Retirement System, Louisiana Sheriffs' Pension &
Relief Fund, Erste-Sparinvest Kapitalanlagegesellschaft mbH,
*Plaintiffs - Appellants*,
Jennifer Tung, Individually and on behalf of all others similarly situated, Metzler
Asset Management GmbH,
*Plaintiffs*,
v.
Bristol-Myers Squibb Company, Michael Giordano, Fouad Namouni, Francis M.
Cuss, Giovanni Caforio, Lamberto Andreotti, Charles A. Bancroft,
*Defendants - Appellees*.

On Appeal from the United States District Court
for the Southern District of New York
(Hon. Mary Kay Vyskocil, U.S.D.J.)

## JOINT REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
SALVATORE J. GRAZIANO
LAUREN A. ORMSBEE
JESSE L. JENSEN
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

*Counsel for Lead Plaintiffs-Appellants
Arkansas Public Employees
Retirement System and the Louisiana
Sheriffs' Pension & Relief Fund, and
Lead Counsel for the Class*

BLEICHMAR FONTI & AULD LLP
JAVIER BLEICHMAR, ESQ.
7 Times Square
New York, New York 10036

*Additional Counsel for Lead Plaintiffs-Appellants*

(*Counsel continued on inside cover*)

MOTLEY RICE LLC
WILLIAM H. NARWOLD
20 Church St., 17th Floor
Hartford, CT 06103

*Counsel for Named Plaintiff-*
*Appellant Erste Asset Management*
*GmbH*

KLAUSNER, KAUFMAN, JENSEN &
LEVINSON, P.A.
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317

*Liaison Counsel for co-Lead Plaintiff-*
*Appellant Louisiana Sheriffs' Pension &*
*Relief Fund*

# TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................1

II.     THE SAC ADEQUATELY PLEADS MATERIAL FALSITY .....................1

        A.      The District Court Improperly Required Plaintiffs To Prove An
                "Industry Standard Definition" of "Strong" to Allege Falsity..............2

        B.      The SAC Adequately Alleges That 5% Expression Was
                Incompatible With The Industry Usage Of "Strong" or "High"...........5

        C.      The Court Improperly Discounted Plaintiffs' Expert
                Allegations...........................................................................................7

        D.      The District Court Improperly Considered Extrinsic Evidence..........10

        E.      Defendants Were Required to Disclose the Endpoint to Make
                Other Statements Not Misleading. .....................................................12

        F.      None of the Challenged Misstatements Are Inactionable as a
                Matter of Law.....................................................................................15

III.    THE SAC ADEQUATELY PLEADS DEFENDANTS' SCIENTER .........17

        A.      The SAC's Motive Allegations Support the Inference of
                Scienter..............................................................................................20

        B.      The SAC Pleads Defendants' Conscious Disregard or Severe
                Recklessness.......................................................................................21

IV.     THE SAC ADEQUATELY PLEADS LOSS CAUSATION ......................26

V.      CONCLUSION...........................................................................................29

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Abeley v. Aeterna Zentaris, Inc*.,
   2013 WL 2399869 (S.D.N.Y. May 29, 2013) ......................................................5

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) .........................................................................16, 27

*In re Adolor Corp. Sec. Litig*.,
   616 F.Supp.2d 551 (E.D. Pa. 2009).......................................................................5

*In re Advanced Battery Techs., Inc*.,
   781 F.3d 638 (2d Cir. 2015) ..................................................................................9

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................................9

*Anderson News, LLC v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................13

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)......................................................22

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) .................................................................................9

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
   215 F.3d 219 (2d Cir. 2000) ................................................................................12

*Booking v. Gen. Star Mgmt. Corp*.,
   254 F.3d 414 (2d Cir. 2001) ................................................................................12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ................................................................................26

*Cozzarelli v. Inspire Pharms. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ...............................................................................19

*Dalberth v. Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014) ................................................................................14

ii

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ...............................................................................11

*In re Dynagas LNG Partners LP Sec. Litig.*,
  2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020).......................................................5

*In re Eros Int'l Sec. Litig.*
  2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017) ......................................................4

*Fidelity Nat. Title Ins. Co. v. Cole Taylor Bank*,
  878 F. Supp. 2d 453 (S.D.N.Y. 2012) ..................................................................9

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ...............................................................................9

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ..............................................................................20

*Friedl v. City of New York*,
  210 F.3d 79 (2d Cir. 2000) ..........................................................................10, 11

*Galestan v. OneMain Holdings, Inc.*,
  348 F.Supp.3d 282 (S.D.N.Y. 2018) .............................................................15, 16

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................22

*Gross v. GFI Grp., Inc.*,
  784 F. App'x 27 (2d Cir. 2019) .........................................................................15

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ....................................................28

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ...............................................................................25

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F.Supp.3d 596 (S.D.N.Y. 2017) .............................................................12, 13

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .........................................................................27, 28

iii

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................22

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................................17

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ...................................................................8

*Marx & Co. v. Diners Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977) ..................................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................................20

*Meyer v. Jinkosolar Holdings Co. Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................................13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 Fed. App'x 10 (2d Cir. 2011) ........................................................................24

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ................................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ...........................................................................2, 21

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018) ....................................................................4

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ................................................................................26

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018) ....................................................................9

*In re OSG Sec. Litig.*,
  12 F.Supp.3d 622 (S.D.N.Y. 2014) ......................................................................26

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F.Supp.3d 602 (S.D.N.Y. 2015) ......................................................................25

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc*.,
769 F.3d 313 (5th Cir. 2014) ................................................................................8

*Reliance Ins. Co. v. Polyvision Corp.*,
474 F.3d 54 (2d. Cir. 2007) ........................................................................10, 11

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ..............................................................................11

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ...............................................................................22

*Roy v. Contra Costa Cnty.*,
694 F. App'x 536 (9th Cir. 2017).......................................................................12

*Set Capital LLC v. Credit Suisse Grp. AG*,
2021 WL 1619620 (2d Cir. Apr. 27, 2021).................................................21, 25

*Setzer v. Omega Healthcare Investors, Inc*.,
968 F.3d 204 (2d Cir. 2020) .......................................................................14, 20

*Shanawaz v. Intellipharmaceutics Int'l, Inc.*,
348 F. Supp. 3d 313 (S.D.N.Y. 2018) ...............................................................17

*Springer v. Wells Fargo Bank, N.A.*,
784 F. App'x 721 (11th Cir. 2019).....................................................................12

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*,
467 F.3d 107 (2d Cir. 2006) ...........................................................................7, 8

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ................................................................................13

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ...........................................................................3, 4

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...............................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................18

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................17

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) .................................................................................8

*United States v. Harra*,
  985 F.3d 196 (3d Cir. 2021) ...................................................................................8

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)........................................................................................2, 3

*In re Vivendi S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................................16

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ...............................................................................19

## I.    INTRODUCTION

In their opening brief, Appellants explained why the district court erred in dismissing the claims asserted in the SAC for failure to adequately plead an actionable misstatement or omission and scienter. Appellees' arguments in response are without merit and Appellants' claims should be reinstated.[1]

## II.    THE SAC ADEQUATELY PLEADS MATERIAL FALSITY

Defendants characterized Bristol-Myers' Checkmate-026 clinical trial as targeting patients with a "strong" or "high positive" PD-L1 expression, indicating that it was conservatively designed to ensure a high possibility of success. In actuality, the trial targeted patients with a "weak" or "mere positive" 5% PD-L1 expression, a choice that contributed to the trial's failure. Notably, Bristol-Myers' chief competitor ran a parallel trial with an actual "strong" endpoint of 50% PD-L1 expression, and that trial resulted in a resounding success. P.Br.14-17, 29-31. Defendants further misled investors by concealing the numerical cutoff of the clinical trial, even in the face of direct questioning, when it was clear that the investing public believed Bristol-Myers' "strong expression" cutoff to be materially

---

[1] "D.Br.__" refers to the Brief for Defendants-Appellees. "P.Br.__" refers to the Brief for Plaintiffs-Appellants. "¶__" refers to paragraphs in the Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC") (JA-708-836). Unless otherwise noted, all emphasis is added, all internal citations are omitted, and all capitalized terms have the meaning provided in Plaintiffs' opening brief.

higher than the actual weak 5% PD-L1 expression cutoff. P.Br.32-33. Finally, Defendants' statements describing the trial as "well-designed and well-powered to detect the difference in all the positives but also in what we define [as] the high positives" was false or misleading because, as became clear by the end of the Class Period, the trial was not powered to detect results when stratified at high levels of expression. P.Br.33-34. The district court erred in rejecting these allegations, demanding a legally unsupported standard of evidentiary proof at the pleading stage, and rejecting Plaintiffs' significant, non-conclusory allegations that satisfied even that higher and unwarranted standard.

### A. The District Court Improperly Required Plaintiffs To Prove An "Industry Standard Definition" of "Strong" to Allege Falsity.

Defendants' repeated descriptions of Checkmate-026's design, and focus on patients with "strong" and "high" expression, while actively concealing that they secretly defined "strong" at a level the industry considered weak (5%), are actionable misstatements under widely-accepted caselaw. *See, e.g.*, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991) (statement that merger had "high" value was actionable); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "under control" when "the contrary was true" were actionable). Indeed, the SAC clearly alleges through plain meaning, analyst commentary and reaction, contemporaneous clinical trials, industry articles, and expert testimony, that a reasonable investor understood Defendants' statements

2

concerning the design of Checkmate-026 to rest on two factual bases: (a) that "strong" meant *at least* more than the commonly understood bare minimum of 5% expression; and (b) that "strong" did not dramatically depart from the definition widely promulgated by Bristol-Myers' chief competitor, Merck, of 50% expression, which was repeated throughout the industry. When statements such as "strong" and "high" "are reasonably understood to rest on a factual basis that justifies them as accurate," a departure from that reasonable understanding "renders them misleading." *Virginia Bankshares,* 501 U.S. at 1093.

In addition to all of the evidence discussed at length in Plaintiffs' brief (P.Br.9-14, 20-22, 28-34), the falsity of Defendants' misuse of "strong" or "high" expression is clear from a review of the "common dictionary usage" of the terms "high" and "strong," a touchstone of falsity recently relied on by this Court to reject defendants' argument that the term "pushback" was vague or immaterial. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) ("We start by defining 'pushback,' using the most straightforward option: common dictionary usage."). Here, the "common dictionary usage" of the term "strong" defines the term by what it is not—"*not* mild or weak" and "*not* weak," respectively.[2] The context of

---

[2]  *Strong*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/strong (last visited May 21, 2021); *Strong*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/strong (last visited May 21, 2021). *See also High*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/high (last visited May 21, 2021) ("of

3

Defendants' prior statements referring to the most nominal "positive" expression of PD-L1 as merely 5%, viewed together with numerous documentary sources, expert allegations, and the plain meaning of the terms "strong" and "high," demonstrate that, rather "than rest on 'conclusory or unsupported' allegations of fraud, [Plaintiffs] provided numerous allegations in its amended complaint that 'explain why the statement[s were] fraudulent." *Synchrony*, 988 F.3d at 169.

The district court's requirement that Plaintiffs prove, seemingly incontrovertibly, that there was "an industry standard definition" of "strong" or "high" in order to allege falsity (SPA-27-28) was in error. None of the cases cited by the district court and Defendants (D.Br.20-22) support a contrary conclusion. For example, in *In re Eros International Securities Litigation*, the Court did not require proof of an industry definition of the term "registered users;" rather, the court found unpersuasive plaintiff's reliance on a Wikipedia definition of the term when that definition was directly contradicted by the definition of the same term accepted by another federal court. 2017 WL 6405846, at *5 (S.D.N.Y Sept. 22, 2017). The court also found that defendants did not actually make any characterization of the term

---

greater degree, amount, cost, value, or content than average, usual, or expected"); *High*, Cambridge Dictionary, https://dictionary.cambridge.org/us/ dictionary/english/high (last visited May 21, 2021) ("greater than the usual level or amount; containing a large quantity of something").

4

that could be construed as false. *Id*.[3] Here, the SAC relied on numerous independently reliable sources, and alleged that Defendants repeatedly characterized the trial's targeted expression levels as "strong" and "high," and therefore the trial as "well-powered." P.Br.9-19, 28-34.

The SAC satisfies this Circuit's pleading standards even without demonstrating "an industry standard definition" because the allegations plainly demonstrate that, in the context of the ongoing trials, investors were misled as to Defendants' use of "strong" and "high".

## B. The SAC Adequately Alleges That 5% Expression Was Incompatible With The Industry Usage Of "Strong" or "High".

Even if the district court's demand that Plaintiffs allege the firm existence of an "industry standard definition" was not in error (which it was), the SAC clearly

---

[3] Defendants' other cases are also inapposite. *See Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 571 (S.D.N.Y. 2018), *aff'd*, *Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (statements that Xerox had a "platform" were not false as the company "did not ever define 'platform' in such a way as to exclude [its product] from that definition"); *Abeley v. Aeterna Zentaris, Inc*., 2013 WL 2399869, at \*7 (S.D.N.Y. May 29, 2013) (complaint did not even allege "what constitutes a double-blind study or allege its relevance to evaluating a clinical trial's results"); *In re Adolor Corp. Sec. Litig*., 616 F.Supp.2d 551, 567 (E.D. Pa. 2009) (plaintiffs made no "allegations that Defendants "use of the term [double blind] directly contradicted either the FDA's definition or common industry usage"). And in *In re Dynagas LNG Partners LP Sec. Litig*., 2020 WL 6947521, at \*15 (S.D.N.Y. Nov. 25, 2020), the court emphasized that the amended complaint "plead[ed] no facts" regarding common usage or analyst understanding of the term "cash flow" – thus, unlike here, there was no actual issue of fact regarding the meaning of the term.

satisfied this burden. P.Br.9-14, 28-41. Defendants' scattershot attempts to minimize the SAC's allegations are unconvincing. D.Br.25-28.

*First*, Defendants argue that Merck's use of "strong" expression in Keynote-024 was disclosed four months after Checkmate-026 was announced and, in any event, its use in one trial for one drug could not represent an industry standard. This argument ignores three material points: (a) by the start of the Class Period, Defendants were clearly aware that both trials were defined by "strong" expression and the industry believed them to be analogous; (b) Merck consistently defined "strong" expression as ≥50% prior to Checkmate-026; and (c) FE-1 described how Defendants Namouni and Giordano, who were directly involved in Checkmate-026's design and public statements, openly discussed Merck's use of 50% expression. JA-741-42(¶71); P.Br.17. *Second*, Defendants argue that they told investors that Checkmate-026's "strong" was lower than Merck's. Yet, Defendants did not admit this until April 28, 2016, just a few months prior to the end of the Class Period, and continued to tout the conservative trial design, emphasizing "the depth of understanding that went into to the statistical plans." JA-759(¶112); P.Br.16. *Third*, Defendants' citation to a handful of articles that purportedly "contradict Plaintiffs' allegation of an industry standard" (D.Br.26-27) do no such thing. The excerpts Defendants cite do not deal with "strong" or "weak" expression at all, but

6

discuss industry discussion of the "***best*** cut-off percentage" or a lack of consensus about whether 1% or 5% expression could indicate minimal positivity. JA-734(¶54).

Plaintiffs allege that there were differing views as to whether minimal positivity was 1% or 5%, and whether strong positivity had to equal 50%, but further allege that no one in the industry understood that 5% positivity equaled "strong" or "high".[4] These opposite words—strong and weak—are clear in what they ***cannot*** mean. A doctor could not say that one's pulse is strong when it is, in fact, weak. There may be ranges of what could be strong and what could be weak, but at some point, there is a divide set by the plain meaning of the words themselves.

### C. The Court Improperly Discounted Plaintiffs' Expert Allegations.

The district court's decision to discount the allegations of Plaintiffs' expert, Dr. Ronald Blum, was clear error. Dr. Blum's expert opinion that "strong" PD-L1 expression could not refer to expression levels of just 5% was based on his considerable relevant oncological trial experience (JA-716-17(¶9), 760-62(¶¶116-21)) and his review of sources cited in the SAC (JA-761-62(¶¶120-21)). P.Br.13-14, 38-41. The district court failed to recognize longstanding precedent holding that the meaning of an industry term may be established through expert testimony and is

---

[4] The Nektar Slide, which should not have been incorporated by reference or judicially noticed (*infra*, §II.D), is not to the contrary. That slide purports to compare competitors' various "assays"—tests for measuring PD-L1—and is not a comparison of how these competitors characterized positive PD-L1 once identified.

ultimately an issue of fact for the jury. *See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132-33 (2d Cir. 2006) (stating that expert testimony regarding the meaning of terms is relevant to falsity and knowledge).

Contrary to Defendants' suggestion (D.Br. 22-23, 29-30), this Court has long permitted expert testimony on industry custom and usage in non-contract cases, including in securities fraud cases. P.Br.38-39; *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (permitting testimony regarding the "meaning of terms"); *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 509-12 (2d Cir. 1977) (stating that "an expert may testify to … the practices and usage of a trade"). The Third Circuit Court of Appeals recently indicated that, in some cases, expert testimony as to the meaning of a term may be the *only* way to demonstrate falsity in a securities fraud case. *See United States v. Harra*, 985 F.3d 196, 216 (3d Cir. 2021) (expert testimony may be necessary to "establish[] that the purportedly ambiguous requirement involved terms of art well known to a reasonable person in the defendant's field").

It is axiomatic that if expert testimony is sufficient to *prove* claims at trial, it is sufficient to satisfy a plaintiff's *pleading burden* at this stage in securities class actions. *See Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc*., 769 F.3d 313, 323 n.3 (5th Cir. 2014)*, cert. denied sub nom. Amedisys, Inc. v. Pub. Emps.' Ret. Sys. of Miss.*, 135 S. Ct. 2892 (2015) (noting use of declaration of outside expert); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 821 (C.D. Cal. 2011)

8

(expert opinion concerning FDA practices and adequacy of defendants' studies supported sufficiency of complaint); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) (accepting expert opinion and rejecting defendants' challenge to the adequacy of expert adjustments because that "would require the Court to delve into complex factual disputes that cannot be resolved on a motion to dismiss"); *Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 257-58 (5th Cir. 2005) ("fact-bound" expert allegations not subject to dismissal at the pleading stage); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (court must assume the truth of fact-based expert allegations at the motion to dismiss stage).[5]

Far from advancing "conclusory" allegations, the SAC alleges a nexus between Dr. Blum's directly relevant expertise and his ultimate opinion that there was "an industrywide consensus among all major participants in the immune-oncology industry" regarding the terminology used to describe a 5% PD-L1 and 50% PD-L1 expression level. *See* JA-752(¶97); JA-761-62(¶¶120-21). That opinion is plausibly admissible under Federal Rule of Evidence 702. *See Fidelity Nat. Title Ins.*

---

[5] Defendants' cited cases are inapposite. For example, in *In re Advanced Battery Techs., Inc*., 781 F.3d 638, 645 (2d Cir. 2015), this Court rejected plaintiffs' expert testimony on noncompliance with auditing standards because the expert failed to identify the specific GAAP or GAAS standards that were applicable. In *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018), the court struck an expert declaration because it was not relied on by plaintiffs in drafting the complaint. Here, Dr. Blum's opinions are part of the SAC itself.

*Co. v. Cole Taylor Bank*, 878 F. Supp. 2d 453, 456-57 (S.D.N.Y. 2012) (citing standard and holding that an expert was qualified to "testify about her experience" in the relevant industry where her opinion "clarified some of the terminology in the relevant evidence").

### D.    The District Court Improperly Considered Extrinsic Evidence.

The District Court committed reversible error by considering as true a single page from a presentation—authored by a non-party and not cited in the SAC—to determine that Plaintiffs' allegations regarding the term "strong" were insufficient. P.Br.41-46. A district court may not consider factual materials submitted by Defendants outside the complaint. *Friedl v. City of New York,* 210 F.3d 79, 83-84 (2d Cir. 2000). The error results in automatic vacatur where there is even the "possibility" that the Court relied on information outside the pleadings. *Id.* at 84.[6]

*First*, the Nektar Slide was not incorporated into the SAC. Contrary to Defendants' false assertions (D.Br.35-36), the SAC referenced a completely separate *transcript* from a conference hosted by Nektar that makes no reference to the Nektar Slide. This is clear from the fact that the single quoted statement in the SAC, JA-741(¶69), JA-812(¶246), is found nowhere in the selective single slide used by

---

[6] Defendants' attempt to distinguish *Friedl* are unconvincing. D.Br.37-38. Indeed, unlike here, the documents considered in *Reliance Ins. Co. v. Polyvision Corp.*, were submitted in defendants' moving, not reply, brief, and the improperly-considered documents did not address any claims central to plaintiff's complaint. 474 F.3d 54, 57 (2d Cir. 2007).

Defendants, or in the entire 174-page slide presentation it was taken from.[7] Because a party may not incorporate a document by reference unless it relies on "the terms and effect *of the document* in drafting the complaint" (*Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 231 (2d Cir. 2016)), the district court clearly erred in relying on the slide to resolve a factual dispute at the pleadings stage. *Friedl*, 210 F.3d at 83.

*Second*, the court may not take judicial notice of the Nektar Slide. This Court's clear precedent is that even public documents, such as documents filed with the SEC *by a party*, may be considered only for the limited purpose "to determine what the documents stated . . . not to prove the truth of their contents." *Id*.; *see Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Here, the district court improperly relied upon a single, out of context slide authored by a non-party, the import of which Defendants mischaracterized (P.Br.45-46), to find that Plaintiffs failed to plausibly allege the meaning of "strong" and "high positive" at the pleading stage. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).[8]

*Finally*, contrary to Defendants' assertion (D.Br.33-35), Plaintiffs did not waive this issue. This case is in the same procedural posture as in *Friedl*, where

---

[7] *See Products and Platforms for Growth*, Nektar (October 8, 2015), https://ir.nektar.com/static-files/df53a5b3-3b93-4b51-a684-f8b62548549a. The Nektar Slide (JA-1934), *not* cited in SAC, is found on page 134 of 174.

[8] *Reliance* does not compel a different result. In that case, the Court found that any error "would not disadvantage" the plaintiff because the plaintiff "responded with its own evidentiary submissions." *Reliance*, 474 F.3d at 57.

11

defendants slipped in documents with their reply, and the cases cited by Defendants are inapposite.[9] Yet, even if the Court did not err in ***reviewing*** the Nektar Slide in resolving the motion to dismiss (which it did), it erred in ignoring clear precedent in ***relying*** on that slide to find that Plaintiffs failed to plausibly allege falsity. A party cannot predict in advance that the district court will violate established precedent.[10]

### E. Defendants Were Required to Disclose the Endpoint to Make Other Statements Not Misleading.

Defendants repeatedly spoke about the design of Checkmate-026 and mischaracterized it as "well-designed and well-powered." Yet, Defendants failed to disclose the "*peculiar risk"* underpinning the clinical trial: the Company's selection of an overly-aggressive endpoint (at variance with a parallel competitor trial) that would have "substantially affect[ed] a reasonable investor's calculation of probability" of the trial's ultimate success. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*,

---

[9] In *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 227 (2d Cir. 2000), this Court held that a party could respond to a *new evidentiary issue* raised by a non-moving party for the first time at ***summary judgment***, where (1) the non-moving party was not surprised by the evidence and affirmatively chose to withhold it; and (2) the non-moving party did not claim to have contrary evidence. *See Springer v. Wells Fargo Bank, N.A.*, 784 F. App'x 721, 726 (11th Cir. 2019) (party failed to object to a Magistrate Judge's Report and Recommendation prior to appeal); *Roy v. Contra Costa Cnty.*, 694 F. App'x 536, 537 (9th Cir. 2017) (*pro se* plaintiff disregarded the district court's "clear and specific instructions on what was required to plead his federal claims properly").

[10] Although there was no waiver, the Court has discretion to consider the issue on appeal when not doing so would lead to substantial injustice. *See Booking v. Gen. Star Mgmt. Corp*., 254 F.3d 414, 418-19 (2d Cir. 2001).

251 F.Supp.3d 596, 612 (S.D.N.Y. 2017); *see also Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 250-51 & n.3 (2d Cir. 2014); P.Br.32-34. Defendants' duty to disclose was heightened in light of their suspicious insider sales while knowing the actual 5% endpoint. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (duty to disclose may arise when "a corporate insider trad[es] on confidential information").

    In response, Defendants essentially ignore this standard in their briefing and ask this Court to recognize a new, "legitimate competitive reasons" exception to the longstanding requirement that companies must provide complete and accurate information when they speak on issues of material importance to investors. D.Br.1, 8, 38-41. Were that the standard, however, corporations could insulate themselves from any responsibility to provide complete and accurate information by characterizing the omitted information as protected by some "legitimate competitive reasons." Moreover, Defendants' purported concerns over competitors create a fact issue that cannot be decided at the pleading stage. *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

    Defendants spoke about Checkmate-026 and touted its design repeatedly, understood that the market was interested in the overall trial design, and knew that the Company's prior clinical trials did not characterize a 5% PD-L1 endpoint as "strong" or "high positive," but the opposite. Having chosen to place the trial's

13

design at issue, Defendants failed to provide complete and accurate information, hiding the key fact that would have best informed investors about the trial's peculiar risk.[11] And when Defendants responded to questions about the trial's design, they did so misleadingly, referring to the cutoff design as "conservative" and the cutoff expression as "high," when it was most certainly not. Defendants' incomplete and misleading statements gave a false impression about the actual endpoint and risk of a key clinical trial, which are actionable regardless of Defendants' meritless "legitimate competitive reasons" theory. *See Setzer v. Omega Healthcare Investors, Inc*., 968 F.3d 204, 213-14 (2d Cir. 2020) (defendants were duty bound to disclose full information about a borrower because otherwise their statements "gave a false impression of the financial health of one of the [defendants'] largest assets").[12]

---

[11] *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014), is not on point. In *Dalberth*, at summary judgment, the Court confirmed that the "touchstone" of whether defendants had a duty to disclose specific information is "whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor[.]" *Id.* at 187.

[12] Plaintiffs did not claim that Defendants owed a general duty to correct third-party analysts. Plaintiffs' brief simply quotes from the district court's opinion. (D.Br.40-41). But where analysts ask questions and defendants decide to speak on an issue, they have the duty to provide accurate and complete information so as not to create a false impression. *Setzer*, 968 F.3d at 214.

14

### F. None of the Challenged Misstatements Are Inactionable as a Matter of Law.

The district court erred in stating, broadly, that some (but not all) of the challenged misstatements were inactionable as a matter of law. P.Br.46-47.

*First*, Defendants incorrectly argue that because "the risk of trial failure was disclosed," a handful of challenged statements are not entitled to the forward-looking statement safe-harbor. D.Br.41-42. To the contrary, this is precisely the risk that was concealed from investors because, as alleged, a patient's level of PD-L1 expression strength was directly correlated to the likelihood of success. P.Br.10; JA-732-34(¶¶48-53).

*Second*, Defendants argue that certain statements constitute "inactionable corporate optimism." D.Br.42. Not so. *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019), cited by Defendants, involved an open-ended statement that a potential merger was a "singular" and "unique" opportunity, which the court found too subjective for an individual investor to rely upon. Such "general corporate optimism" is far removed from specific descriptions about a clinical trial design that Defendants repeatedly touted and about which they received regular, focused questions from analysts and investors.[13] *See Galestan v. OneMain Holdings, Inc.*,

---

[13] *E.g.,* JA-782, 787, 790, 792(¶172 ("we have recapitulated the role of PD-L1 expression in non-small cell lung cancer and we have identified that the magnitude of benefit in the PD-L1 expressors confirms our first-line monotherapy approach"); ¶183 ("[W]e have a fairly broad patient population in that trial. So we have . . . high

15

348 F.Supp.3d 282, 303 (S.D.N.Y. 2018) (a statement was actionable because it involved "specific references" to a program rather than "barebones references to corporate synergies"); *Inv. Tech. Grp.*, 251 F.Supp.3d at 611 (same); *see also In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (a company's statements that it posted "record high net income" and "had cash available for investing" were actionable because a reasonable investor could have relied upon them in deciding whether to purchase company stock).

*Finally*, Plaintiffs' challenged statements were not protected opinions. "When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177-78 (2d Cir. 2020) (statement that the defendant believed in its study design was an actionable statement of opinion because the facts required the defendant "either to speak less confidently" or to disclose the existence of additional information). Plaintiffs alleged a prevalent industry understanding of the terms "strong," "high," and "weak" that, if the actual expression endpoint were disclosed, would have supplied the necessary

_____

expressers and low expressers in that trial. And we feel good about how that trial was designed and the overall patient population that that covers."); ¶189 (the trial was "well-designed and well-powered to detect the difference in all the positives but also in what we define [as] the high positives"); ¶193 ("[L]et me emphasize, we've really taken great care in the design of study 026 in its choice of its endpoint . . . . And we've used the results of many of our published and unpublished data to look at this and essentially we remain very confident.").

16

omitted contrary facts about the trial design. These omitted facts would "conflict with what a reasonable investor would take from the statement itself," *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016), and are thus actionable even if portions of the identified statements may be characterized as opinions. *See Shanawaz v. Intellipharmaceutics Int'l, Inc.*, 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018).

## III.   THE SAC ADEQUATELY PLEADS DEFENDANTS' SCIENTER

The district court improperly absolved Defendants' deception on the grounds that, *if successful*, Defendants' secretly-aggressive endpoint would have "reach[ed] a broader segment of cancer patients" than Merck's Keynote-024. SPA-21. But the district court's acknowledgment that Defendants made the choice to target a broader, riskier pool of patients while repeatedly characterizing the endpoint as "strong" and "high" and "conservative" only confirms Defendants' "reckless indifference to whether the statements were misleading," irrespective of any purportedly loftier (and more lucrative) goals. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs II*"). In their brief, Defendants emphasize this fact, arguing that "Defendants *made the good-faith business judgment* to focus CM-026's primary endpoint on patients with ≥5% PD-L1 expression" and "*did not disclose the specific cutoff while the trial was pending* to protect competitively sensitive information." D.Br.57.

17

Plaintiffs' claims do not question Defendant's business judgment. Plaintiffs challenge Defendants' knowing misrepresentations to investors that materially and recklessly misrepresented the risk inherent in the decision to focus Checkmate-026's endpoint on nearly all patients who expressed PD-L1 and not only the smaller, safer subset who showed "strong" or "high" expression. Defendants' "business motivations," legitimate or otherwise, do not excuse their materially false or misleading misrepresentations.

Viewed holistically, the SAC clearly alleges (and Defendants largely confirm) that (a) Defendants knew that Checkmate-026's endpoint was 5% PD-L1 expression; (b) Defendants knew that Bristol-Myers told the public that the endpoint was "strong" expression, and not 5% expression, purportedly to safeguard some "competitively sensitive information;" (c) Defendants knew that Merck and others in the industry used "strong" to denote ≥50% PD-L1 expression and, (d) Defendants knew that Bristol-Myers historically employed 5% expression to measure even a minimal amount of PD-L1 expression (and, at a minimum, knew that no one in the industry characterized 5% as "strong" or "high"). Because Plaintiffs' scienter allegations, which must be accepted as true, are—at a minimum—at least as compelling as Defendants' unsubstantiated counter-narrative (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("The inference . . . need not be . . .

18

even the 'most plausible of competing inferences[.]'")), the district court's decision should be overturned.

Defendants' reliance on *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626-27 (4th Cir. 2008) is overplayed and certainly not "directly on point." D.Br.58-59. In *Cozzarelli*, the allegations of scienter revolved around a single individual defendant's one-time use of the term "corneal staining" rather than "corneal clearing," a decision that plaintiffs alleged knowingly misled investors as to the risks of the trial because "clearing" was harder to achieve than "staining." The Fourth Circuit disagreed, finding that the defendant's use of "staining" (the process being applied) as opposed to "clearing" (the result of the staining process) did not support scienter because, "[i]n fact, the two terms are more or less interchangeable—or at least interchangeable enough to dispel a strong inference of fraud." *Cozzarelli*, 549 F.3d at 626-27. Given that defendants otherwise did not characterize the endpoint in any misleading manner, the decision to use one term over the other "support[ed]s at most an inference of imprecise or even negligent use of language, not an inference of scienter." *Id.*[14] The facts here are entirely different and compel a different

---

[14] Other courts have rejected similar attempts to exploit *Cozzarelli* into a general principle that would insulate executives from having to provide complete and accurate information under a "legitimate business reasons" exception. The Fourth Circuit's subsequent decision in *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015), makes clear that scienter is a fact-dependent inquiry that must be evaluated against a plaintiff's theory in a particular case. *See id.* at 609 (distinguishing *Cozzarelli* as involving "a corporate officer's use of an imprecise

conclusion—that Defendants acted with scienter, an inference that is, at a minimum, "at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).[15]

## A. The SAC's Motive Allegations Support the Inference of Scienter.

Plaintiffs plausibly alleged that Defendants' insider sales of nearly $55 million motivated them to mislead investors as to Checkmate-026's risk to inflate Bristol-Myers' stock price on a failed gamble that the riskier trial would ultimately succeed. Defendants' significant Class Period stock sales demonstrate motive because of their sheer volume and the fact that Defendants' sales were made "at conveniently opportune times," which the district court acknowledged. SPA-26; P.Br.55-57. Defendants' attempts to minimize these suspicious stock sales are unpersuasive. D.Br.45-49. Defendants' stock sales may not compel a strong inference of scienter, standing alone, when viewed holistically with the other

---

medical term" and finding a strong inference of scienter where the defendants chose to speak about the status of a clinical trial yet released incomplete information that caused their statements to be misleading); *see also, e.g.*, *Setzer*, 968 F.3d at 215 (complaint sufficiently alleged that the defendants acted recklessly in failing to disclose the risk that a key borrower might become insolvent, "particularly where the defendant "had to know that revealing the full extent of [the borrower's] performance problems would have been troubling news to its investors").

[15] *See also Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011) (citing *Matrixx* and stating that "the inference that [the defendants] recklessly disregarded the falsity of their extremely optimistic statements is at least as compelling to us as their excuse of failed accounting systems").

20

compelling indicia of recklessness and knowledge, below, contribute to the conclusion that Defendants acted with scienter. P.Br.55-59.

### B. The SAC Pleads Defendants' Conscious Disregard or Severe Recklessness.

The SAC alleges several strong indicia of scienter that compel a "strong inference" of scienter because Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. These indicia of scienter include, in addition to $55 million in suspicious stock sales: (a) Defendants' admissions that Checkmate-026 was not designed to target high expressers; (b) former employee accounts demonstrating that Defendants chose the 5% endpoint and knew that Merck historically and in Keynote-024, specifically, employed a "strong" 50% endpoint; (c) Defendants were personally involved in developing the industry standard use of 5% expression to denote weak or minimal positivity; (d) Defendants' were aware that analysts and investors were misled as to Checkmate-026's risk; and (e) Defendants Cuss and Giordano's suspicious resignations that analysts tied to Checkmate-026. P.Br.49-55.

As demonstrated by the SAC, these scienter allegations are "cogent and at least as compelling as any opposing inference" offered by Defendants. *Set Capital LLC v. Credit Suisse Grp. AG*, 2021 WL 1619620, at *8 (2d Cir. Apr. 27, 2021). Defendants' attempts to isolate and discredit various categories of scienter evidence are unavailing for several reasons.

21

*First*, Defendants are wrong that post-Class Period admissions, including admissions that Checkmate-026 did not target patients with "high expression of PD-L1," that the choice of a "lower cutoff" than Merck's caused the study's failure, and Bristol-Myers' ex-post correction of their ClinicalTrials.gov entry, changing "strong" expression to "5%" (P.Br.49-50) are not relevant to Defendants' scienter (D.Br.51). As courts have often concluded, a "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his [earlier] statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 597 (S.D.N.Y. 2011). That is exactly the case here. *See also In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) ("[D]istrict courts may draw inferences favorable to the Plaintiff in a PSLRA case from post-Class Period events and statements.") (*citing Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). The district court erred in ignoring Defendants' "direct[] and cogent[]" admissions. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).

*Second*, allegations from reliable former employees corroborate that Defendants were aware of the significant difference between Merck's use of a 50% expression level and the Company's selection of a highly-aggressive 5% expression

level. P.Br.50-52.[16] Defendants knew these relevant facts in the context of (1) the company's prior statements consistently defining a 5% expression as the "minimal" level of positivity, not "high" or "strong"; (2) Namouni's post-trial admission that the clinical trial was not designed to have a "high" endpoint; and (3) the prevalent industry standard understanding of "strong expression" that precluded the use of 5% in that definition.

Defendants also misrepresent a so-called "concession" regarding Dr. Blum's opinion. D.Br.53. Defendants' reference to JA-1797 is to Plaintiffs' motion to dismiss opposition brief where Plaintiffs actually argued that Dr. Blum's "confirmation of industry understanding of PD-L1expression levels" bolsters the evidence of Defendants' knowing misrepresentations from Defendants' categorical expressions of mere positivity as 5% and the industry's usage of ≥50% to denote "strong." JA-1797 n.6.

***Third***, Defendants cannot escape the fact that they were directly involved in developing the industry standard usage of 5% to define minimal or weak PD-L1 expression, and deliberately used the word "strong expression," not only knowing that it would mislead investors into thinking that Checkmate-026's endpoint was

---

[16] Defendants argue that because these former employees did not prove, standing alone, that Defendants discussed calling their 5% endpoint "strong" in the employees' presence, that their allegations are meaningless. D.Br.52-53. This myopic argument ignores that the information provided by these former employees adds meaningful pieces to the holistic inference of scienter.

greater than 5%, but *intending* for it to mislead investors in order "to protect competitively sensitive information," as Defendants admit in their brief (D.Br.57-58). P.Br.52-53. Defendants' attempt to diminish the Company's prior characterization of the 5% cutoff as the minimal level of PD-L1 positivity because such usage occurred "in other clinical trials for different types of cancers in different patient polls" (D.Br.55) is illogical. PD-1 is a protein that exists on the surface of *all* immune system cells. PD-L1 is a ligand that binds with PD-1 and causes the immune system to stop attacking various types of cancer cells. JA-713(¶2). The goal of each of the multiple studies cited in the SAC was to block the interaction between PD-1 and PD-L1 so that the body's immune system may fight back and kill cancer cells. *Id.* As alleged in the SAC, there is no difference in the terminology to describe that process, or the endpoint, across the various clinical trials, as each described the level of PD-L1 positivity as the relevant biomarker data. JA-735-38(¶¶55, 57-58, 60).

*Fourth*, Plaintiffs do not suggest that disconnected analyst statements or predictions, standing alone, may support an inference of scienter. *See* D.Br.56. But a panel of this Court has indicated that an inference of scienter may be reinforced by questions raised by analysts and investors, particularly where such questions relate to a "key" measure of the company's performance—like the success of a critically important clinical trial. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14-15 (2d Cir. 2011). That determination is consistent with the

24

recklessness standard – that Defendants "knew *facts* or had access to information suggesting that their public statements were not accurate." *Set Capital*, 2021 WL 1619620, at \*9; *see also Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 270 (3d Cir. 2009).

     *Fifth*, the resignations of Defendants' Cuss and Giordano were "highly unusual and suspicious" and add further weight to an overall inference of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F.Supp.3d 602, 619 (S.D.N.Y. 2015). Giordano, the Company's Senior Vice President and Head of Development for Oncology and Immuno-oncology, resigned abruptly *one month* before Bristol-Myers reported the initial failure of Checkmate-026 JA-723(¶26); JA-826(¶280). Cuss, the Company's Chief Scientific Officer and chief trial spokesperson, resigned approximately five months after the Company's October 2016 announcement that the clinical trial was a complete failure. JA-723-24(¶28); JA-825-26(¶279). The importance of the clinical trial, the central role played by both Defendants therein, and the timing of their resignations support an inference of scienter. *See Orthofix*, 89 F.Supp.3d at 619 (finding that the resignations of a company's president and CEO and CFO more than four months and 41 days, respectively, prior to the announcement of a financial restatement lent "further weight to an inference of scienter"). That industry observers tied Cuss's resignation to the failure of the clinical studies further underscores that it was, in fact, "highly

25

unusual and suspicious." *See In re OSG Sec. Litig.*, 12 F.Supp.3d 622, 632 (S.D.N.Y. 2014) (finding that an executive's resignation "a few months" later for "a seemingly pretextual reason" suggests that a "more likely" reason for the departure was "a higher level of wrongdoing approaching recklessness or even conscious malfeasance").

*Finally*, this case does not involve a "generalized motive" that "could be imputed to *any* publicly-owned, for-profit endeavor." D.Br.56-57. Defendants chose to communicate to investors that Checkmate-026 focused on patients with "strong" PD-L1 expression, indicating to a reasonable investor that the trial would focus on a smaller pool of patients with a greater likelihood of success. Once Defendants chose to spoke about Checkmate-026's endpoint, they were required to provide full information so that their statements were not otherwise misleading, a longstanding tenet of the securities laws.

## IV. THE SAC ADEQUATELY PLEADS LOSS CAUSATION

The SAC sufficiently pleads loss causation by alleging that "the available public information regarding the company's financial condition [was] corrected, and that the market reacted negatively," through two corrective disclosures. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). *See* P.Br.60. The Company's August 5, 2016 announcement that Checkmate-026

26

failed to meet its endpoint, which was revealed for the first time to be patients with a weak 5% PD-L1 expression level, caused the Company's stock to fall \$12.04 (16%) in one day. JA-764-65(¶¶129-30); JA-797-98(¶209). Then, on October 9, 2016, after months of representing that Checkmate-026's data could contain usable subgroup data relating to "strong" PD-L1 expressors, Defendants revealed that their choice to focus on 5% expressors rendered the study entirely useless. JA-768-69(¶138); JA-798(¶210). The Company's stock fell another \$5.62 (10%) on this news. *Id*. These allegations adequately plead loss causation. *See Newlink*, 965 F.3d at 180 n. 17 (loss causation when plaintiffs alleged that "the risk of Defendants' alleged improper enrollments materialized when the Phase 3 trial failed").

Although Defendants concede that they first disclosed the risk that Checkmate-026 might fail on August 5, 2016, they claim that Plaintiffs fail to establish a nexus between the revelation of Checkmate-026's definition of "strong" and Plaintiff's loss. D.Br.61. This argument fails.

The August 5 disclosure caused a loss "within the zone of risk concealed by the misrepresentations and omissions alleged by" Plaintiffs. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiffs allege that Defendants misleadingly represented that, consistent with their own prior studies (*see* JA-734-39(¶¶54-61); JA-751(¶95)) and industry usage of the term "high," (*see* JA-739-40(¶¶62-65); JA-741(¶69)) Checkmate-026 would focus on "strong" expressors (*see*

27

JA-745(¶79); JA-775-79(¶¶158-63)) and would employ a "high" endpoint cutoff (*see* JA-756-57(¶¶105-06)). The selection of such an aggressive end point was within the zone of risk that, once disclosed, may be attributed to investor losses. *See Lentell*, 396 F.3d at 173 ("If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely . . . and the loss ultimately suffered is within that zone, then a misrepresentation or omission . . . may be deemed a foreseeable or proximate cause of the loss.").

Defendants' argument that the October 9, 2016 disclosure contained no new information and is therefore not corrective (D.Br.60-61) is equally unavailing. Defendants ignore Plaintiff's allegations, which make clear that after the August 5 disclosure, Defendants continued to represent that Checkmate-026 might contain usable subgroup data about 50% PD-L1 expressors (*see* JA-766-68(¶¶134-36)). It was only on October 9 that it was revealed that the clinical trial was not well-powered and could yield no useful data for the actual "strong" expressors. JA-768-69(¶138). Defendants' argument that no new information was revealed is plainly incorrect, and Plaintiffs sufficiently plead loss causation as to the October 9 date. *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *27 (E.D.N.Y. Sept. 27, 2019) (allegations of partial corrective disclosure revealing further details of scheme sufficiently pleaded loss causation); *In re Take-Two Interactive Sec. Litig.*,

551 F. Supp. 2d 247, 290 (S.D.N.Y. 2008) (partial corrective disclosure that "conveyed information to the investing public concerning the extent and likelihood of [the alleged scheme] which was not present in the [first disclosure]" sufficiently pleaded loss causation).

## V.    CONCLUSION

The Judgment of the district court should be reversed.

DATED: May 27, 2021                     Respectfully submitted,

/s/ Salvatore J. Graziano

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Lauren A. Ormsbee
Jesse L. Jensen
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
sgraziano@blbglaw.com
lauren@blbglaw.com
jesse.jensen@blbglaw.com

*Counsel for Lead Plaintiffs
Arkansas Public Employees
Retirement System and the
Louisiana Sheriffs' Pension &
Relief Fund, and Lead Counsel for
the Class*

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar, Esq.
7 Times Square
New York, New York 10036
Tel: 212-789-1341
jbleichmar@bfalaw.com

*Additional Counsel for Lead Plaintiffs*

**MOTLEY RICE LLC**
William H. Narwold
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 882-1681
Fax: (860) 882-1682
bnarwold@motleyrice.com

*Counsel for Named Plaintiff Erste Asset Management GmbH (formerly d/b/a Erste Sparinvest Kapitalanlagegesellschaft mbH)*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON, P.A.**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Tel.: 954-916-1202
Fax.: 954-916-1232
bob@robertdklausner.com

*Liaison Counsel for co-Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund*

30

## STATEMENT OF COMPLIANCE

This brief complies with the Second Circuit Local Rule 32.1(a)(4) which requires that the reply brief contain no more than 7,000 words because it contains 6,995 words, exclusive of the sections that do not count towards the limitation pursuant to Fed. R. App. P. 32(f). This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Lauren A. Ormsbee*